## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CINCINNATI INSURANCE CO., | ) | FILED: AUGUST 22, 2008 |
| | ) | 08CV4817 |
| Plaintiff, | ) | JUDGE DER-YEGHIAYAN |
| | ) | MAGISTRATE JUDGE NOLAN |
| v. | ) | BR |
| | ) | |
| AMERICAN STANDARD CIRCUITS, INC.; | ) | |
| VIJAY PATEL; JOSE BENITEZ; and | ) | |
| JUAN REYES. | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Cincinnati Insurance Company, by and through its attorneys, submits the following Complaint for Declaratory Judgment:

### NATURE OF THE ACTION

1.    This is a declaratory judgment action brought pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1332.  This action will resolve an actual dispute over whether Cincinnati Insurance Company ("Cincinnati") must defend or indemnify American Standard Circuits Inc. ("ASC") and Vijay Patel ("Patel") in the lawsuit of *Jose Benitez and Juan Reyes v. American Standard Circuit, Inc., et al.*, case no. 08 CV 1998, currently pending in the United States District Court for the Northern District of Illinois (the "Underlying Lawsuit").  The Underlying Lawsuit alleges that Vijay Patel sexually abused and harassed Jose Benitez and Juan Reyes while they were employed by ASC.

### PARTIES

1.    Plaintiff Cincinnati Insurance Company ("Cincinnati") is an Ohio corporation with its principal place of business in Ohio.

2.    Defendant American Standard Circuits, Inc. ("ASC") is an Illinois

corporation. Its principal place of business is in Cook County, Illinois.

3.    Defendant Vijay Patel ("Patel") is a citizen of Cook County, Illinois and is an employee of ASC.

4.    Defendant Jose Benitez ("Benitez"), a former employee of ASC, is a citizen of Kane County, Illinois. Benitez is a plaintiff in the Underlying Lawsuit. He is named as a defendant to this action solely because he may be a necessary party to this insurance dispute which arises from the Underlying Lawsuit. Cincinnati seeks no relief from Benitez other than to bind him to the outcome of this coverage dispute.

5.    Defendant Juan Reyes ("Reyes"), a former employee of ASC, is a citizen of Melrose Park, Cook County, Illinois. Reyes is a plaintiff in the Underlying Lawsuit. He is named as a defendant to this action solely because he may be a necessary party to this insurance dispute which arises from the Underlying Lawsuit. Cincinnati seeks no relief from Reyes other than to bind him to the outcome of this coverage dispute.

### JURISDICTION AND VENUE

6.    Cincinnati brings this action seeking a declaration of its rights and obligations under a policy of insurance issued to ASC. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 2201 because an actual controversy exists among the parties.

7.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because there exists complete diversity between the plaintiff and the defendants. As each plaintiff seeks in excess of $50,000 in the underlying case, the actual amount in controversy (including both liability and costs of defense in the Underlying Lawsuit) exceeds $75,000, exclusive of interest and costs.

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the defendants reside in this judicial district and because some or all of the events or omissions giving rise to this cause of action occurred in this judicial district.

## THE UNDERLYING EEOC CHARGES AND LAWSUIT

9.    The Underlying Lawsuit was originally filed in the Circuit Court of Cook County on October 9, 2007, but was removed to the federal court in April 2008.  A true and correct copy of the complaint as originally filed in the Circuit Court of Cook County (without exhibits) is attached hereto as **Exhibit A.**  A true and correct copy of the current version of the complaint (without exhibits) (the "Amended Complaint") in the Underlying Lawsuit is attached hereto as **Exhibit B**.

## Juan Reyes

10.    According to the Amended Complaint, Juan Reyes ("Reyes") began his employment with ASC in February 1998.  Reyes alleged that Patel repeated grabbed and fondled him in the workplace from February 1998 until early 2006.  Ex. B, ¶¶ 20-45.

11.    In November or December 2005, Patel allegedly locked Reyes in a tool room and fondled him.  Ex. B, ¶ 30.

12.    Reyes asserts the following counts in the Amended Complaint:

   a.    Count I – assault against ASC;
   b.    Count III – battery against ASC;
   c.    Count V – intentional infliction of emotional distress against ASC;
   d.    Count VII – assault against Patel;
   e.    Count IX – battery against Patel;
   f.    Count XI – intentional infliction of emotional distress against Patel;
   g.    Count XIII – false imprisonment against Patel;
   h.    Count XVI – violation of Title VII (harassment) against ASC; and
   i.    Count XVII – violation of Title VII (retaliation) against ASC.

**Jose Benitez**

13.    According to the Amended Complaint, Jose Benitez ("Benitez") began his employment with ASC in February 2003.  He alleged that, beginning in approximately September 2005, Patel began making unwelcome sexual comments to Benitez in the workplace.  Ex. B, ¶¶ 46 – 49.

14.    Benitez further alleged that, from November or December 2005 through at least January 2006, Patel exposed himself to Benitez and began groping and fondling him.  Benitez alleges that Patel sodomized and threatened him in January 2006.  Ex. B, ¶¶ 50 – 60.

15.    Benitez asserts the following counts in the Amended Complaint:

    a.    Count II – assault against ASC;
    b.    Count IV – battery against ASC;
    c.    Count VI – intentional infliction of emotional distress against ASC;
    d.    Count VIII – assault against Patel;
    e.    Count X – battery against Patel;
    f.    Count XII – intentional infliction of emotional distress against Patel;
    g.    Count XIV – violation of Title VII (harassment) against ASC; and
    h.    Count XV – violation of Title VII (retaliation) against ASC.

**American Standard Circuits, Inc.**

16.    The Amended Complaint alleges that Patel's harassing conduct began as early as February 1998 and that ASC was aware of Patel's conduct towards Reyes and Benitez.  Ex. B, ¶¶ 20, 32 – 37, 51 – 53, 59, 69 – 70.

17.    The Amended Complaint alleges that Patel was a supervisor and member of ASC management, and that Patel's knowledge of his own purposeful conduct is attributable to ASC.  Ex. B, ¶¶ 13 – 14, 72.

18.    Reyes alleges that two ASC management employees witnessed Patel's conduct vis-à-vis Reyes on January 13, 2006.  Ex. B, ¶¶ 32 – 37.

19.     Benitez allegedly informed his supervisor at ASC of the unwanted conduct in November or December 2005.  Ex. B, ¶¶ 51 – 53.

20.     Reyes and Benitez filed police reports in January 2006, complaining of Patel's conduct.  Ex. B, ¶¶ 38, 65.  True and correct copies of their police reports were exhibits to the Amended Complaint and are attached hereto as **Group Exhibit C**.

21.     On April 5, 2006, Reyes and Benitez each filed charges with the EEOC, claiming unlawful sexual harassment, discrimination based on sex, and retaliation.  Ex. B, ¶ 16.  True and correct copies of their EEOC charges were exhibits to the Amended Complaint and are attached hereto as **Exhibit D**.

22.     Counsel for ASC appeared before the EEOC ASC on May 2, 2006.  True and correct copies of ASC's notices of appearance are attached as **Group Exhibit E**.  Counsel submitted position statements in both the Reyes and Benitez proceedings on or about May 15, 2006.

23.     On September 13, 2007, the EEOC issued Determinations which found that sufficient evidence existed to support the claims made by Reyes and Benitez for sexual harassment, discrimination and retaliation.  Ex. B, ¶ 17.  True and correct copies of these determinations were exhibits to the Amended Complaint and are attached hereto as **Group Exhibit F**.

24.     By letters dated September 25, 2007, ASC agreed to participate in EEOC-moderated conciliation of the Reyes and Benitez claims.   That conciliation was unsuccessful.

25.     The EEOC issued right-to-sue letters to Reyes and Benitez on February 29, 2008.  Ex. B, ¶ 18.  Reyes and Benitez then added Title VII counts to their complaint

and removed the Underlying Lawsuit to federal court.

## TENDER OF DEFENSE TO CINCINNATI AND RESPONSE

26.     On or about October 4, 2007, Patel first notified its insurance agent of the claims by Reyes and Benitez.  The agency notified Cincinnati of those claims on or about October 5, 2007.  A true and correct copy of the General Liability Notice of Occurrence/Claim form sent by the agency to Cincinnati is attached hereto as **Exhibit G**.

27.     Prior to receiving that notice from the agency, Cincinnati was unaware of any dispute between the underlying claimants and ASC or Patel, including the police reports claiming sexual harassment or the EEOC proceedings.

28.     Cincinnati has explained to both ASC and Patel that coverage is not available for the Underlying Lawsuit under the policies purchased by ASC, and that Cincinnati therefore has no duty to defend either of them in connection with the claims asserted by Reyes or Benitez.

29.     Cincinnati has made numerous efforts to avoid coverage litigation with both ASC and Patel, but has been unable to resolve those issues without litigation.

## THE POLICIES

30.     Cincinnati issued policy CPP 553 15 65 to ASC, which contained Commercial General Liability coverage (the "Primary Policy").  The Primary Policy was renewed and modified from time to time and was in effect from January 25, 1997 until January 25, 2007.  A true and correct copy of the General Liability portion of the Primary Policy in effect from January 25, 2005 through January 25, 2006 is attached hereto as **Exhibit H**.

31.    Cincinnati issued umbrella liability policy CCC 440 45 19 to ASC (the "Umbrella Policy").  The Umbrella Policy was renewed and modified from time to time and was in effect from January 25, 1997 until January 25, 2007.  A true and correct copy of the Umbrella Policy in effect from January 25, 2005 through January 25, 2006 is attached hereto as **Exhibit I**.

32.    Each of the policy provisions in both the Primary and Umbrella Policies addressed herein remained substantially the same throughout the entire policy period.

<u>COVERAGE GRANTS OF THE POLICIES</u>

33.    Subject to its terms and conditions, the Primary Policy provides coverage for sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "personal and advertising injury" or "property damage."  Ex. H, p. CIN0021.

34.    Subject to its terms and conditions, the Umbrella Policy provides coverage for the "ultimate net loss" which the insured is legally obligated to pay as damages for "bodily injury", "personal and advertising injury", or "property damage" arising out of an "occurrence" to which this insurance applies, which is in excess of the "underlying insurance," or which is either excluded or not insured by "underlying insurance."  Ex. I, p. CIN0090.

35.    To fall within the coverage grant of the Policies, any "bodily injury" or "property damage" must be caused by an "occurrence."  Ex. H, p. CIN0021; Ex. I, p. CIN0090.

<u>RELEVANT DEFINITIONS IN THE POLICIES</u>

36.    For purposes of "bodily injury" or "property damage" coverage, the Policies

7

define "occurrence" to mean an accident, including continuous or repeated exposure to substantially the same general harmful conditions. Ex. H, p. CIN0038; Ex. I, p. CIN0105.

37.    The Policies define "bodily injury" to mean bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. The Umbrella Policy also includes "disability, humiliation, shock, fright, mental anguish or mental injury" in its definition of "bodily injury." Ex. H, p. CIN0036; Ex. I, p. CIN0102.

38.    The Policies define "property damage" to mean physical injury to tangible property, or loss of use of tangible property that is not physically injured. Ex. H, p. CIN0039; Ex. I, pp. CIN0105 – CIN0106.

39.    The Policies define "personal and advertising injury" (sometimes called "personal injury" and "advertising injury") to mean injury caused by certain defined offenses. False imprisonment is one of the defined offenses that can lead to "personal and advertising injury." Ex. H, p. CIN0038; Ex. I, p. CIN0105.

40.    Employees of ASC may qualify for status as an "insured" under the policy, but only for acts within the scope of their employment by ASC or while performing duties related to the conduct of ASC's business. Ex. H, p. CIN0031; Ex. I, p. CIN0097.

41.    ASC's employees do not qualify as an "insured" for "bodily injury" or "personal and advertising injury" to a co-employee while in the course of his or her employment, or while performing duties related to the conduct of ASC's business. Ex. H, p. CIN0022; Ex. I, p. CIN0092.

<u>RELEVANT EXCLUSIONS IN THE POLICIES</u>

42.    The Policies exclude coverage for "bodily injury" or "property damage"

which may reasonably be expected to result from the intentional or criminal acts of the insured, or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than is actually expected or intended (the "Expected/intended injury exclusion"). Ex. H, p. CIN0022; Ex. I, p. CIN0092.

43.    The Policies exclude coverage for "personal and advertising injury" caused by or at the direction of the insured with the knowledge that such conduct would violate the rights of another and would inflict "personal and advertising injury" (the "Knowing violation exclusion"). Ex. H, p. CIN0027; Ex. I, p. CIN0091.

44.    The Policies exclude coverage for "personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured (the "Criminal acts exclusion"). Ex. H, p. CIN0027; Ex. I, p. CIN0092.

45.    The Policies exclude coverage for "bodily injury" or "personal and advertising injury" arising out of any employment-related practices, policies, acts or omissions including but not limited to coercion, criticism, demotion, evaluation, failure to promote, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person.  These damages are excluded from coverage whether the insured may be liable as an employer or in any other capacity (the "Employment related practices exclusion").  Ex. H, pp. CIN022, CIN0028 – CIN0029; Ex. I, p. CIN0092.

## NOTICE REQUIREMENTS IN THE POLICIES

46.    The Policies require that an insured notify Cincinnati as soon as practicable of an "occurrence" or of a "personal and advertising injury" offense which may result in a claim. Ex. H, p. CIN0033; Ex. I, pp. CIN0099 – CIN0100.

9

47.    The Policies require an insured to provide immediate notice of any suit, and to immediately forward any suit papers to Cincinnati. Ex. H, p. CIN0033; Ex. I, pp. CIN0099 – CIN0100.

48.    The Policies define "suit" to mean "a civil proceeding in which money damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged." Ex. H, p. CIN0039; Ex. I, p. CIN0106.

## COUNT I – DECLARATORY RELIEF
## (LATE NOTICE PRECLUDES COVERAGE FOR BOTH ASC AND PATEL)

49.    Cincinnati realleges and restates Paragraphs 1 – 48 above, as if fully set forth herein as Paragraph 49 of Count I.

50.    The Policies require the insured to notify Cincinnati promptly in the event of an occurrence, claim or suit and to immediately send suit papers to Cincinnati. Ex. H, p. CIN0033; Ex. I, pp. CIN0099 – CIN0100.

51.    Reyes and Benitez allege that ASC knew generally of Patel's propensities and knew specifically of their complaints about Patel's conduct as early as November or December 2005. Ex. B, ¶¶ 16 – 19, 69 – 72.

52.    Reyes and Benitez filed police reports against Patel and ASC in January 2006. Ex. B, ¶¶ 38, 65.

53.    Reyes and Benitez filed charges with the EEOC on or about April 5, 2006. Ex. B, ¶ 16; Ex. D.  The EEOC has the authority to award monetary damages to claimants who prevail on their claims.

54.    ASC and Patel knew of Reyes' and Benitez's police reports in or about January 2006, and knew of the EEOC charges by no later than May 2, 2006 when they

filed their appearances with the EEOC. Ex. E.

55.    Neither ASC nor Patel told Cincinnati about any "occurrence," or any actual or potential claims against them, until October 2007. This was a delay of nearly 23 months after ASC allegedly knew of Patel's propensities and wrongful conduct toward Reyes and Benitez; a delay of 21 months after Reyes and Benitez filed police reports complaining of Patel's conduct; and a delay of 18 months after the EEOC charges were filed.

56.    ASC and Patel waited until after the EEOC issued adverse findings (Group Exhibit F) before notifying Cincinnati of these claims.

57.    ASC and Patel attempted to conciliate the EEOC claims before notifying Cincinnati of the claims.

58.    Cincinnati was unaware of any of these issues, claims or suits until October 2007 and was prejudiced by the delay in receiving notice from ASC and/or Patel.

59.    The delay in providing notice to Cincinnati breached the notice provisions of the Policies, and excuses any obligation that Cincinnati otherwise might have had to provide coverage to ASC or Patel in connection with the claims raised by Reyes and Benitez.

60.    As a result of late notice and breach of the policy conditions, Cincinnati had and has no duty to defend or indemnify ASC or Vijay Patel in connection with the Underlying Lawsuit.

WHEREFORE, Cincinnati prays that this Court enter a judgment declaring the following:

A.    That the notice given to Cincinnati of the "occurrences," claims and suits involving Reyes and Benitez was late as a matter of law;

B.    That Cincinnati has no duty to defend or indemnify ASC or Vijay Patel in the Underlying Lawsuit; and

C.    For any and all other relief this Court deems just and appropriate.

## COUNT II – DECLARATORY RELIEF
## (PATEL IS NOT "AN INSURED" UNDER THE POLICIES)

61.    Cincinnati realleges and restates Paragraphs 1 – 48 above, as if fully set forth herein as Paragraph 61 of Count II.

62.    Both the Primary and Umbrella Policies provide that ASC employees may qualify for coverage as an "insured," but only for acts that are within the scope of their employment by ASC or while performing duties related to the business of ASC.  Ex. H, p. CIN0031; Ex. I, p. CIN0097.

63.    Patel's alleged sexual harassment and assault of Reyes and Benitez cannot properly be characterized as within the scope of his employment with ASC or as in furtherance of the business of ASC.

64.    Neither the Primary nor the Umbrella policy provides "insured" status to an employee who allegedly inflicts "bodily injury" or "personal and advertising injury" on another employee. Ex. H, p. CIN00022; Ex. I, p. CIN00092.

65.    Because Patel's alleged conduct takes him outside the scope of "insured" status under the Policies, Patel does not qualify for coverage under either the Primary or Umbrella Policies.

WHEREFORE, Cincinnati prays that this Court enter a judgment declaring the following:

A.　　That Vijay Patel is not an insured under the Primary or Umbrella Policies;

B.　　That Cincinnati has no duty to defend or indemnify Vijay Patel in the Underlying Lawsuit; and

C.　　For any and all other relief this Court deems just and appropriate.

<div align="center">

**COUNT III – DECLARATORY RELIEF**
**(NO "PROPERTY DAMAGE," "BODILY INJURY" OR "OCCURRENCE")**

</div>

66.　　Cincinnati realleges and restates Paragraphs 1 – 48 above, as if fully set forth herein as Paragraph 66 of Count III.

67.　　The Primary and Umbrella Policies define "property damage" as physical injury to tangible property, or loss of use of tangible property. The Complaint does not assert any damages that fall within the Primary or Umbrella Policies' definitions of "property damage."

68.　　The Primary Policy defines "bodily injury" as injury, sickness or disease sustained by a person, including death resulting from any of these at any time. Ex. H, p. CIN0038; Ex. I, p. CIN0105. The Complaint does not assert any damages that fall within that definition of "bodily injury."

69.　　There is no coverage under either the Primary or Umbrella policy for any "bodily injury" or "property damage" unless such injury or damage was caused by an "occurrence."

70.　　The Primary and Umbrella Policies define an "occurrence" as an accident, including continuous or repeated exposure to the same general harmful conditions. No "occurrence" is alleged in the Lawsuit because each cause of action against Patel and ASC is based on willful and deliberate conduct toward Benitez and Reyes, rather than any "accident."

WHEREFORE, Cincinnati prays that this Court enter a judgment declaring the following:

A.      That Benitez and Reyes have not asserted damages that fall within the definitions of "property damage";

B.      That Benitez and Reyes have not asserted damages that fall within the Primary Policy's definition of "bodily injury";

C.      That the damages claimed by Reyes and Benitez in the Underlying Lawsuit were not caused by an "occurrence" as required for coverage under the Policies;

D.      That Cincinnati has no duty to defend or indemnify ASC or Vijay Patel in the Underlying Lawsuit; and

E.      For any and all other relief this Court deems just and appropriate.

## COUNT IV – DECLARATORY RELIEF
## ("EXPECTED OR INTENDED INJURY" EXCLUSION)

71.     Cincinnati realleges and restates Paragraphs 1 – 48 above, as if fully set forth herein as Paragraph 71 of Count IV.

72.     The Policies exclude coverage for "bodily injury" or "property damage" which may reasonably be expected to result from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than is actually expected or intended.  Ex. H, p. CIN0022; Ex. I, p. CIN0092.

73.     Patel's purposeful and/or criminal conduct was directed toward each Plaintiff, and he should reasonably have expected the resulting harmful effect on Benitez and Reyes.

14

74.     ASC allegedly knew of Patel's conduct, or is charged with knowledge of Patel's conduct, and should reasonably have expected the resulting harmful effect on Benitez and Reyes.

75.     The expected or intended injury exclusion bars coverage under the Policies for any "bodily injury" or "property damage" caused by Patel's or ASC's conduct.

WHEREFORE, Cincinnati prays that this Court enter a judgment declaring the following:

A.     That the claims by Benitez and Reyes fall within the "expected or intended injury exclusion" of the Policies;

B.     That Cincinnati has no duty to defend or indemnify ASC or Vijay Patel in the Underlying Lawsuit; and

C.     For any and all other relief this Court deems just and appropriate.

## COUNT V – DECLARATORY RELIEF
## ("EMPLOYMENT RELATED PRACTICES" EXCLUSION)

76.     Cincinnati realleges and restates Paragraphs 1 – 48 above, as if fully set forth herein as Paragraph 76 of Count V.

77.     Both of the Policies exclude coverage for "bodily injury" to a person arising out of employment related practices including, among other things, coercion, harassment, humiliation or discrimination.  Ex. H, pp. CIN022, CIN0028 – CIN0029; Ex. I, p. CIN0092.

78.     Benitez and Reyes allege that all the abusive conduct took place at the ASC workplace while they were employed there and violated various employment-

related laws.

79.    The employment-related practices exclusions preclude coverage for ASC or Patel for the Underlying Lawsuit.

WHEREFORE, Cincinnati prays that this Court enter a judgment declaring the following:

A.    That ASC's and Patel's conduct falls within the "employment related practices" exclusions;

B.    That Cincinnati has no duty to defend or indemnify ASC or Vijay Patel in the Underlying Lawsuit; and

C.    For any and all other relief this Court deems just and appropriate.

## COUNT VI – DECLARATORY RELIEF
## ("KNOWING VIOLATION OF RIGHTS OF ANOTHER" EXCLUSION)

80.    Cincinnati realleges and restates Paragraphs 1 – 48 above, as if fully set forth herein as Paragraph 80 of Count VI.

81.    Count XIII of the Underlying Lawsuit purports to state a cause of action by Reyes for false imprisonment.  Counts I-IV and VII-X allege assault and battery against ASC and Patel, by both Reyes and Benitez. Ex. B, ¶¶ 163 – 169.

82.    The Policies do not provide coverage for false imprisonment that was caused by the knowing violation of the rights of another or by the commission of a criminal act. Ex. H, p. CIN0027; Ex. I, p. CIN0091.

83.    In Count XIII, Reyes alleges that Patel's conduct was personally invasive and intentional.

84.    Assault and battery are intentional torts that also could constitute criminal conduct.

85.     Any damages that Reyes or Benitez sustained arising from the alleged false imprisonment, assault or battery are not covered by the Policies.

WHEREFORE, Cincinnati prays that this Court enter a judgment declaring the following:

A.     That Patel's conduct falls within the "knowing violation of the rights of another" exclusion;

B.     That Cincinnati has no duty to defend or indemnify Vijay Patel; and

C.     For any and all other relief this Court deems just and appropriate.

**The Cincinnati Insurance Company**


/s/ Hope G. Nightingale
Hope G. Nightingale (06184864)
Bradford A. LeHew (6280452)
Litchfield Cavo LLP
Attorneys for Plaintiff
303 West Madison Street, Suite 300
Chicago, Illinois 60606
(312) 781-6614 (Nightingale)
(312) 781-6680 (LeHew)
(312) 781-6630 (Fax)
Email:  nightingale@litchfieldcavo.com
Email: lehew@litchfieldcavo.com

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

JOSE LUIS BENITEZ and JUAN REYES,  )
                                    )
            Plaintiffs,             )
                                    )        Case No.
                                    )
AMERICAN STANDARD CIRCUIT, INC. )
and VIJAY PATEL,                    )        Judge
                                    )
            Defendants.             )

## COMPLAINT

Plaintiffs Jose Luis Benitez and Juan Reyes, on behalf of themselves and other similarly situated employees known and unknown, through their attorneys, for their Complaint against Defendants American Standard Circuit, Inc. and Vijay Patel, individually, (collectively "Defendants"), state as follows:

### NATURE OF PLAINTIFFS' CLAIMS

1.    Plaintiffs Jose Luis Benitez and Juan Reyes are former employees of American Standard Circuit, Inc. Throughout the course of their employment, Vijay Patel, a supervisor at American Standard Circuit, Inc., repeatedly fondled and harassed Plaintiffs and other employees while they were working at American Standard Circuit, Inc. American Standard Circuit, Inc. knew of Mr. Patel's conduct, but did nothing to remediate it. In this lawsuit, Plaintiffs claim American Standard Circuit, Inc. is liable for battery, assault, and intentional infliction of emotional distress. Plaintiffs further claim Vijay Patel is individually liable for battery, assault, intentional infliction of emotional distress, and false imprisonment.

### THE PARTIES

2.    Plaintiff Jose Luis Benitez ("Benitez") resides in Aurora, Illinois, which is located in Kane County.

1



3.    Plaintiff Juan Reyes ("Reyes") resides in Melrose Park, Illinois, which is located in Cook County.

4.    Defendant American Standard Circuit, Inc. (herein "American Standard") is an Illinois Corporation licensed to do business in Illinois and is doing business Illinois. Defendants' corporate headquarters is located in Franklin Park, Illinois, which is located in Cook County.

5.    Plaintiffs Jose Luis Benitez and Juan Reyes are former employees of American Standard Circuit, Inc. Plaintiffs worked for Defendant American Standard at its 3615 Wolf Road, Franklin Park, Illinois location, which is located in Cook County.

6.    Upon information and belief, Defendant Vijay Patel (herein "Vijay") resides and is domiciled in Cook County, Illinois.

7.    During the course of Plaintiffs' employment, Defendant Vijay Patel was employed by Defendants as a supervisor and was a member of American Standard management.

## FACTUAL BACKGROUND

### A.    Plaintiff Juan Reyes

8.    Plaintiff Reyes began his employment with American Standard on or around February 9, 1998.

9.    During the course of his employment with Defendant American Standard, Plaintiff Reyes worked in the plating department.

10.    Defendant Vijay Patel was working as a mechanic at American Standard at the time Plaintiff Reyes began his employment. Defendant Vijay worked in the maintenance department.

11.     On Plaintiff Reyes' first day of employment, Vijay Patel asked Plaintiff Reyes' immediate supervisor, known as "Raju," if he would permit Reyes to assist Vijay in fixing a machine. Raju agreed to Vijay's request.

12.     As Plaintiff Reyes assisted Vijay in repairing the machine, Vijay grabbed Plaintiff Reyes' genitalia with his hand.

13.     Other employees, including Raju and Raju's cousin, were in the vicinity at the time Vijay grabbed Plaintiff Reyes' genitals.

14.     Later that same day, Vijay again asked Raju for Reyes' assistance and Raju agreed. Plaintiff Reyes went to assist Vijay in grabbing tools that were a few floors up. As Plaintiff Reyes and Vijay walked up the second flight of stairs, Vijay began to aggressively grope Reyes in the genital area and attempted to place his hand down Reyes' pants. Reyes moved away from Vijay and ran back down the stairs.

15.     When Reyes returned, "Raju" and his cousin, who were familiar with Vijay's misconduct, laughed at Reyes.

16.     Vijay continued to grope and fondle Plaintiff Reyes several times a week throughout the course of his employment, until he was terminated in early 2006.

17.     Other employees witnessed Vijay fondle Plaintiff Reyes, and Plaintiff Reyes saw Vijay fondle other employees.

18.     In or around November or December 2005, Reyes asked Vijay for a tool. Vijay instructed Reyes to follow him into his tool room to get it. After Reyes and Vijay entered the room, Vijay locked the door. Vijay then groped Plaintiff Reyes' genitalia. Plaintiff Reyes had to push past Vijay to unlock the door and exit the tool room.

3

19.    In another incident, which occurred on or around January 13, 2006, Vijay came up behind Reyes while he was working and began groping Reyes' genital area with his hand. Reyes backed away in response, but Vijay continued to grab Plaintiff Reyes' genital area. Reyes placed his hand over his genital area in response.

20.    Plaintiff Reyes' direct supervisor, Amaraht Patel, witnessed Vijay grab Plaintiff Reyes on this occasion, but took no action to respond to it. Instead, Amaraht Patel laughed and told Juan that Vijay was gay.

21.    On January 28, 2006, Plaintiff Reyes filed a police report with the Franklin Park Police Department against Vijay for battery for the January 13, 2006 incident. The Police Report Plaintiff Reyes filed against Vijay Patel on January 28, 2006 is attached hereto as Exhibit A.

**B.    Plaintiff Jose Luis Benitez**

22.    Plaintiff Jose Luis Benitez began his employment with American Standard on or around February 17, 2003.

23.    During the course of his employment with American Standard, Plaintiff Benitez worked in the screening department.

24.    Defendant Vijay Patel was working as a mechanic at American Standard at the time Plaintiff Benitez began his employment.

25.    In September and October 2005, Vijay began making unwelcome sexually explicit comments to Plaintiff Benitez. For example, Vijay told Plaintiff Benitez to "Show me your penis" and "Let me see your dick."

26.    In November or December 2005, Vijay began groping Benitez. In one instance, Plaintiff Benitez was working in the screening room when Vijay entered. Vijay pushed Plaintiff

4

Benitez into a corner and grabbed Benitez's penis. Benitez told Vijay to leave. Vijay laughed and called Benitez a "Cabron," a derogatory term in Spanish.

27.    The day after the incident described above in paragraph 26 occurred, Plaintiff Benitez complained to his immediate supervisor, Baraht Patel, about Vijay's conduct. Plaintiff Benitez reported what transpired between himself and Vijay and told Baraht that he did not want Vijay going into the screening department any more.

28.    After Plaintiff Benitez told Baraht Patel about Vijay's misconduct, Baraht laughed at Plaintiff Benitez and called him crazy.

29.    Baraht Patel took no action to respond to Plaintiff Benitez's complaint.

30.    Defendant Patel continued to grab Plaintiff Benitez's genitalia even after Plaintiff Benitez complained to Baraht Patel.

31.    For example, on or around January 4, 2006, Vijay approached Plaintiff Benitez again while he was working in the screening room and instructed him to "Come over here and show me your dick." Plaintiff Benitez refused and Vijay told Benitez that if he did not comply with Vijay's request he would regret it. Vijay told Benitez that he would tell his supervisors that Benitez was a problem and that American Standard would fire him. Benitez then showed Vijay his penis and Vijay performed oral sex on Benitez. Thereafter, Vijay dropped his pants, exposed himself to Benitez, bent over and said "Fuck Me, Fuck Me." Benitez told Vijay he would not and walked to a different area of the screening room and returned to his work.

32.    Approximately two weeks later, on or around January 18, 2006, Vijay approached Benitez again while he was working in the screening department. Vijay grabbed Benitez's hand and began to pull him to the second room in the screening department. Vijay told Benitez to

5

"Stay there. I am going to show you." Vijay then dropped his pants, bent over, and told Benitez to "Fuck him." Plaintiff Benitez left that area of the screening department.

33.    On Monday, January 23, 2006, Plaintiff Benitez filed a police report against Defendant Vijay Patel for battery for the January 18, 2006 incident with the Franklin Park Police Department. The Police Report Plaintiff Benitez filed against Defendant Vijay Patel on January 23, 2006 is attached hereto as Exhibit B.

C.    **Other American Standard Employees**

34.    Other persons employed by American Standard Circuit were groped by Vijay Patel.

35.    Vijay was notoriously known to fondle and harass American Standard employees since at least 1998 and up to January 2006.

36.    Vijay's conduct was not welcome.

37.    American Standard employees warned each other to stay away from Vijay.

38.    American Standard did not take any action in response to complaints about Vijay's behavior and actions.

39.    American Standard had full knowledge of Vijay's improper and abusive conduct and allowed, authorized, and permitted his actions and behavior to continue.

**COUNT I- ASSAULT**
**(Plaintiff Reyes against Defendant American Standard Circuit, Inc.)**

40.    Plaintiffs restate and reallege paragraphs 1 through 39 above as though fully set forth herein.

41.    At all relevant times hereto, Plaintiff Reyes was acting in furtherance of American Standard's business and was acting in the scope of his duties in employment.

42. At all relevant times hereto, Vijay's conduct was in furtherance of American Standard's business and he was acting within the scope of his duties of employment.

43. At numerous times throughout his employment, including the time period between October 2005 and January 2006, and while Plaintiff Reyes was performing his job duties, Vijay accosted Plaintiff Reyes and by his actions willfully and intentionally caused Plaintiff Reyes to be in great fear and apprehension of imminent harmful and offensive contact.

44. American Standard knew of Vijay's propensity for improper and abusive behavior toward his co-workers, including Plaintiff Reyes, in the workplace.

45. American Standard permitted and authorized Vijay's improper and abusive behavior to continue.

46. American Standard's actions were willful and deliberate.

47. As a direct and proximate result of American Standard's actions, Plaintiff Reyes suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT II- ASSAULT
### (Plaintiff Benitez against Defendant American Standard Circuit, Inc.)

48. Plaintiffs restate and reallege paragraphs 1 through 47 above as though fully set forth herein.

49. At all relevant times hereto, Plaintiff Benitez was acting in furtherance of American Standard's business and was acting in the scope of his duties in employment.

7

50.    At all relevant times hereto, Vijay's conduct was in furtherance of American Standard's business and he was acting within the scope of his duties of employment.

51.    At numerous times throughout his employment, including the time period between October 2005 and January 2006, and while Plaintiff Benitez was performing his job duties, Vijay accosted Plaintiff Benitez and by his actions willfully and intentionally caused Plaintiff Benitez to be in great fear and apprehension of imminent harmful and offensive contact.

52.    American Standard knew of Vijay's propensity for improper and abusive behavior toward his co-workers, including Plaintiff Benitez, in the workplace.

53.    American Standard permitted and authorized Vijay's improper and abusive behavior to continue.

54.    American Standard's actions were willful and deliberate.

55.    As a direct and proximate result of American Standard's actions, Plaintiff Benitez suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT III- BATTERY
### (Plaintiff Reyes against Defendant American Standard Circuit, Inc.)

56.    Plaintiffs restate and reallege paragraphs 1 through 55 above as though fully set forth herein.

57.    At all relevant times hereto, Plaintiff Reyes was acting in furtherance of American Standard's business and was acting in the scope of his duties in employment.

8

58. At all relevant times hereto, Vijay's conduct was in furtherance of American Standard's business and he was acting within the scope of his duties of employment.

59. At numerous times throughout his employment, including the time period between October 2005 and January 2006, and while Plaintiff Reyes was performing his job duties, Vijay willfully and intentionally grabbed, touched, and fondled Plaintiff Reyes' person without his consent or authorization and without provocation and without jurisdiction.

60. American Standard knew of Vijay's propensity for improper touching and fondling of his co-workers, including Plaintiff Reyes, in the workplace.

61. American Standard permitted and authorized Vijay's improper and abusive behavior to continue.

62. American Standard's actions were willful and deliberate.

63. As a direct and proximate result of American Standard's actions, Plaintiff Reyes suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT IV- BATTERY
### (Plaintiff Benitez against Defendant American Standard Circuit, Inc.)

64. Plaintiffs restate and reallege paragraphs 1 through 63 above as though fully set forth herein.

65. At all relevant times hereto, Plaintiff Benitez was acting in furtherance of American Standard's business and was acting in the scope of his duties in employment.

9

66.    At all relevant times hereto, Vijay's conduct was in furtherance of American Standard's business and he was acting within the scope of his duties of employment.

67.    At numerous times throughout his employment, including the time period between October 2005 and January 2006, and while Plaintiff Benitez was performing his job duties, Vijay willfully and intentionally grabbed, touched, and fondled Plaintiff Benitez's person without his consent or authorization and without provocation and without jurisdiction.

68.    American Standard knew of Vijay's propensity for improper touching and fondling of his co-workers, including Plaintiff Benitez, in the workplace.

69.    American Standard permitted and authorized Vijay's improper and abusive behavior to continue.

70.    American Standard's actions were willful and deliberate.

71.    As a direct and proximate result of American Standard's actions, Plaintiff Benitez suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT V- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff Reyes against Defendant American Standard Circuit, Inc.)

72.    Plaintiffs restate and reallege paragraphs 1 through 71 above as though fully set forth herein.

73.    At all relevant times hereto, Plaintiff Reyes was acting in furtherance of American Standard's business and was acting in the scope of his duties in employment.

10

74.    At all relevant times hereto, Vijay's conduct was in furtherance of American Standard's business and he was acting within the scope of his duties of employment.

75.    Vijay's persistent abusive conduct toward Plaintiff Reyes over eight (8) years, including but not limited to, unauthorized and unwelcome groping, fondling, and other threatening behavior, constituted extreme and outrageous behavior.

76.    As a supervisor for American Standard, Vijay had the ability to affect the terms and conditions of Plaintiff Reyes' employment.

77.    Vijay knew there was at least a high probability that his conduct would cause Plaintiff Reyes severe emotional distress.

78.    American Standard knew of Vijay's propensity for improper and abusive behavior toward his co-workers, including Plaintiff Reyes, in the workplace.

79.    American Standard knew there was at least a high probability that Vijay's conduct would cause Plaintiff Reyes severe emotional distress.

80.    American Standard permitted and authorized Vijay's improper and abusive behavior to continue.

81.    American Standard's actions were willful and deliberate.

82.    As a direct and proximate result of American Standard's actions, Plaintiff Reyes experienced severe emotional distress including but not limited to feelings of fear, shame, anguish, and great humiliation and embarrassment. As a result of the severe emotional distress he experienced, Plaintiff Reyes suffered and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

11

## COUNT VI- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff Benitez against Defendant American Standard Circuit, Inc.)

83.     Plaintiffs restate and reallege paragraphs 1 through 82 above as though fully set forth herein.

84.     At all relevant times hereto, Plaintiff Benitez was acting in furtherance of American Standard's business and was acting in the scope of his duties in employment.

85.     At all relevant times hereto, Vijay's conduct was in furtherance of American Standard's business and he was acting within the scope of his duties of employment.

86.     Vijay's abusive conduct toward Plaintiff Benitez, including but not limited to, unauthorized and unwelcome groping, fondling, name calling, exposing himself to, propositioning for sex, sodomizing, and other threatening behavior, constituted extreme and outrageous behavior.

87.     As a supervisor for American Standard, Vijay Patel had the ability to affect the terms and conditions of Plaintiff Benitez's employment.

88.     Vijay knew there was at least a high probability that his conduct would cause Plaintiff Benitez severe emotional distress.

89.     American Standard knew of Vijay's propensity for improper and abusive behavior toward his co-workers, including Plaintiff Benitez, in the workplace.

90.     American Standard knew there was at least a high probability that Vijay's conduct would cause Plaintiff Benitez severe emotional distress.

91.     American Standard permitted and authorized Benitez's improper and abusive behavior to continue.

92.     American Standard's actions were willful and deliberate.

12

93.     As a direct and proximate result of American Standard's actions, Plaintiff Benitez experienced severe emotional distress including but not limited to feelings of fear, shame, anguish, and great humiliation and embarrassment. As a result of the severe emotional distress he experienced, Plaintiff Benitez suffered and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT VII- ASSAULT
### (Plaintiff Reyes against Defendant Vijay Patel)

94.     Plaintiffs restate and reallege paragraphs 1 through 93 as though fully set forth herein.

95.     At numerous times throughout his employment, including the time period between October 2005 and January 2006, and while Plaintiff Reyes was performing his job duties, Vijay Patel accosted Plaintiff Reyes and by his actions caused Plaintiff Reyes to be in great fear and apprehension of imminent harmful and offensive contact.

96.     Defendant Vijay Patel's improper conduct was willful and deliberate.

97.     As a direct and proximate result of Vijay Patel's actions, Plaintiff Reyes suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT VIII- ASSAULT
### (Plaintiff Benitez against Defendant Vijay Patel)

13

98.    Plaintiffs restate and reallege paragraphs 1 through 97 as though fully set forth herein.

99.    At numerous times throughout his employment, including the time period between October 2005 and January 2006, and while Plaintiff Benitez was performing his job duties, Vijay Patel accosted Plaintiff Benitez and by his actions caused Plaintiff Benitez to be in great fear and apprehension of imminent harmful and offensive contact.

100.    Defendant Vijay Patel's improper conduct was willful and deliberate.

101.    As a direct and proximate result of Vijay Patel's actions, Plaintiff Benitez suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT IX- BATTERY
### (Plaintiff Reyes against Defendant Vijay Patel)

102.    Plaintiffs restate and reallege paragraphs 1 through 101 as though fully set forth herein.

103.    At numerous times throughout his employment, including the time period between October 2005 and January 2006, Defendant Vijay Patel willfully and intentionally grabbed, touched, and fondled Plaintiff Reyes' person without his consent or authorization and without provocation and without jurisdiction.

104.    Vijay Patel's actions were willful and deliberate.

14

105.   As a direct and proximate result of Vijay Patel's actions, Plaintiff Reyes suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT X- BATTERY
### (Plaintiff Benitez against Defendant Vijay Patel)

106.   Plaintiffs restate and reallege paragraphs 1 through 105 as though fully set forth herein.

107.   At numerous times throughout his employment, including the time period between October 2005 and January 2006, Defendant Vijay Patel willfully and intentionally grabbed, touched, and fondled Plaintiff Benitez's person without his consent or authorization and without provocation and without jurisdiction.

108.   Vijay Patel's actions were willful and deliberate.

109.   As a direct and proximate result of Vijay Patel's actions, Plaintiff Benitez suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT XI- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff Reyes against Defendant Vijay Patel)

15

110.     Plaintiffs restate and reallege paragraphs 1 through 109 as though fully set forth herein.

111.     Vijay Patel's persistent abusive conduct toward Plaintiff Reyes over eight (8) years, including but not limited to, unauthorized and unwelcome groping, fondling, and other threatening behavior, constituted extreme and outrageous behavior.

112.     As a supervisor for American Standard, Vijay Patel had the ability to affect the terms and conditions of Plaintiff Reyes' employment.

113.     Vijay Patel knew or should have known that his actions had at least a high probability of causing Plaintiff Reyes severe emotional distress.

114.     Vijay Patel's actions were willful and deliberate

115.     As a direct and proximate result of Vijay Patel's actions, Plaintiff Reyes experienced severe emotional distress including but not limited to feelings of fear, shame, anguish, and great humiliation and embarrassment. As a result of the severe emotional distress he experienced, Plaintiff Reyes suffered and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT XII- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff Benitez against Vijay Patel)

116.     Plaintiffs restate and reallege paragraphs 1 through 115 as though fully set forth herein.

117.     Defendant Vijay Patel's abusive conduct toward Plaintiff Benitez, including but not limited to, unauthorized and unwelcome groping, fondling, name calling, exposing himself

16

to, propositioning for sex, sodomizing, and other threatening behavior, constituted extreme and outrageous behavior.

118.    As a supervisor for American Standard, Vijay Patel had the ability to affect the terms and conditions of Plaintiff Benitez's employment.

119.    Vijay Patel knew or should have known that his actions had at least a high probability of causing Plaintiff Benitez severe emotional distress.

120.    Vijay Patel's actions were willful and deliberate

121.    As a direct and proximate result of American Standard's actions, Plaintiff Benitez experienced severe emotional distress including but not limited to feelings of fear, shame, anguish, and great humiliation and embarrassment. As a result of the severe emotional distress he experienced, Plaintiff Benitez suffered and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT XIII- FALSE IMPRISONMENT
### (Plaintiff Reyes against Defendant Vijay Patel)

122.    Plaintiffs restate and reallege paragraphs 1 through 121 as though fully set forth herein.

123.    In or around November or December 2005, Defendant Vijay Patel instructed Reyes to follow him to his tool room to retrieve a particular tool Reyes needed.

124.    Once Plaintiff Reyes entered the tool room, Vijay Patel locked Plaintiff Reyes in the room.

125.    By locking Plaintiff Reyes in the tool room, Vijay Patel restrained Plaintiff Reyes' freedom of movement.

17

126.    Vijay Patel locked Plaintiff Reyes in the tool room and retrained his freedom of movement against Plaintiff Reyes' will.

127.    Vijay Patel's actions were willful and deliberate

128.    As a direct and proximate result of Vijay Patel's actions, Plaintiff Reyes suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

Respectfully Submitted,

One of the Attorneys for Plaintiffs

Douglas M. Werman
Maureen A. Bantz
Werman Law Office, P.C. (#42031)
77 West Washington Street, Suite 1402
Chicago, IL 60602
(312) 419-1008

18

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

JOSE LUIS BENITEZ and JUAN REYES,  )
                             )
      Plaintiffs,           )
                             )    Case No.
                             )
AMERICAN STANDARD CIRCUIT, INC. )
and VIJAY PATEL,             )    Judge
                             )
      Defendants.          )

## 222 AFFIDAVIT

I, DOUGLAS M. WERMAN, attorney for Plaintiffs, JOSE LUIS BENITEZ and JUAN

REYES, hereby claims that the amount of damages sought in this claim exceeds $50,000.00.

Affiant further sayeth naught.

_____
Douglas M. Werman

Douglas M. Werman
Werman Law Office, P.C.
77 W. Washington Street, Suite 1402
Chicago, IL 60602
(312) 419-1008

**IN THE CIRCUITS COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| JOSE LUIS BENITEZ and JUAN REYES, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 2007L010655 |
| ) | |
| AMERICAN STANDARD CIRCUITS, ) | |
| INC., and VIJAY PATEL, ) | Calendar/Room B |
| ) | |
| Defendants. ) | |

ON MAR 12 PM 3 07
DOROTHY BROWN
CLERK OF CIRCUIT COURT
LAW DIVISION

### FIRST AMENDED COMPLAINT

Plaintiffs Jose Luis Benitez and Juan Reyes, through their attorneys, for their First

Amended Complaint against Defendants American Standard Circuits, Inc. and Vijay Patel,

individually, (collectively "Defendants"), state as follows:

### NATURE OF PLAINTIFFS' CLAIMS

1.    This lawsuit arises under Title VII of the Civil Rights Act of 1964 ("Title VII"),

42 U.S.C. §2000e-5 *et seq.*, for Defendant American Standard Circuits, Inc.'s unlawful

discrimination of Mr. Benitez and Mr. Reyes on the basis of their sex. Plaintiffs allege Vijay

Patel, a manager for American Standard Circuits, Inc., sexually harassed Plaintiffs and other

male employees while they were working at American Standard Circuits, Inc. Plaintiffs further

allege Defendant American Standard Circuits, Inc. violated Title VII by unlawfully retaliating

against them because they objected to and opposed the unlawful sexual harassment they were

subjected to in the workplace.

2.    Plaintiffs also claim American Standard Circuits, Inc. is liable to Plaintiffs for

battery, assault, and intentional infliction of emotional distress because American Standard

Circuit, Inc. committed, commanded, and/or expressly authorized Vijay Patel's improper

conduct.

1



3.    Plaintiffs further claim Vijay Patel is individually liable for the torts of battery, assault, intentional infliction of emotional distress, and false imprisonment.

**THE PARTIES**

4.    Plaintiff Jose Luis Benitez ("Benitez") resides in Aurora, Illinois, which is located in Kane County.

5.    Plaintiff Juan Reyes ("Reyes") resides in Melrose Park, Illinois, which is located in Cook County.

6.    Defendant American Standard Circuits, Inc. (herein "American Standard") is an Illinois Corporation licensed to do business in Illinois and is doing business Illinois. Defendants' corporate headquarters is located in Franklin Park, Illinois, which is located in Cook County.

7.    Plaintiffs Jose Luis Benitez and Juan Reyes are former employees of American Standard. Plaintiffs worked for Defendant American Standard at its 3615 Wolf Road, Franklin Park, Illinois location, which is located in Cook County.

8.    At all material times hereto, Plaintiff Jose Luis Benitez has been American Standard's "employee" within the meaning of § 701(f) of Title VII, 42 U.S.C. §2000e(f).

9.    At all material times hereto, Plaintiff Juan Reyes has been American Standard's "employee" within the meaning of § 701(f) of Title VII, 42 U.S.C. §2000e(f).

10.    At all material times hereto, American Standard has been an "employer" within the meaning of § 701(b) of Title VII, 42 U.S.C. §2000e(b).

11.    At all relevant times, Defendant American Standard has continuously had at least fifteen (15) employees.

12.    Upon information and belief, Defendant Vijay Patel (herein "Vijay") resides and is domiciled in Cook County, Illinois.

13.    Defendant Vijay Patel was employed by American Standard as a management level employee.

14.    As a management level employee, American Standard vested Vijay Patel with the authority to hire, fire, and discipline employees, and Vijay Patel in fact exercised his authority to hire, fire, and discipline employees.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

15.    Plaintiffs have exhausted all administrative remedies required by Title VII, 42 U.S.C. § 2000e-5, prior to filing this lawsuit.

16.    On or about April 5, 2006, Plaintiffs filed Charges of Discrimination against American Standard with the Equal Employment Opportunity Commission's ("EEOC") Chicago District Office, Charge No. 440-2006-03280 and Charge No. 440-2006-03283, charging Defendant American Standard with unlawful sex discrimination and retaliation in connection with their termination from employment. A copy of the charges Plaintiffs filed with the EEOC are attached hereto as Group Exhibit A.

17.    On or about September 13, 2007, after the EEOC conducted an investigation, the District Director of the EEOC's Chicago Office issued a determination stating that there is reasonable cause to believe that Defendant American Standard discriminated against Plaintiffs and a class of individuals on the basis of their sex in violation of Title VII. The EEOC also concluded there is reasonable cause to believe Defendant American Standard unlawfully retaliated against Plaintiffs for opposing the discrimination in violation of Title VII. Copies of those determinations are attached hereto as Group Exhibit B.

18.    By notices dated February 29, 2008, the EEOC issued Plaintiffs Notices of Right to Sue. Copies of the Right to Sue Notices are attached hereto as Group Exhibit C.

19.    This lawsuit has been timely filed within 90 days of Plaintiffs' receipt of the EEOC's Right to Sue Notices.

## FACTUAL BACKGROUND

A.    **Plaintiff Juan Reyes**

20.    Plaintiff Reyes began his employment with American Standard on or around February 9, 1998.

21.    During the course of his employment with Defendant American Standard, Plaintiff Reyes worked in the plating department.

22.    Defendant Vijay Patel was working as a mechanic at American Standard at the time Plaintiff Reyes began his employment. Defendant Vijay worked in the maintenance department.

23.    On Plaintiff Reyes' first day of employment, Vijay Patel asked Plaintiff Reyes' immediate supervisor, known as "Raju," if he would permit Reyes to assist Vijay in fixing a machine. Raju agreed to Vijay's request. As Plaintiff Reyes assisted Vijay in repairing the machine, Vijay grabbed Plaintiff Reyes' genitalia with his hand.

24.    Other employees, including Raju and Raju's cousin, were in the vicinity at the time Vijay grabbed Plaintiff Reyes' genitals. Nonetheless, Vijay openly engaged in the conduct.

25.    Later that same day, Vijay again asked Raju for Reyes' assistance and Raju agreed. Plaintiff Reyes assisted Vijay in grabbing tools that were a few floors up. As Plaintiff Reyes and Vijay walked up the second flight of stairs, Vijay began to aggressively grope Reyes in the genital area and attempted to place his hand down Reyes' pants. Reyes moved away from Vijay and ran back down the stairs.

4

26.    When Reyes returned, "Raju" and his cousin laughed at Reyes because they were familiar with Vijay's misconduct.

27.    Vijay continued to engage in the same or similar types of behavior, as described in paragraphs 23 and 25 above, which included improper touching, fondling, and grabbing of Plaintiff Reyes' genitals and person, throughout the course of his employment, until he was terminated in early 2006. Vijay subjected Plaintiff Reyes to such harassing conduct several times a week.

28.    Other employees, including but not limited to Santos Velasquez, Arturo Arenas, Cristobal Reyes, and Etesh witnessed Vijay fondle Plaintiff Reyes. In addition, Plaintiff Reyes saw Vijay fondle at least seven other male employees.

29.    Vijay engaged in his improper behavior openly and notoriously over the course of at least 8 years.

30.    In one particular incident, in or around November or December 2005, Reyes asked Vijay for a tool. Vijay instructed Reyes to follow him into his tool room to get it. After Reyes and Vijay entered the room, Vijay locked the door. Vijay then groped Plaintiff Reyes' genitalia and propositioned Plaintiff Reyes for sex. Plaintiff Reyes pushed past Vijay, unlocked the door, and exited the tool room.

31:    In another incident, which occurred on or around January 13, 2006, Vijay came up behind Reyes while he was working and began groping Reyes' genital area with his hand. Reyes backed away in response, but Vijay continued to grab Plaintiff Reyes' genital area. Reyes placed his hand over his genital area to protect himself.

5

32.     Amaraht Patel, a management level employee for American Standard, witnessed Vijay grab Plaintiff Reyes on the occasion occurring on or around January 13, 2006. Plaintiff Reyes indicated to Amaraht Patel that he was bothered that Vijay groped him.

33.     As a management level employee, Amaraht Patel had authority to hire, fire, and discipline employees, and did so in fact exercise his authority to hire, fire, and discipline employees.

34.     Amaraht Patel did not discipline or reprimand Vijay for engaging in such improper conduct toward Plaintiff Reyes. Instead, Amaraht Patel laughed at Vijay's behavior and told Juan that Vijay was gay. Amaraht Patel's action, or lack thereof, directly contradicted American Standard's written sexual harassment policy, attached hereto as Exhibit D.

35.     Bobbish, who was employed by American Standard as the Plant Manager, also witnessed Vijay grab and fondle Plaintiff Reyes and other employees.

36.     As a management level employee, Bobbish had authority to hire, fire, and discipline employees, and did so in fact exercise his authority to hire, fire, and discipline employees.

37.     Although Bobbish knew Vijay grabbed and fondled other employees, Bobbish took no action to remediate or stop the conduct. Bobbish's action, or lack thereof, directly contradicted American Standard's written sexual harassment policy set forth in Exhibit D.

38.     On Saturday, January 28, 2006, Plaintiff Reyes and another American Standard employee, called by the name Leo, filed a police report with the Franklin Park Police Department against Vijay for battery. The Police Report Plaintiff Reyes filed against Vijay Patel on January 28, 2006 is attached hereto as Exhibit E.

6

39.    Early the next week, American Standards' owners, who Plaintiff Reyes believes to be Gordham Patel and Jay Hirpara, called "Leo" into the American Standards' Office. Gordham Patel and Jay Hirpara pressured "Leo" into dropping his criminal charges against Vijay Patel.

40.    Thereafter, Gordham Patel and Jay Hirpara called Plaintiff Reyes into American Standard's office. While in the office, Plaintiff Reyes indicated he opposed the sexually harassing conduct Vijay Patel subjected him to in the workplace. Gorham Patel and Jay Hirpara requested that Plaintiff Reyes withdraw the criminal charge against Vijay. In addition, Gorham Patel and Jay Hirpara told Plaintiff Reyes that his employment at American Standard would remain "normal" as long as Plaintiff Reyes dismissed his complaint against Vijay.

41.    Gordhan Patel and Jay Hirpara ratified Vijay's improper conduct.

42.    Plaintiff Reyes refused to dismiss the criminal charges he had against Vijay.

43.    Later that week, American Standard terminated Plaintiff Reyes' employment.

44.    American Standard terminated Plaintiff Reyes' employment because Plaintiff Reyes opposed Vijay Patel's conduct, including the sexual harassment he was subjected to while employed at American Standard.

45.    Upon information and belief, Vijay Patel is currently employed by American Standard.

**B.    Plaintiff Jose Luis Benitez**

46.    Plaintiff Jose Luis Benitez began his employment with American Standard on or around February 17, 2003.

47.    During the course of his employment with American Standard, Plaintiff Benitez worked in the screening department.

7

48.     Defendant Vijay Patel was employed as a Manager by American Standard at the time Plaintiff Benitez began his employment.

49.     In September and October 2005, Vijay began making unwelcome sexually explicit comments to Plaintiff Benitez. For example, Vijay told Plaintiff Benitez to "Show me your penis" and "Let me see your dick."

50.     In November or December 2005, Vijay began groping Benitez. In one instance, Plaintiff Benitez was working in the screening room when Vijay entered. Vijay pushed Plaintiff Benitez into a corner and grabbed Benitez's penis. Benitez told Vijay to leave. Vijay laughed and called Benitez a "Cabron," a derogatory term in Spanish.

51.     The day after the incident described above in paragraph 50 occurred, Plaintiff Benitez complained to his immediate supervisor, Baraht Patel, about Vijay's conduct. Plaintiff Benitez reported what transpired between himself and Vijay and told Baraht that he did not want Vijay going into the screening department and harassing him any more.

52.     Plaintiff Benitez also told Baraht Patel he did like the problems Vijay was giving him and told Baraht Patel that he would file a complaint if the problems were not fixed.

53.     After Plaintiff Benitez told Baraht Patel about Vijay's misconduct, Baraht laughed at Plaintiff Benitez.

54.     Baraht Patel did nothing to remediate the conduct Plaintiff Benitez complained about.

55.     Baraht Patel's action, or lack thereof, directly contradicted American Standard's written sexual harassment policy as set forth in Exhibit D.

56.     Vijay continued to grab Plaintiff Benitez's genitalia even after Plaintiff Benitez complained to Baraht Patel.

8

57.    For example, on or around January 4, 2006, Vijay approached Plaintiff Benitez again while he was working in the screening room and instructed him to "Come over here and show me your dick." Plaintiff Benitez refused, and Vijay told Benitez that if he did not comply with Vijay's request he would regret it. Vijay told Benitez that he would tell his supervisors that Benitez was a problem and that American Standard would fire him. Benitez then showed Vijay his penis and Vijay performed oral sex on Benitez. Thereafter, Vijay dropped his pants, exposed himself to Benitez, bent over and said "Fuck Me, Fuck Me." Benitez told Vijay he would not and walked to a different area of the screening room and returned to his work.

58.    Approximately two weeks later, on or around January 18, 2006, Vijay approached Plaintiff Benitez while he was working, grabbed his testicles, and pushed him into a wall. Plaintiff Benitez pushed Vijay off of him. A half an hour later, Vijay again approached Plaintiff Benitez while he was working in the screening department. Vijay grabbed Benitez's hand and began to pull Benitez to the second room in the screening department. Vijay told Benitez to "Stay there. I am going to show you." Vijay then dropped his pants, bent over, and told Benitez to "Fuck him." Plaintiff Benitez refused to comply and left.

59.    The next day, on or around January 19, 2006, Plaintiff Benitez once again complained to his supervisor, Baraht Patel, about Vijay's conduct.

60.    The next day, on approximately January 20, 2006, a manager who Plaintiff Benitez believes to be Jay Hirpara's nephew, called Plaintiff Benitez into the office and told Plaintiff Benitez he was fired. Plaintiff Benitez demanded to know why American Standard was terminating his employment. The Manager told Plaintiff Benitez to return on Monday, January 23, 2006 if he wanted to find out why he was being terminated.

9

61. Plaintiff Benitez's job performance at American Standard was satisfactory prior to his termination, and he never received a warning.

62. Plaintiff Benitez returned to the office on Monday, January 23, 2006 with his sister-in-law and met with Jay Hirpara. Plaintiff Benitez asked Jay Hirpara if he knew that Vijay was improperly touching Plaintiff Benitez. Jay Hirpara told Plaintiff Benitez "I don't care."

63. Plaintiff Benitez's sister-in-law told Jay Hirpara what he was doing to Plaintiff Benitez was illegal. Jay Hirpara again told Plaintiff Benitez and his sister-in-law "I don't care. You do what you have to do. I have money to fight."

64. Plaintiff Benitez was terminated because he did not submit to Vijay's sexual demands and instead opposed the sexual harassment he was subjected to while employed by American Standard.

65. Later that same day, on Monday, January 23, 2006, Plaintiff Benitez filed a police report against Defendant Vijay Patel for battery for the January 18, 2006 incident with the Franklin Park Police Department. The Police Report Plaintiff Benitez filed against Defendant Vijay Patel on January 23, 2006 is attached hereto as Exhibit F.

66. Plaintiff Reyes and Leo filed their respective police reports against Vijay after they learned Plaintiff Benitez filed a police report.

C.    Other American Standard Employees

67. Other persons employed by American Standard Circuits were groped, fondled, and propositioned for sex by Vijay Patel.

68. Vijay's conduct was not welcome.

10

69. Vijay was notoriously known to fondle and harass American Standard employees since at least 1998 and up to January 2006. American Standard employees warned each other to stay away from Vijay.

70. American Standard had full knowledge of Vijay's improper and abusive conduct and allowed, authorized, and permitted his actions and behavior to continue.

71. American Standard had a sexual harassment policy in place, but it did abide by the policy. For example, members of American Standard's management, including but not limited to, Jay Hirpara, Gordhan Patel, Bobbish, Amaraht Patel, and Baraht Patel knew Vijay was sexually harassing employees but took no action to stop such conduct.

72. American Standard, through its managers, including but not limited to, Jay Hirpara, Gordhan Patel, Bobbish, Amaraht Patel, Baraht Patel, and Vijay Patel, committed, commanded, and/or expressly authorized Vijay Patel's harassing conduct.

73. American Standard did not take any action in response to complaints about Vijay's behavior and actions.

74. Upon information and belief, Vijay Patel currently remains employed by American Standard.

<u>COUNT I- ASSAULT</u>
(Plaintiff Reyes against Defendant American Standard Circuits, Inc.)

75. Plaintiffs restate and reallege paragraphs 1 through 74 above as though fully set forth herein.

76. At all relevant times hereto, Plaintiff Reyes was acting in furtherance of American Standard's business and was acting in the scope of his duties in employment.

77. At all relevant times hereto, Vijay's conduct was in furtherance of American Standard's business and he was acting within the scope of his duties of employment.

11

78.     At numerous times during the relevant time period between October 2005 and January 2006, and while Plaintiff Reyes was performing his job duties, Vijay accosted Plaintiff Reyes and by his actions willfully and intentionally caused Plaintiff Reyes to be in great fear and apprehension of imminent harmful and offensive contact.

79.     Members of American Standard management knew of Vijay's propensity to place employees, including Plaintiff Reyes, in great fear and apprehension of imminent harmful and offensive contact in the workplace, but they took no action to remediate or stop the behavior.

80.     American Standard ratified Vijay's improper conduct.

81.     Members of American Standard management committed, commanded, and expressly authorized Vijay to threaten to inflict imminent harmful and offensive contact on Plaintiff Reyes.

82.     Members of American Standard management willfully, deliberately, knowingly and intentionally caused Plaintiff Reyes to be in great fear and apprehension of imminent harmful and offensive contact by Vijay Patel.

83.     As a direct and proximate result of American Standard's actions, Plaintiff Reyes suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT II- ASSAULT
### (Plaintiff Benitez against Defendant American Standard Circuits, Inc.)

12

84.     Plaintiffs restate and reallege paragraphs 1 through 83 above as though fully set forth herein.

85.     At all relevant times hereto, Plaintiff Benitez was acting in furtherance of American Standard's business and was acting in the scope of his duties in employment.

86.     At all relevant times hereto, Vijay's conduct was in furtherance of American Standard's business and he was acting within the scope of his duties of employment.

87.     At numerous times during the relevant time period between October 2005 and January 2006, and while Plaintiff Benitez was performing his job duties, Vijay accosted Plaintiff Benitez and by his actions willfully and intentionally caused Plaintiff Benitez to be in great fear and apprehension of imminent harmful and offensive contact.

88.     Members of American Standard management knew of Vijay's propensity to place employees, including Plaintiff Benitez, in great fear and apprehension of imminent and harmful offensive contact in the workplace, but they took no action to remediate or stop the behavior.

89.     American Standard ratified Vijay's improper conduct.

90.     Members of American Standard management committed, commanded, and expressly authorized Vijay to threaten to inflict imminent harmful and offensive contact on Plaintiff Benitez.

91.     Members of American Standard management willfully, deliberately, knowingly and intentionally caused Plaintiff Benitez to be in great fear and apprehension of imminent harmful and offensive contact by Vijay Patel.

92.     As a direct and proximate result of American Standard's actions, Plaintiff Benitez suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish,

and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT III- BATTERY
### (Plaintiff Reyes against Defendant American Standard Circuits, Inc.)

93.    Plaintiffs restate and reallege paragraphs 1 through 92 above as though fully set forth herein.

94.    At all relevant times hereto, Plaintiff Reyes was acting in furtherance of American Standard's business and was acting in the scope of his duties in employment.

95.    At all relevant times hereto, Vijay's conduct was in furtherance of American Standard's business and he was acting within the scope of his duties of employment.

96.    At numerous times during the relevant time period between October 2005 and January 2006, and while Plaintiff Reyes was performing his job duties, Vijay willfully and intentionally inflicted harmful and offensive contact on Plaintiff Reyes without his consent or authorization and without provocation and without jurisdiction.

97.    Members of American Standard management knew of Vijay's propensity for improper touching and grabbing of his co-workers, including Plaintiff Reyes, in the workplace, but they took no action to remediate or stop the behavior.

98.    American Standard ratified Vijay's improper conduct.

99.    Members of American Standard management committed, commanded, and expressly authorized Vijay to inflict harmful and offensive contact on Plaintiff Reyes' person without his consent or authorization and without provocation and without jurisdiction.

14

100.    Members of American Standard management willfully, deliberately, knowingly, and intentionally caused Plaintiff Reyes' person to be harmfully and offensively touched and grabbed without his consent or authorization and without provocation and without jurisdiction.

101.    As a direct and proximate result of American Standard's actions, Plaintiff Reyes suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT IV- BATTERY
### (Plaintiff Benitez against Defendant American Standard Circuits, Inc.)

102.    Plaintiffs restate and reallege paragraphs 1 through 101 above as though fully set forth herein.

103.    At all relevant times hereto, Plaintiff Benitez was acting in furtherance of American Standard's business and was acting in the scope of his duties in employment.

104.    At all relevant times hereto, Vijay's conduct was in furtherance of American Standard's business and he was acting within the scope of his duties of employment.

105.    At numerous times during the relevant time period between October 2005 and January 2006, and while Plaintiff Benitez was performing his job duties, Vijay willfully and intentionally inflicted harmful and offensive contact on Plaintiff Reyes without his consent or authorization and without provocation and without jurisdiction.

15

106.    Members of American Standard management knew of Vijay's propensity for improper touching and grabbing of his co-workers, including Plaintiff Benitez, in the workplace, but they took no action to remediate or stop the behavior.

107.    American Standard ratified Vijay's improper conduct.

108.    Members of American Standard Management committed, commanded, and expressly authorized Vijay to inflict harmful and offensive contact on Plaintiff Benitez's person without his consent or authorization and without provocation and without jurisdiction.

109.    Members of American Standard management willfully, deliberately, knowingly, and intentionally caused Plaintiff Benitez's person to be harmfully and offensively touched and grabbed without his consent or authorization and without provocation and without jurisdiction.

110.    As a direct and proximate result of American Standard's actions, Plaintiff Benitez suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT V- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff Reyes against Defendant American Standard Circuits, Inc.)

111.    Plaintiffs restate and reallege paragraphs 1 through 110 above as though fully set forth herein.

112.    At all relevant times hereto, Plaintiff Reyes was acting in furtherance of American Standard's business and was acting in the scope of his duties in employment.

16

113.    At all relevant times hereto, Vijay's conduct was in furtherance of American Standard's business and he was acting within the scope of his duties of employment.

114.    Vijay's persistent abusive conduct toward Plaintiff Reyes over the course of eight years, including but not limited to, unauthorized and unwelcome groping, fondling, and other threatening behavior, constituted extreme and outrageous behavior.

115.    As a manager for American Standard, Vijay had the ability to affect the terms and conditions of Plaintiff Reyes' employment.

116.    Vijay knew there was at least a high probability that his conduct would cause Plaintiff Reyes severe emotional distress.

117.    Members of American Standard management knew of Vijay's extreme and outrageous behavior toward his co-workers in the workplace, including Plaintiff Reyes, but they took no action to remediate or stop the behavior.

118.    American Standard ratified Vijay's extreme and outrageous behavior.

119.    Members of American Standard Management committed, commanded, and expressly authorized Vijay to grope, fondle, and threaten Plaintiff Reyes. American Standard's conduct constituted extreme and outrageous behavior.

120.    American Standard knew there was at least a high probability that American Standard's and Vijay's conduct would cause Plaintiff Reyes severe emotional distress.

121.    American Standard's actions were willful, intentional, and deliberate.

122.    As a direct and proximate result of American Standard's actions, Plaintiff Reyes experienced severe emotional distress including but not limited to feelings of fear, shame, anguish, and great humiliation and embarrassment. As a result of the severe emotional distress he experienced, Plaintiff Reyes suffered and continues to suffer great pain and distress.

17

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT VI- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff Benitez against Defendant American Standard Circuits, Inc.)

123.   Plaintiffs restate and reallege paragraphs 1 through 122 above as though fully set forth herein.

124.   At all relevant times hereto, Plaintiff Benitez was acting in furtherance of American Standard's business and was acting in the scope of his duties in employment.

125.   At all relevant times hereto, Vijay's conduct was in furtherance of American Standard's business and he was acting within the scope of his duties of employment.

126.   Vijay's abusive conduct toward Plaintiff Benitez, including but not limited to, unauthorized and unwelcome groping, fondling, name calling, exposing himself to, propositioning for sex, sodomizing, and other threatening behavior, constituted extreme and outrageous behavior.

127.   As a supervisor for American Standard, Vijay Patel had the ability to affect the terms and conditions of Plaintiff Benitez's employment.

128.   Vijay knew there was at least a high probability that his conduct would cause Plaintiff Benitez severe emotional distress.

129.   Members of American Standard management knew of Vijay's extreme and outrageous behavior toward his co-workers in the workplace, including Plaintiff Benitez, but they took no action to remediate or stop the behavior.

130.   American Standard ratified Vijay's extreme and outrageous behavior.

131.    Members of American Standard management committed, commanded, and expressly authorized Vijay to grope, fondle, and threaten Plaintiff Benitez. American Standard's conduct constituted extreme and outrageous behavior.

132.    American Standard knew there was at least a high probability that American Standard's and Vijay's conduct would cause Plaintiff Benitez severe emotional distress.

133.    American Standard's actions were willful and deliberate.

134.    As a direct and proximate result of American Standard's actions, Plaintiff Benitez experienced severe emotional distress including but not limited to feelings of fear, shame, anguish, and great humiliation and embarrassment. As a result of the severe emotional distress he experienced, Plaintiff Benitez suffered and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT VII- ASSAULT
### (Plaintiff Reyes against Defendant Vijay Patel)

135.    Plaintiffs restate and reallege paragraphs 1 through 134 as though fully set forth herein.

136.    At numerous times throughout his employment, including the time period between October 2005 and January 2006, and while Plaintiff Reyes was performing his job duties, Vijay Patel accosted Plaintiff Reyes and by his actions caused Plaintiff Reyes to be in great fear and apprehension of imminent harmful and offensive contact.

137.    Defendant Vijay Patel's improper conduct was willful, intentional, and deliberate.

19

138.    As a direct and proximate result of Vijay Patel's actions, Plaintiff Reyes suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT VIII- ASSAULT
### (Plaintiff Benitez against Defendant Vijay Patel)

139.    Plaintiffs restate and reallege paragraphs 1 through 138 as though fully set forth herein.

140.    At numerous times throughout his employment, including the time period between October 2005 and January 2006, and while Plaintiff Benitez was performing his job duties, Vijay Patel accosted Plaintiff Benitez and by his actions caused Plaintiff Benitez to be in great fear and apprehension of imminent harmful and offensive contact.

141.    Defendant Vijay Patel's improper conduct was willful and deliberate.

142.    As a direct and proximate result of Vijay Patel's actions, Plaintiff Benitez suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT IX- BATTERY
### (Plaintiff Reyes against Defendant Vijay Patel)

20

143.    Plaintiffs restate and reallege paragraphs 1 through 142 as though fully set forth herein.

144.    At numerous times throughout his employment, including the time period between October 2005 and January 2006, Defendant Vijay Patel willfully and intentionally grabbed, touched, and fondled Plaintiff Reyes' person without his consent or authorization and without provocation and without jurisdiction.

145.    Vijay Patel's actions were willful and deliberate.

146.    As a direct and proximate result of Vijay Patel's actions, Plaintiff Reyes suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish, and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT X- BATTERY
### (Plaintiff Benitez against Defendant Vijay Patel)

147.    Plaintiffs restate and reallege paragraphs 1 through 146 as though fully set forth herein.

148.    At numerous times throughout his employment, including the time period between October 2005 and January 2006, Defendant Vijay Patel willfully and intentionally grabbed, touched, and fondled Plaintiff Benitez's person without his consent or authorization and without provocation and without jurisdiction.

149.    Vijay Patel's actions were willful and deliberate.

150.    As a direct and proximate result of Vijay Patel's actions, Plaintiff Benitez suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish,

21

and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT XI- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff Reyes against Defendant Vijay Patel)

151.    Plaintiffs restate and reallege paragraphs 1 through 150 as though fully set forth herein.

152.    Vijay Patel's persistent abusive conduct toward Plaintiff Reyes over eight (8) years, including but not limited to, unauthorized and unwelcome groping, fondling, and other threatening behavior, constituted extreme and outrageous behavior.

153.    As a supervisor for American Standard, Vijay Patel had the ability to affect the terms and conditions of Plaintiff Reyes' employment.

154.    Vijay Patel knew or should have known that his actions had at least a high probability of causing Plaintiff Reyes severe emotional distress.

155.    Vijay Patel's actions were willful and deliberate

156.    As a direct and proximate result of Vijay Patel's actions, Plaintiff Reyes experienced severe emotional distress including but not limited to feelings of fear, shame, anguish, and great humiliation and embarrassment. As a result of the severe emotional distress he experienced, Plaintiff Reyes suffered and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

22

## COUNT XII- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff Benitez against Vijay Patel)

157.    Plaintiffs restate and reallege paragraphs 1 through 156 as though fully set forth herein.

158.    Defendant Vijay Patel's abusive conduct toward Plaintiff Benitez, including but not limited to, unauthorized and unwelcome groping, fondling, name calling, exposing himself to, propositioning for sex, sodomizing, and other threatening behavior, constituted extreme and outrageous behavior.

159.    As a supervisor for American Standard, Vijay Patel had the ability to affect the terms and conditions of Plaintiff Benitez's employment.

160.    Vijay Patel knew or should have known that his actions had at least a high probability of causing Plaintiff Benitez severe emotional distress.

161.    Vijay Patel's actions were willful and deliberate

162.    As a direct and proximate result of American Standard's actions, Plaintiff Benitez experienced severe emotional distress including but not limited to feelings of fear, shame, anguish, and great humiliation and embarrassment. As a result of the severe emotional distress he experienced, Plaintiff Benitez suffered and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT XIII- FALSE IMPRISONMENT
### (Plaintiff Reyes against Defendant Vijay Patel)

163.    Plaintiffs restate and reallege paragraphs 1 through 162 as though fully set forth herein.

23

164.   In or around November or December 2005, Defendant Vijay Patel instructed Reyes to follow him to his tool room to retrieve a particular tool Reyes needed.

165.   Once Plaintiff Reyes entered the tool room, Vijay Patel locked Plaintiff Reyes in the room.

166.   By locking Plaintiff Reyes in the tool room, Vijay Patel restrained Plaintiff Reyes' freedom of movement.

167.   Vijay Patel locked Plaintiff Reyes in the tool room and retrained his freedom of movement against Plaintiff Reyes' will.

168.   Vijay Patel's actions were willful and deliberate

169.   As a direct and proximate result of Vijay Patel's actions, Plaintiff Reyes suffered injuries, including but not limited to, pain and suffering, emotional distress, anguish and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

WHEREFORE, Plaintiff demands compensatory damages in an amount in excess of Fifty Thousand ($50,000) dollars, from the Defendant named in this Count, punitive or exemplary damages, plus costs and whatever additional relief this Court deems equitable and just.

## COUNT XIV- VIOLATION OF TITLE VII- SEXUAL HARASSMENT
### (Plaintiff Benitez against Defendant American Standards Circuits, Inc.)

170.   Plaintiffs restate and reallege paragraphs 1 through 169 as though fully set forth herein.

171.   This count arises from American Standard's violation of Title VII, 42 U.S.C. §2000e *et seq.*, for its unlawful discrimination of Plaintiff Benitez on the basis of sex.

172.   Vijay Patel, a managerial employee at American Standard, subjected Plaintiff Benitez to unwelcome harassment on account of his sex, male, on repeated occasions throughout the course of his employment. Among other things, Vijay Patel groped Plaintiff Benitez's

genitalia, made sexually explicit remarks to him, and demanded that Plaintiff Benitez engage in sexual activities with him on a number of occasions.

173.    Vijay Patel also subjected other male employees to unwelcome sexual harassment based on their sex.

174.    The sexual harassment Vijay Patel subjected Plaintiff Benitez to was sufficiently severe and pervasive to alter the terms and conditions of his employment and create a hostile or abusive atmosphere.

175.    Plaintiff Benitez was subjectively offended by the sexual harassment Vijay Patel subjected him to in the work place.

176.    Plaintiff Benitez's subjective offense was objectively reasonable because a reasonable person would find the work environment to be hostile and/or abusive given that the conduct occurred on numerous occasions and was particularly egregious, severe, and humiliating. Further, Vijay Patel's conduct interfered with Plaintiff Benitez's work performance, created an unreasonably hostile environment, and seriously affected his psychological and physical well being.

177.    Defendant American Standard, its managers, employees and agents, engaged in a pattern and practice of subjecting Plaintiff Benitez and other male employees to sexual harassment and a sexually hostile work environment.

178.    The discriminatory acts of American Standard, its agents and managers were deliberate, intentional, wanton, and malicious, and were done with malice or with reckless indifference to Plaintiff's civil rights, an entitle Plaintiff to punitive damages. The acts complained of herein were ratified, authorized or permitted or performed by American Standard and its management.

179.    American Standard is responsible and liable for the conduct of its managers, employees and agents that amount to the sexual harassment suffered by Plaintiff Benitez.

180.    American Standard's conduct toward Plaintiff Benitez and the ratification of the conduct by its managers, employees, and agents, adversely affected Plaintiff Benitez's job duties because the conduct unreasonably interfered with Plaintiff's employment to such an extent that it made it more difficult for Plaintiff to perform his job, from advancing in his career, and ultimately to Plaintiff Benitez's termination of employment.

181.    Plaintiff Benitez suffered tangible employment actions, including the termination of his employment, because he opposed the sexual harassment he was subjected to and because he refused to comply with Vijay Patel's demands for sexual favors.

182.    Plaintiff's objection and opposition to the sexual harassment he experienced was a motivating factor in American Standard's decision to terminate Plaintiff Benitez's employment.

183.    Plaintiff suffered physical and emotional injuries and illness due to American Standard's conduct.

184.    Because of American Standard's discriminatory customs and practices, all in violation of Title VII, Plaintiff has suffered and continues to suffer substantial losses in earnings, benefits, and other terms and conditions of employment.

WHEREFORE, Plaintiff prays for a judgment against Defendant American Standard as follows:

A.    A declaration, decree, and adjudgment that American Standard violated Title VII;

B.    A preliminary and permanent injunction against American Standard and its
        officers, agents, and managers from violating Title VII;

C.    Compensatory damages for his non-economic injuries;

D.   Punitive damages in an amount sufficient to punish American Standard for its past

discrimination and to deter it from continuing with its discriminatory practices;

E.   An award of reasonable attorneys' fees and costs;

F.   Such other and further relief as this Court deems appropriate and just.

## COUNT XV- VIOLATION OF TITLE VII- RETALIATION
### (Plaintiff Benitez against Defendant American Standards Circuits, Inc.)

185.   Plaintiffs restate and reallege paragraphs 1 through 184 as though fully set forth

herein.

186.   In or about November or December 2005, Plaintiff Benitez complained to a

manager, Baraht Patel, about Vijay Patel's sexually harassing conduct. Plaintiff Benitez opposed

the sexual harassment Vijay Patel subjected him to in the workplace.

187.   On January 4, 2006, Vijay Patel demanded that Plaintiff Benitez comply with his

requests for sexual favors and threatened to have Benitez terminated if he did not comply with

his demands.

188.   On January 18, 2006, Plaintiff Benitez rejected Vijay Patel's demands for sexual

favors and opposed the harassment he was subjected to.

189.   On January 19, 2006, Plaintiff Benitez once again complained to a manager,

Baraht Patel, about Vijay Patel's sexually harassing conduct. Plaintiff Benitez opposed the

sexual harassment Vijay Patel subjected him to in the workplace.

190.   On January 20, 2006, American Standard terminated Plaintiff Benitez's

employment.

191.   American Standard terminated Plaintiff Benitez's employment because he

opposed the sexual harassment he experienced as an American Standard employee.

27

192.    American Standard's termination of Plaintiff Benitez's employment as a result of his opposition to the sexual harassment he experienced constitutes unlawful retaliation in violation of Title VII.

WHEREFORE, Plaintiff Benitez prays for a judgment against Defendant American Standard as follows:

A.    A declaration, decree, and adjudgment that American Standard violated Title VII;

B.    A preliminary and permanent injunction against American Standard and its officers, agents, and managers from violating Title VII;

C.    Compensatory damages for his non-economic injuries;

D.    Punitive damages in an amount sufficient to punish American Standard for its past discrimination and to deter it from continuing with its discriminatory practices;

E.    An award of reasonable attorneys' fees and costs;

F.    Such other and further relief as this Court deems appropriate and just.

### COUNT XVI- VIOLATION OF TITLE VII- SEXUAL HARASSMENT
### (Plaintiff Reyes against Defendant American Standards Circuits, Inc.)

193.    Plaintiffs restate and reallege paragraphs 1 through 192 as though fully set forth herein.

194.    This count arises from American Standard's violation of Title VII, 42 U.S.C. §2000e *et seq.*, for its unlawful discrimination of Plaintiff Reyes on the basis of sex.

195.    Vijay Patel, a managerial employee at American Standard, subjected Plaintiff Reyes to unwelcome harassment on account of his sex, male, on repeated occasions throughout the course of his employment. Among other things, Vijay Patel groped Plaintiff Reyes's genitalia several times a week and made sexually explicit remarks to him throughout the course of Plaintiff Reyes' employment.

28

196.    Vijay Patel also subjected other male employees to unwelcome sexual harassment based on their sex.

197.    The sexual harassment Vijay Patel subjected Plaintiff Reyes to was sufficiently severe and pervasive to alter the terms and conditions of his employment and create a hostile or abusive atmosphere.

198.    Plaintiff Reyes was subjectively offended by the sexual harassment Vijay Patel subjected him to in the work place.

199.    Plaintiff Reyes' subjective offense was objectively reasonable because a reasonable person would find the work environment to be hostile and/or abusive given that the conduct occurred on numerous occasions and was particularly egregious, severe, and humiliating. Further, Vijay Patel's conduct interfered with Plaintiff Reyes' work performance, created an unreasonably hostile environment, and seriously affected his psychological and physical well being.

200.    Defendant American Standard, its managers, employees and agents, engaged in a pattern and practice of subjecting Plaintiff Reyes and other male employees to sexual harassment and a sexually hostile work environment.

201.    The discriminatory acts of American Standard, its agents and managers were deliberate, intentional, wanton, and malicious, and were done with malice or with reckless indifference to Plaintiff Reyes's civil rights, an entitle Plaintiff to punitive damages. The acts complained of herein were ratified, authorized or permitted or performed by American Standard and its management.

202.    American Standard is responsible and liable for the conduct of its managers, employees and agents that amount to the sexual harassment suffered by Plaintiff Reyes.

29

203.    American Standard's conduct toward Plaintiff Reyes and the ratification of the conduct by its managers, employees, and agents, adversely affected Plaintiff Reyes' job duties because the conduct unreasonably interfered with Plaintiff Reyes's employment to such an extent that it made it more difficult for Plaintiff to perform his job, from advancing in his career, and ultimately to Plaintiff Reyes' termination of employment.

204.    Plaintiff Reyes suffered tangible employment actions, including the termination of his employment, because he opposed the sexual harassment he was subjected to.

205.    Plaintiff's objection and opposition to the sexual harassment he experienced was a motivating factor in American Standard's decision to terminate Plaintiff Reyes' employment.

206.    Plaintiff Reyes suffered physical and emotional injuries and illness due to American Standard's conduct.

207.'    Because of American Standard's discriminatory customs and practices, all in violation of Title VII, Plaintiff Reyes has suffered and continues to suffer substantial losses in earnings, benefits, and other terms and conditions of employment.

WHEREFORE, Plaintiff Reyes prays for a judgment against Defendant American Standard as follows:

B.    A declaration, decree, and adjudgment that American Standard violated Title VII;

B.    A preliminary and permanent injunction against American Standard and its officers, agents, and managers from violating Title VII;

C.    Compensatory damages for his non-economic injuries;

D.    Punitive damages in an amount sufficient to punish American Standard for its past discrimination and to deter it from continuing with its discriminatory practices;

E.    An award of reasonable attorneys' fees and costs;

F.    Such other and further relief as this Court deems appropriate and just.

## COUNT XVII- VIOLATION OF TITLE VII- RETALIATION
### (Plaintiff Reyes against Defendant American Standards Circuits, Inc.)

208.    Plaintiffs restate and reallege paragraphs 1 through 207 as though fully set forth herein.

209.    On January 28, 2008, Plaintiff Reyes filed a police report with the Franklin Park Police Department against Vijay for battery.

210.    The following week, two of American Standard's owners, Gordham Patel and Jay Hirpara, called Plaintiff Reyes into American Standards' Office.

211.    While meeting with Gorham Patel and Jay Hirpara, Plaintiff indicated he opposed the unlawful sexual harassment he was exposed to in the workplace. In that same meeting, Gordham Patel and Jay Hirpara requested that Plaintiff withdraw his police charge against Vijay Patel and informed Plaintiff Reyes that his employment at American Standard would remain "normal" if he dismissed the charge against Vijay Patel.

212.    Plaintiff Reyes refused to dismiss the charge against Vijay.

213.    Shortly thereafter, American Standard terminated Plaintiff Reyes' employment.

214.    American Standard terminated Plaintiff's employment because he opposed Vijay's conduct, including the sexual harassment he was subjected to while employed at American Standard.

215.    American Standard's termination of Plaintiff Reyes's employment as a result of his opposition to the sexual harassment he experienced constitutes unlawful retaliation in violation of Title VII.

WHEREFORE, Plaintiff prays for a judgment against Defendant American Standard as follows:

31

A.      A declaration, decree, and adjudgment that American Standard violated Title VII;

B.      A preliminary and permanent injunction against American Standard and its officers, agents, and managers from violating Title VII;

C.      Compensatory damages for his non-economic injuries;

D.      Punitive damages in an amount sufficient to punish American Standard for its past discrimination and to deter it from continuing with its discriminatory practices;

E.      An award of reasonable attorneys' fees and costs;

F.      Such other and further relief as this Court deems appropriate and just.


Respectfully Submitted,


One of the Attorneys for Plaintiffs


Douglas M. Werman
Maureen A. Bantz
Werman Law Office, P.C. (#42031)
77 West Washington Street, Suite 1402
Chicago, IL 60602
(312) 419-1008

10-02-'07 15:27 FROM-                                    T-212  P004/013 F-300

# FRANKLIN PARK POLICE DEPARTMENT                    CRIME AGAINST PERSON REPORT

| R/P'S PLACE OF EMPLOYMENT OR SCHOOL    CITY | ZONE | VICTIM'S NAME (LAST, FIRST, MIDDLE) | | COMPLAINT NO. |
|---|---|---|---|---|
| NONE | 4 | BENITEZ JOSE L. | | 06-1121 |
| R/P'S OCCUPATION | HRS. OF EMPLOYMENT | SOBRIETY | VICTIM'S ADDRESS            CITY | RES. PHONE 630 |
| NONE | DNA | DNA | 746 SPRING ST    AURORA | 898-9301 |
| COMP'S OCCUPATION | HRS. OF EMPLOYMENT | SOBRIETY | VICTIM'S PLACE OF EMPLOYMENT OR SCHOOL   CITY | BUS. PHONE |
| NONE | DNA | DNA | NONE | DNA |
| DESCRIBE LOCATION OF OFFENSE OR TYPE OF PREMISE | | | VICTIM'S SEX-RACE-DOB | LOCATION OF OFFENSE (ADDRESS) | SEX-RACE-DOB | RES. PHONE |
| FACTORY | | | M/W 7/4/70 | 3615 WOLF RD | | SAME |
| VEHICLE USED      LICENSE NO.    STATE    YEAR | | | REPORTING PERSON | | | |
| BY SUSPECTS:  UNK | | | SAME | | | SAME |
| YEAR    MAKE    BODY    MODEL    COLOR(S) | | | REPORTING PERSON'S ADDRESS | | CITY | BUS. PHONE |
| | | | SAME | | | DNA |
| IDENTIFYING CHARACTERISTICS OF VEHICLE | | | DATE & TIME OCCURRED | | DATE & TIME REPORTED | |
| | | | 1/18/06    4:45 PM | 1/23/06 | 1453 | |
| CODE: V-VICTIM (OTHER THAN ABOVE) SHOW SEX, RACE , AGE, | | | CRIME | | LEADS NO. | |
| W-WITNESS; P-PARENT OR GUARDIAN | | | BATTERY | | | |
| NAME | | CODE | RESIDENCE | CITY | RES. PHONE | BUS. PHONE |
| | | | | | | |

| IDENTIFY SUSPECTS BY NO. (NAME-ADDRESS-SEX-DESCENT-DOB-HEIGHT-WEIGHT-EYES-HAIR-COMPLEXION-CLOTHING-IDENTIFYING CHARACTERISTICS-APPROX. AGE) |
|---|
| (A) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ |
| (B) |

| WEAPON OR MEANS OF ATTACK | METHOD USED TO COMMIT CRIME | |
|---|---|---|
| HANDS | GRABBED VICTIM | |
| TYPE OF PROPERTY TAKEN | APPROX. LOSS VALUE | TRADEMARKS OF SUSPECT(S) (ACTION OR CONVERSATION) |
| DNA | NONE | SEE NARRATIVE |
| NATURE OF INJURIES AND LOCATION ON BODY - VICTIM'S CONDITION | | VICTIM HOSPITALIZED WHERE? |
| NONE | | DNA |

NARRATIVE: (1) CONTINUATION OF ABOVE ITEMS. INCLUDE ADDITIONAL VICTIMS, WITNESSES AND SUSPECTS AS OUTLINED ABOVE. (2) DESCRIBE DETAILS OF INCIDENT. (3) DESCRIBE EVIDENCE AND PROPERTY & INDICATE DISPOSITION.

## I DO NOT WANT TO SIGN A CRIMINAL COMPLAINT:

VICTIM BENITEZ JOSE, RELATED THAT ON 1/18/06 THE PLANT
MANAGER ▬▬▬ (NOT SURE OF SPELLING) HAD GRABBED HIS TESTICLES
+ PUSHED HIM TO A WALL JOSE BENITEZ PUSHED HIM BACK
OUT OF THE WAY. JOSE BENITEZ WAS FIRED 2 DAYS LATER. ON
SEVERAL OTHER OCCASIONS THE SAME FONDELING TOOK PLACE +
JOSE BENITEZ FEARED HE WOULD LOSE HIS JOB. ON OR ABOUT
THE 1ST WEEK OF DEC. THE SAME SUPERVISOR DROPPED HIS
PANTS TO THE FLOOR + SAID "FUCK ME FUCK ME" (SUPERVISOR WAS
BENT OVER + NAKED FROM WAIST DOWN) JOSE BENITEZ TOLD HIM
HE LIKED WOMEN. NOTE: OTHER EMPLOYEES HAVE HAD SAME PROBLEM.
COMPLAINTS WILL BE SIGNED.

| 1ST REPORTING OFFICER    NO. | STATUS (CHECK ONE) | UNIT REFERRED TO: | UCR DISPOSITION |
|---|---|---|---|
| COLE | ☑ OPEN  ☐ SUSPENDED  ☐ CLOSED | | |
| 2ND REPORTING OFFICER    NO. | SUPERVISOR APPROVAL    NO. | REVIEWER    NO. | |
| | 35 | | |



EXHIBIT
C

10-02-'07 15:27 FROM-                          T-212  P005/013 F-566

**FRANKLIN PARK POLICE DEPARTMENT**                    CRIME AGAINST PERSON REPORT

| R/P's PLACE OF EMPLOYMENT OR SCHOOL | CITY | ZONE | VICTIM'S NAME (LAST, FIRST, MIDDLE) | COMPLAINT NO. |
| --- | --- | --- | --- | --- |
| | | 4 | REYES Juan Ramon | 05-1345 |

| R/P'S OCCUPATION | R/P'S OF EMPLOYMENT | SOBRIETY | VICTIM'S ADDRESS | CITY | RES. PHONE |
| --- | --- | --- | --- | --- | --- |
| | | | 3006 Rhodes Ava Maison 2 | | 847.560.1409 |

| COMP'S OCCUPATION | YRS OF EMPLOYMENT | SOBRIETY | VICTIM'S PLACE OF EMPLOYMENT OR SCHOOL | CITY | BUS. PHONE |
| --- | --- | --- | --- | --- | --- |
| Machinist | 15 yr | | American Standard | F.P. | 847.455.1500 |

| OFFICER'S LOCATION OF OFFENSE OR TYPE OF PREMISE | LOCATION OF OFFENSE (ADDRESS) | SEX-RACE-DOB |
| --- | --- | --- |
| Office Area Supply Room | 3615 Wolf Rd | |

| VEHICLE USED BY SUSPECT(S) | LICENSE NO. | STATE | YEAR | REPORTING PERSON | CITY | RES. PHONE / BUS. PHONE |
| --- | --- | --- | --- | --- | --- | --- |
| N | | | | | | |

| YEAR | MAKE | BODY | MODEL | COLOR(S) |
| --- | --- | --- | --- | --- |

| IDENTIFYING CHARACTERISTICS OF VEHICLE | DATE & TIME OCCURRED | DATE & TIME REPORTED | LEADS NO. |
| --- | --- | --- | --- |
| | 01.06 2115/2130 | 01.28.06 1333 | |

CODE: V-VICTIM (OTHER THAN ABOVE) SHOW SEX, RACE, AGE,    CRIME
W-WITNESS  P-PARENT OR GUARDIAN                          (BATTERY)

| NAME | CODE | RESIDENCE | CITY | RES. PHONE | BUS. PHONE |
| --- | --- | --- | --- | --- | --- |
| None | | | | | |

| WEAPON OR MEANS OF ATTACK | METHOD USED TO COMMIT CRIME |
| --- | --- |
| Hands | SEE NARR... |

| TYPE OF PROPERTY TAKEN | APPROX. LOSS VALUE | TRADEMARK OF SUSPECT(S)  (ACTION OR CONVERSATION) |
| --- | --- | --- |
| | | SEE NARR... |

| NATURE OF INJURIES AND LOCATION ON BODY - VICTIM'S CONDITION | VICTIM HOSPITALIZED WHERE? |
| --- | --- |

NARRATIVE: (1) CONTINUATION OF ABOVE ITEMS. INCLUDE ADDITIONAL VICTIMS, WITNESSES AND SUSPECTS AS OUTLINED ABOVE. (2) DESCRIBE DETAILS OF INCIDENT. (3) DESCRIBE EVIDENCE AND PROPERTY & INDICATE DISPOSITION.

**I DO NOT WANT TO SIGN A CRIMINAL COMPLAINT:**

In Summary, Vict. came into station to relate the following events that had occurred on this above date & time. Vict. related thru translation thru Richaud Tammy M. 9045 Sumner Ave Aurora IL. 60505 Ph cell 630.788.8826. That on date & time Vict. was working at his machine at the Atlas Plant & while working, Sub(s) had walked up to Vict. by surprise & took his hand & groped Vict. genital area & then Vict. backed away from Sub(s) & Sub(s) continued to approach Vict. w/ hands & grabbing his genital area. Vict. then backed off. From See supplement.

| 1ST REPORTING OFFICER | NO. | STATUS (CHECK ONE) | UNIT REFERRED TO | UCR DISPOSITION |
| --- | --- | --- | --- | --- |
| | | ☐ OPEN  ☐ SUSPENDED  ☐ CLOSED | | |
| 2ND REPORTING OFFICER | NO. | SUPERVISOR APPROVING | NO. | REVIEWER | NO. |

10-02-'07 15:28 FROM-                                    T-212  P006/013 F-566

# FRANKLIN PARK POLICE DEPARTMENT                    SUPPLEMENT REPORT

| COMPLAINANT, DRIVER, VICTIM OR ARRESTEE | ARREST NO. | COMPLAINT NO. |
|---|---|---|
| REYES, Juan Roman | — | 06-1395 |

| ☑ FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT | ☐ FORM USED TO REPORT FOLLOWUP INVESTIGATION ON SUPPLEMENTAL INFORMATION | |
|---|---|---|
| PAGE NO.   TRAFFIC CITATION NOS. | CORRECT OFFENSE OR INCIDENT CLASSIFICATION | CHANGED? ☐ YES |
| 2 | | |
| KIND OF REPORT CONTINUED | MULTIPLE CLEAN-UP? | ☐ NO |
| ☐ OFFENSE ☐ TRAFFIC ACCIDENT ☐ ARREST ☐ INVENTORY SEARCH | ☐ YES (LIST OTHER COMPLAINT NOS. IN NARRATIVE) | |
| OFFENSE, CHARGE OR INCIDENT ON ORIGINAL REPORT | APPROX. VALUE OF PROPERTY RECOVERED | |
| BATTERY | | |

INSTRUCTIONS FOR SUPPLEMENTAL USAGE. UNDER NARRATIVE, RECORD YOUR ACTIVITY & ALL DEVELOPMENTS IN THE CASE SUBSEQUENT TO LAST REPORT. DESCRIBE & RECORD VALUE OF ANY PROPERTY RECOVERED, NAMES & ARREST NOS. OF ANY PERSONS ARRESTED. EXPLAIN ANY OFFENSE CLASSIFICATION CHANGE. CLEARLY SHOW DISPOSITION OF RECOVERED PROPERTY & INVENTORY NO. RECOMMEND TO SUPERVISOR CASE STATUS & TO REVIEWER UCR DISPOSITION.

SUSP (A) + SUSP (A) WALKED AWAY W/O INCIDENT. VICT.
RELATES THAT AMROD A SUPERVISOR HAD WITNESSED
THIS OCCURANCE BUT NOTHING WAS SAID OR
DONE ABOUT IT. VICT. RELATES THAT WITNESS
HAD JUST LAUGHED IT OFF VICT. RELATES
THAT SUSP (A) HAD BEEN CONDUCTING THIS TYPE
OF BEHAVIOR SINCE THE BEGINNING OF VICT.
EMPLOYMENT BACK IN FEB 1999 REPORTS OR
PAST OCCURANCES NOT REPORTED DUE TO
VICT. FEELING HUMILIATED + IN FEAR OF
LOOSING HIS JOB. VICT. TRYED TO COMPLAIN ON
EMPLOYEE BUT DID NOT KNOW HOW TO FILE
A COMPLAINT. WHEN VICT. TRIED TO REPORT
VERBALLY BUT EMPLOYMENT "STAFF JUST
LAUGHED IT OFF. REPORT FILED ON TODAYS DATE
DUE TO OTHER EMPLOYEES FILING REPORTS OF
SAME NATURE ON SUSP. (A).

Comp To BE SIGNED

| 1ST REPORTING OFFICER   NO. | STATUS (CHECK ONE) ☑ OPEN ☐ SUSPENDED ☐ CLOSED | UNIT REFERRED TO: | UCR POSITION |
|---|---|---|---|
| 2  101 | | | NO. |
| 2ND REPORTING OFFICER   NO. | SUPERVISOR APPROVING   NO. R2/7 | REVIEWER | NO. |

## CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy act statement before Completing this form. | [X] FEPA [X] EEOC | 440-2006-0 3283 |

**Illinois Department of Human Rights** and EEOC
*State or local Agency, if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Juan Reyes | (847) 560-1409 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 3006 Rhodes, Melrose Park, IL 60164 | | 03-23-1969 |

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** *(If more than one, list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| American Standard CIrcuit | 15+ | (847) 455-1500 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 3615 Wolf Rd., Franklin Park, IL 60131 | | Cook |

| NAME | | TELEPHONE (Include Area Code) |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

**CAUSE OF DISCRIMINATION BASED ON** *(Check appropriate box (es))*

[ ] RACE   [ ] COLOR   [X] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN

[X] RETALIATION   [ ] AGE   [ ] DISABILITY   [ ] OTHER

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST (ADEA/EPA) | LATEST (ALL) |
| | 01-13-2006 |
| [ ] CONTINUING ACTION | |

**THE PARTICULARS ARE** *(If additional space is needed, attach extra sheet(s) )*

See Attachment.

RECEIVED EEOC

APR 0 5 2006

CHICAGO DISTRICT OFFICE

"OFFICIAL SEAL"
JACQUELINE H VILLANUEVA
NOTARY PUBLIC STATE OF ILLINOIS
COMMISSION EXPIRES 10/17/07

| [X] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone Number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (when necessary for State and Local Requirements) 4/5/ |
|---|---|
| | Jacquelin H Villanueva |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | DATE 4/5/6 |
| | x Juan Reyes |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year |

**EXHIBIT**

tabbies

**D**

Juan Reyes
Charge of Discrimination
Page 2

## ATTACHMENT

I.    I am a former employee of American Standard Circuits, Inc. My employment began on or around February 9, 1998 and ended on or around February 4, 2006. During the course of my employment, a class of similarly situated employees and I were sexually harassed by an American Standard Circuits, Inc. supervisor. I know this supervisor by the name "Ville."

II.    During my first week of employment, Ville groped and fondled me without my consent and tried to force himself on me. Ville continued to grope me and sexually harass me throughout the course of my employment. This sexual harassment occurred in the open and in front of other employees and supervisors.

III.    For example, on or around January 13, 2006, Ville came up behind me and began groping my genitals. My supervisor witnessed this incident occur, but he laughed and took no action to respond to it.

IV.    On or around January 25, 2006, I was informed that another American Standard Circuits, Inc. employee, Jose Luis Benitez, filed a police report against Ville because Ville had groped Benitez's genital area.

V.    On January 28, 2006, I filed a police report with the Franklin Park Police Department against Ville for battery.

VI.    On or around February 3, 2006, American Standard Circuits, Inc. terminated my employment. American Standard Circuits, Inc. attempted to get me to sign a document stating that I had quit my employment, but I refused to sign it.

VII.    I was unlawfully discharged in retaliation for opposing the sexual harassment I experienced while an employee at American Standard Circuits, Inc.

VIII.    A class of other similarly situated employees have been discriminated against because of their sex with respect to their terms and conditions of employment. This charge of discrimination is brought on behalf of a class of other similarly situated employees who likewise have been sexually harassed at American Standard Circuits, Inc.

RECEIVED EEOC

APR 0 5 2006

CHICAGO DISTRICT OFFICE

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy act statement before Completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| [X] FEPA | |
| [X] EEOC | 440-2006-03280 |

Illinois Department of Human Rights     and EEOC

_State or local Agency, if any_

**NAME** (Indicate Mr., Ms., Mrs.)
Jose Luis Benitez

**HOME TELEPHONE** (Include Area Code)
(847) 414-5180

**STREET ADDRESS**    **CITY, STATE AND ZIP CODE**
746 Spring Street, Aurora, IL 60505

**DATE OF BIRTH**
07-04-1970

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** (if more than one, list below.)

**NAME**
American Standard Circuit

**NUMBER OF EMPLOYEES, MEMBERS**
15+

**TELEPHONE** (Include Area Code)
(847) 455-1500

**STREET ADDRESS**    **CITY, STATE AND ZIP CODE**
3615 Wolf Rd., Franklin Park, IL 60131

**COUNTY**
Cook

**NAME**

**TELEPHONE** (Include Area Code)

**STREET ADDRESS**    **CITY, STATE AND ZIP CODE**

**COUNTY**

**CAUSE OF DISCRIMINATION BASED ON** (Check appropriate box (es))

[ ] RACE   [ ] COLOR   [X] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN

[X] RETALIATION   [ ] AGE   [ ] DISABILITY   [ ] OTHER

**DATE DISCRIMINATION TOOK PLACE**
EARLIEST (ADEA/EPA)   LATEST (ALL)
01-18-2006

[ ] CONTINUING ACTION

**THE PARTICULARS ARE** ( if additional space is needed, attach extra sheets )

See Attachment.

RECEIVED EEOC

APR 0 5 2006

CHICAGO DISTRICT OFFICE

"OFFICIAL SEAL"
JACQUELINE H VILLANUEVA
COMMISSION EXPIRES 10/17/07

[X] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone Number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

**NOTARY** - (when necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief

**SIGNATURE OF COMPLAINANT**

x _Jose L. Benitez_    4/5/6

**SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE** (Day, month, and year)

Jose Luis Benitez
Charge of Discrimination
Page 2

## ATTACHMENT

I.    I am a former employee of American Standard Circuits, Inc. My employment began on or around February 17, 2003 and ended on or around January 20, 2006. During the course of my employment, a class of similarly situated employees and I were sexually harassed by an American Standard Circuits, Inc. supervisor. I know this supervisor by the name "Ville."

II.    Throughout the course of my employment, Ville groped and fondled me without my consent and exposed himself to me. For example, on or around January 4, 2006, Ville approached me, dropped his pants, exposed himself to me, and asked me to have sex with him.

III.    I complained about the above incident to my manager, but he told me that he did not believe me.

IV.    On January 18, 2006, Ville approached me and fondled my genitals and pushed me into a wall. I responded by pushing Ville off of me.

V.    On January 20, 2006, American Standard Circuits, Inc. terminated my employment.

VI.    I was unlawfully discharged in retaliation for opposing the sexual harassment I experienced while an employee at American Standard Circuits, Inc.

VII.    On January 23, 2006, I filed a police report against Ville at the Franklin Park Police Department for battery. On January 28, 2006, another American Standard Circuits, Inc. employee, Juan Reyes, filed a police report against Ville because Ville had groped Reyes' genital area.

VIII.    A class of other similarly situated employees have been discriminated against because of their sex with respect to their terms and conditions of employment. This charge of discrimination is brought on behalf of a class of other similarly situated employees who likewise have been sexually harassed at American Standard Circuits, Inc.

RECEIVED EEOC

APR 0 5 2006

CHICAGO DISTRICT OFFICE

# ANDREWS KOEHLER & PASSARELLI, P.C.

**FILE COPY**

4343 Commerce Court, Suite 615, Lisle, Illinois 60532
(630) 505-9939T   (630) 505-9969 F
www.akplaw.com

May 2, 2006

**SENT VIA U.S. MAIL**

Shawn Hayes
Investigator
Equal Employment Opportunity Commission
Chicago District Office - 440
500 West Madison Street, Suite 2800
Chicago, Illinois 60661

Re:   **Complainant:**    **Juan Reyes**
      **Respondent:**     **American Standard Circuits, Inc.**
      **Charge No:**      **440-2006-03283**

Dear Mr. Hayes:

Please be advised that our firm represents the interests of Respondent, American Standard Circuits, Inc. in the above-referenced matter. Thus, the purpose of this letter is to provide to you a NOTICE OF APPEARANCE in this matter. Please forward any future correspondence pertaining to this charge to the attention of the undersigned.

I am currently in the process of preparing the statement of position in this matter and will forward it to your attention on or before the May 15, 2006 due date. In the meantime, should you have any questions or if you would like to discuss this matter further, please contact me.

Sincerely,

Renée L. Koehler
RLK/kae

cc:   American Standard Circuits, Inc.

**EXHIBIT**
**E**

# ANDREWS KOEHLER & PASSARELLI, P.C.

**FILE COPY**

4343 Commerce Court, Suite 615, Lisle, Illinois 60532
(630) 505-9939T · (630) 505-9969 F
www.akplaw.com

May 2, 2006

**SENT VIA U.S. MAIL**

Shawn Hayes
Investigator
Equal Employment Opportunity Commission
Chicago District Office - 440
500 West Madison Street, Suite 2800
Chicago, Illinois 60661

Re:    Complainant:     **Jose Luis Benitez**
       Respondent:      **American Standard Circuits, Inc.**
       Charge No:       **440-2006-03280**

Dear Mr. Hayes:

Please be advised that our firm represents the interests of Respondent, American Standard Circuits, Inc. in the above-referenced matter. Thus, the purpose of this letter is to provide to you a NOTICE OF APPEARANCE in this matter. Please forward any future correspondence pertaining to this charge to the attention of the undersigned.

I am currently in the process of preparing the statement of position in this matter and will forward it to your attention on or before the May 15, 2006 due date. In the meantime, should you have any questions or if you would like to discuss this matter further, please contact me.

Sincerely,

Renée L. Koehler
RLK/kae

cc:    American Standard Circuits, Inc.



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

500 West Madison Street, Suite 2800
Chicago, IL 60661
(312) 353-2713
TTY (312) 353-2421
FAX (312) 353-4041

EEOC Charge Number: 440-2006-03283

Mr. Juan Reyes                                                    Charging Party
3006 Rhodes Avenue
Melrose Park, Illinois 60164

vs.

American Standard Circuits, Inc.                                 Respondent
3615 Wolf Road
Franklin Park, Illinois 60131

## DETERMINATION

Under the authority vested in me by the Commission's Procedural Regulations, I issue the following determination on the merits of the subject charge filed under Title VII of the Civil Rights Act of 1964, as amended (Title VII).

The Respondent is an employer within the meaning of Title VII and all requirements for coverage have been met.

Charging Party alleged Respondent discriminated against him and a class of individuals, based on their sex, male, when it subjected them to sexual harassment, and discriminated against him based on retaliation when it discharged him, in violation of Title VII.

I have determined that the evidence obtained in the investigation establishes reasonable cause to believe that Respondent discriminated against a class of individuals, including Charging Party, based on their sex, male, and retaliation, when it subjected them to sexual harassment and/or discharge/constructive discharge.

This determination is final. When the Commission finds that violations have occurred, it attempts to eliminate unlawful practices by informal methods of conciliation. Therefore, I invite the parties to join with the Commission in reaching a just resolution of this matter. Disclosure of information obtained during the conciliation process will be made only in accordance with the Commission's Procedural Regulations (29 CFR Part 1601.26).

If the Respondent wishes to accept this invitation to participate in conciliation efforts, it may do so at this time by proposing terms for a conciliation agreement; that proposal should be provided to the Commission representative within 14 days of the date of determination. The remedies for violations of the statutes we enforce are designed to make the identified victims whole and to provide corrective and preventive relief. These remedies may include, as appropriate, an agreement by the Respondent not to engage in unlawful employment practices, placement of identified victims in positions they would have held but for discriminatory actions, back pay,

**EXHIBIT**
**F**

EEOC Charge No. 440-2006-03283
Page 2 of 2

restoration of lost benefits, injunctive relief, compensatory and/or punitive damages, and notice to employees of the violation and the resolution of the claim.

Should the Respondent have further questions regarding the conciliation process or the conciliation terms it would like to propose, we encourage it to contact the assigned Commission representative. Should there be no response from the Respondent within 14 days, we may conclude that further conciliation efforts would be futile or nonproductive.

On Behalf of the Commission,

_September 13 2007_
Date

_John P. Rowe_
John P. Rowe
District Director

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

500 West Madison Street, Suite 2800
Chicago, IL 60661
(312) 353-2713
TTY (312) 353-2421
FAX (312) 353-4041

EEOC Charge Number: 440-2006-03280

Mr. Jose Benitez
746 Spring Street
Aurora, Illinois 60505

Charging Party

vs.

American Standard Circuits, Inc.
3615 Wolf Road
Franklin Park, Illinois 60131

Respondent

## DETERMINATION

Under the authority vested in me by the Commission's Procedural Regulations, I issue the following determination on the merits of the subject charge filed under Title VII of the Civil Rights Act of 1964, as amended (Title VII).

The Respondent is an employer within the meaning of Title VII and all requirements for coverage have been met.

Charging Party alleged Respondent discriminated against him and a class of individuals, based on their sex, male, when it subjected them to sexual harassment, and discriminated against him based on retaliation when it discharged him, in violation of Title VII.

I have determined that the evidence obtained in the investigation establishes reasonable cause to believe that Respondent discriminated against a class of individuals, including Charging Party, based on their sex, male, and retaliation, when it subjected them to sexual harassment and/or discharge/constructive discharge.

This determination is final. When the Commission finds that violations have occurred, it attempts to eliminate unlawful practices by informal methods of conciliation. Therefore, I invite the parties to join with the Commission in reaching a just resolution of this matter. Disclosure of information obtained during the conciliation process will be made only in accordance with the Commission's Procedural Regulations (29 CFR Part 1601.26).

If the Respondent wishes to accept this invitation to participate in conciliation efforts, it may do so at this time by proposing terms for a conciliation agreement; that proposal should be provided to the Commission representative within 14 days of the date of determination. The remedies for violations of the statutes we enforce are designed to make the identified victims whole and to provide corrective and preventive relief. These remedies may include, as appropriate, an agreement by the Respondent not to engage in unlawful employment practices, placement of identified victims in positions they would have held but for discriminatory actions, back pay,

EEOC Charge No. 440-2006-03280
Page 2 of 2

restoration of lost benefits, injunctive relief, compensatory and/or punitive damages, and notice to employees of the violation and the resolution of the claim.

Should the Respondent have further questions regarding the conciliation process or the conciliation terms it would like to propose, we encourage it to contact the assigned Commission representative. Should there be no response from the Respondent within 14 days, we may conclude that further conciliation efforts would be futile or nonproductive.

On Behalf of the Commission,

_September 13, 2007_
Date

_John P. Rowe_
John P. Rowe
District Director

10/09/2005 12:03 FAX                                                                    ☒001

# ACORD® GENERAL LIABILITY NOTICE OF OCCURRENCE/CLAIM

|  | | DATE (MM/DD/YYYY) |
|---|---|---|
| | CSR EL | 10/05/2007 |

| AGENCY | PHONE (A/C, No, Ext) 847-741-1000 | NOTICE OF OCCURRENCE | DATE OF OCCURRENCE AND TIME | AM | DATE OF CLAIM | PREVIOUSLY REPORTED |
|---|---|---|---|---|---|---|
| Lundstrom Insurance 645 Tollgate Road Elgin IL 60123 Roger Lenart, CIC | | NOTICE OF CLAIM | 01/18/06 | PM | | YES   NO |

| | FAX (A/C-No): 847-741-1715 | EFFECTIVE DATE | EXPIRATION DATE | POLICY TYPE | | RETROACTIVE DATE |
|---|---|---|---|---|---|---|
| | E-MAIL ADDRESS: | 01/25/05 | 01/25/06 | ☒ OCCURRENCE | CLAIMS MADE | |

| CODE: 12141 | SUB CODE: | COMPANY | NAIC CODE: | MISCELLANEOUS INFO (Site & location code) |
|---|---|---|---|---|
| AGENCY CUSTOMER ID: AMEST-1 | | Cincinnati Insurance | | |

| | | POLICY NUMBER | REFERENCE NUMBER |
|---|---|---|---|
| | | CPP5531565AWR | |

## INSURED

| NAME AND ADDRESS | SOC SEC # OR FEIN: | CONTACT | | CONTACT INSURED | |
|---|---|---|---|---|---|
| American Standard Circuits Inc AMI Investment Partnership, 3615 Wolf Rd Franklin Park IL 60131 | | NAME AND ADDRESS Gordhan Patel | | | WHERE TO CONTACT At Office |

| E-MAIL ADDRESS: gordhan@asc-i.com | | E-MAIL ADDRESS: | | WHEN TO CONTACT |
|---|---|---|---|---|
| RESIDENCE PHONE (A/C, No) | BUSINESS PHONE (A/C, No, Ext) 847 455-1500 | RESIDENCE PHONE (A/C, No) | BUSINESS PHONE (A/C, No, Ext) 847 455-1500 | During |

## OCCURRENCE

| LOCATION OF OCCURRENCE (include city & state) | | AUTHORITY CONTACTED |
|---|---|---|
| DESCRIPTION OF OCCURRENCE (Use separate sheet, if necessary) | Sexual Harrassment | |

## POLICY INFORMATION

| COVERAGE PART OR FORMS (Insert form #s and edition dates) | | | | | | | |
|---|---|---|---|---|---|---|---|
| GENERAL AGGREGATE | PROD/COMP OP AGG | PERS & ADV INJ | EACH OCCURRENCE | FIRE DAMAGE | MEDICAL EXPENSE | DEDUCTIBLE | PD |
| 2,000,000 | 2,000,000 | 1,000,000 | 1,000,000 | 500,000 | 10,000 | 1000 | BI |

| UMBRELLA/ EXCESS | UMBRELLA | EXCESS | CARRIER: | | LIMITS: | AGGR | PER CLAIM/OCC | SIR/ DED |
|---|---|---|---|---|---|---|---|---|

## TYPE OF LIABILITY

| PREMISES: INSURED IS | | OWNER | TENANT | OTHER: | TYPE OF PREMISES |
|---|---|---|---|---|---|
| OWNER'S NAME & ADDRESS (if not insured) | | | | | |

| | | | | | OWNERS PHONE (A/C, No, Ext): |
|---|---|---|---|---|---|
| PRODUCTS: INSURED IS | | MANUFACTURER | VENDOR | OTHER: | TYPE OF PRODUCT |

| MANUFACTURER'S NAME & ADDRESS (if not insured) | | MANUFACT PHONE (A/C, No, Ext): |
|---|---|---|
| WHERE CAN PRODUCT BE SEEN? | | |
| OTHER LIABILITY IN- CLUDING COMPLETED OPERATIONS (Explain) | | |

## INJURED/PROPERTY DAMAGED

| NAME & ADDRESS (Injured/Owner) | Jose Benitz Juan Reyes | | | | PHONE (A/C, No, Ext) |
|---|---|---|---|---|---|
| AGE | SEX | OCCUPATION | EMPLOYER'S NAME & ADDRESS | | PHONE (A/C, No, Ext) |
| DESCRIBE INJURY | | | WHERE TAKEN | WHAT WAS INJURED DOING? | |
| FATALITY | | | | | |
| DESCRIBE PROPERTY (Type, model, etc) | | ESTIMATE AMOUNT | WHERE CAN PROPERTY BE SEEN? | | WHEN CAN PROPERTY BE SEEN? |

## WITNESSES

| | NAME & ADDRESS | | BUSINESS PHONE (A/C, No, Ext) |
|---|---|---|---|
| | | | |

REMARKS

| REPORTED BY Gordhan Patel | REPORTED TO Heather L. Friedel | SIGNATURE OF INSURED | SIGNATURE OF PRODUCER Roger Lenart, CIC |
|---|---|---|---|

ACORD 3 (2005/06)          NOTE: IMPORTANT STATE INFORMATION ON REVERSE SIDE          © ACORD CORPORATION 1986-2005

**EXHIBIT G**
tabbies®

# THE CINCINNATI INSURANCE COMPANY

P.O. BOX 145496, CINCINNATI, OHIO 45250-5496
(513) 870-2000

This is a true & certified copy of the
General Liability portion of policy.

*Matt Zimmerman*

Matt Zimmerman, Assistant Vice President

**5531565**

A Stock Insurance Company

Previous Policy No.

## COMMON POLICY DECLARATIONS

RENEWAL

| DECLARATIONS | POLICY NUMBER: CPP 553 15 65 AWR/CPA 553 15 65 AWR |
|---|---|

NAMED INSURED **AMERICAN STANDARD CIRCUITS INC**
**REFER TO IA905**
ADDRESS **3615 WOLF RD**
(Number & Street) **FRANKLIN PARK IL   60131-1425**
Town, County,
State & Zip No.)

**Policy Period:** At 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE

All coverages except Automobile and/or Garage
Policy number: **CPP 553 15 65 AWR**      FROM: **01-25-2005**   TO: **01-25-2006**
Automobile and/or Garage
Policy number: **CPA 553 15 65 AWR**      FROM: **01-25-2005**   TO: **01-25-2006**

Agency
City   **LUNDSTROM INSURANCE**                                                **12-141**

Legal Entity/Business Description
**CORPORATION**

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS
POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.
FORMS APPLICABLE TO ALL COVERAGE PARTS: (show numbers)

**REFER TO IA901**

SSQ      **05**
**03-02-2005**

Countersigned _____      By _____
                              (Date)                              (Authorized Representative)

IN WITNESS WHEREOF, this policy has been signed by our President and Secretary in the City of Fairfield,
Ohio, but this policy shall not be binding upon us unless countersigned by an authorized representative of
ours.  This provision does not apply in Arizona, Virginia and Wisconsin.

*Kenneth W. Stecher*

Secretary

*John Schiff Jr.*

President

COMPANY

**EXHIBIT**

**H**

CIN0001

*Litchfield Cavo, LLP*

8/21/08

IA 501 02 01

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination of Your Books and Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections and Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer of Your Rights and Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**CIN0002**

*Litchfield Cavo, LLP*    8/21/08

Copyright, Insurance Services Office, Inc., 1998

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NAMED INSURED SCHEDULE

AMERICAN STANDARD CIRCUITS INC

AMI INVESTMENT PARTNERSHIP

AMI PARTNERS LLC

AM-WAVE LLC

CIN0003

IA 905 01 92

*Litchfield Cavo, LLP*                    *8/21/08*

# SUMMARY OF PREMIUMS CHARGED

Attached to and forming part of
POLICY NUMBER: **CPP 553 15 65 AWR/CPA 553 15 65 AWR**    Effective Date: **01-25-2005**

Named Insured: **AMERICAN STANDARD CIRCUITS INC**

### THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE
### PARTS FOR WHICH A PREMIUM CHARGE IS INDICATED

| | |
|---|---|
| Commercial Property Coverage Part | $ **20,582** |
| Commercial General Liability Coverage Part | $ **19,300** |
| Commercial Crime Coverage Part | $ **100** |
| Commercial Auto Coverage Part | $ **16,661** |
| Commercial Umbrella / Excess Liability Coverage Part | $ |
| **ACCOUNTS RECEIVABLE** | $ **350** |
| **ELECTRONIC DATA PROCESSING** | $ **45** |
| **GENERAL FLOATER** | $ **184** |
| **TRANSPORTATION FLOATER** | $ **1,300** |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| Terrorism Coverage | $ **2,126** |
| Installment Charge | $ **20** |
| **ANNUAL TOTAL** | $ **60,668** |

## PAYMENTS

| | | First Installment | Remaining Installment(s) |
|---|---|---|---|
| ☐ | SEMI-ANNUAL | | |
| ☒ | QUARTERLY | **15,167** | **15,167** |

Automobile Coverages, Employers Liability, Employment Practices Liability Coverage, Professional Liability Coverage, Terrorism Coverage and / or Wrongful Acts Coverage, if included in the policy, are subject to Annual Adjustment of rates and premium on each anniversary of the policy.

Commercial Umbrella and Excess Liability, if included in the policy, may be subject to Annual Adjustment of premium on each anniversary. Refer to the Commercial Umbrella or Excess Liability Coverage Part Declarations form to see if this is applicable.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGEI    **CIN0004**

IA 102 A 02 03

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SCHEDULE OF LOCATIONS

| ITEM | STREET ADDRESS | CITY | STATE | ZIP CODE |
|------|----------------|------|-------|----------|
| 1 | 3615 WOLF ROAD FRANKLIN PARK, IL | | | 60131 |
| 2 | 475 INDUSTRIAL DR WEST CHICAGO, IL | | | 60131 |

IA 904 01 92

CIN0005

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SUPPLEMENTAL ENDORSEMENT

**FORMS AND/OR ENDORSEMENTS APPLICABLE TO ALL COVERAGE PARTS:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| IA905 | 01/92 | IA102A | 02/03✳ | IA904 | 01/92 | IA901 | 01/92✳ |
| IA4006 | 05/99 | CA1139 | 01/86 | IA4210IL | 09/02✳ | IA4236 | 11/02✳ |
| IA4238 | 02/03✳ | IL0118 | 06/97 | IL0284 | 05/90 | IP409IL | 01/91 |
| IP446 | 08/01✳ | IA4179 | 10/98✳ | IA4262IL | 02/03✳ | IA4239 | 02/03✳ |
| FM501 | 06/94 | GA501 | 10/01✳ | CA501 | 01/92 | AA501 | 03/03✳ |
| MA501 | 01/97 | MA524 | 01/93 | MA502 | 01/97 | MA523 | 01/97 |

**CIN0006**

IA901 01 92

# POLICYHOLDER NOTICE

**NO COVERAGE IS PROVIDED BY THIS POLICYHOLDER NOTICE NOR CAN IT BE CONSTRUED TO RE-PLACE ANY PROVISION OF YOUR POLICY. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE FOR COMPLETE INFORMATION ON THE COVERAGES YOU ARE PROVIDED. IF THERE IS ANY CONFLICT BETWEEN THE POLICY AND THIS NOTICE, THE PROVISIONS OF THE POL-ICY SHALL PREVAIL.**

The Inspections and Surveys condition in your policy has been expanded by addition of an explicit statement that certain of its provisions do not apply to certification of boilers, pressure vessels or elevators mandated by state or municipal statutes, ordinances or regulations. The provisions specified as inapplicable are those stipulating that:

- Inspections, surveys, reports or recommendations do not warrant that conditions are safe, healthful or in compliance with laws, regulations, codes or standards; and

- The insurer is not obligated to make inspections, surveys, reports or recommendations.

Contains copyrighted material of Insurance Services Office, Inc., with its permission. Copyright, Insurance Services Office, Inc., 1998

IA 4179 10 98

**CIN0007**

*Litchfield Cavo, LLP*          *8/21/08*

# IMPORTANT NOTICE

The address of the Complaint Department of The Cincinnati Insurance Company is P. O. Box 145496, Cincinnati, Ohio, 45250-5496.

The address of the Public Service Division of the Department of Insurance is 320 West Washington, Springfield, Illinois, 62767.

CA 1139 01 86

CIN0008

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CLAIMS MADE CONTRACTORS ERRORS AND OMISSIONS COVERAGE FORM
CLAIMS-MADE EXCESS LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL UMBRELLA LIABILITY COVERAGE PART
EMPLOYEE BENEFIT LIABILITY COVERAGE FORM
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART
EXCESS LIABILITY COVERAGE PART
HOLE-IN-ONE COVERAGE FORM
ILLINOIS CONTRACTORS' LIMITED WORKSITE POLLUTION LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS / COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART
PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE

**A.** **Cancellation** (Common Policy Conditions) is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this Coverage Part by mailing to us advance written notice of cancellation.

2. **a.** We may cancel this policy by mailing to you written notice stating the reason for cancellation.

   **b.** If we cancel for nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   **c.** If we cancel for a reason other than nonpayment of premium, we will mail the notice at least;

   **(1)** 30 days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

   **(2)** 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   **a.** Nonpayment of premium;

   **b.** The policy was obtained through a material misrepresentation;

   **c.** Any insured has violated any of the terms and conditions of the policy;

   **d.** The risk originally accepted has measurably increased;

   **e.** Certification to the Director of Insurance of the loss of reinsurance by

   the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

   **f.** A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled we will send the First Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be less than pro rata. The cancellation will be effective even if we have not offered a refund.

**B.** The following is added and supersedes any provision to the contrary:

**NONRENEWAL**

1. If we decide not to renew this policy, we will mail written notice stating the reason for nonrenewal no less than 60 days before the expiration date to:

   **a.** You; and

**CIN0009**

Includes copyrighted material of Insurance Services Office, Inc., with its permission. Copyright, Insurance Services Office, Inc., 1987

*Litchfield Cavo, LLP*                8/21/08

**b.** The broker, if known to us, or the agent of record.

**2.** Even if we do not comply with these terms, this policy will terminate:

    **a.** On the expiration date if:

        **(1)** You fail to perform any of your obligations in connection with the payment of the premium for the policy, or any installment payment, whether payable directly to us or our agents or indirectly under any premium finance plan or extension of credit; or

        **(2)** We have indicated our willingness to renew this policy to you or your representative; or

        **(3)** You have notified us or our agent that you do not want to renew this policy.

    **b.** On the effective date of any other insurance replacing this policy.

**C. Mailing of Notices**

We will mail cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

**CIN0010**

Includes copyrighted material of Insurance Services Office, Inc., with its permission. Copyright, Insurance Services Office, Inc., 1987

*Litchfield Cavo, LLP*    *8/21/08*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES

This endorsement modifies insurance provided under the following:

   BUSINESSOWNERS POLICY
   COMMERCIAL PROPERTY COVERAGE PART
   FARM COVERAGE PART
   STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to Standard Property Policy CP 00 99 or to the Businessowners' Policy, the terms Coverage Part and Coverage Form in this endorsement are replaced by the term Policy.

**B.** The following is added to the **Legal Action Against Us** Condition:

The 2 year period for legal action against us is extended by the number of days between the date the proof of loss is filed with us and the date we deny the claim in whole or in part.

**C.** If this policy covers:

   **1.** The following in **a.** and **b.**, then Paragraphs **2.** and **3.** apply:

   **a.** Real property used principally for residential purposes up to and including a four family dwelling; or

   **b.** Household or personal property that is usual or incidental to the occupancy of any premises used for residential purposes;

   **2.** The second paragraph of the **Appraisal** Condition is deleted and replaced by the following:

   **a.** Each party will pay its own appraiser and bear the other expenses of the appraisal and umpire equally, except as provided in **b.** below.

   **b.** We will pay your appraiser's fee and the umpire's appraisal fee, if the following conditions exist:

   **(1)** You demanded the appraisal; and

   **(2)** The full amount of loss, as set by your appraiser or by the umpire.

   **3.** The **Concealment, Misrepresentation or Fraud** Condition is replaced by the following:

**CONCEALMENT, MISREPRESENTATION OR FRAUD**

   **a.** This Coverage Part or Coverage Form is void if you or any insured ("insured") commit fraud or conceal or misrepresent a fact in the process leading to the issuance of this insurance, and such fraud, concealment or misrepresentation is stated in the policy or endorsement or in the written application for this policy and:

   **(1)** Was made with actual intent to deceive; or

   **(2)** Materially affected either our decision to provide this insurance or the hazard we assumed.

   However, this condition will not serve as a reason to void this Coverage Part or Coverage Form after the Coverage Part or Coverage Form has been in effect for one year or one policy term, whichever is less.

   **b.** This Coverage Part or Coverage Form is void if you or any other insured ("insured"), at any time subsequent to the issuance of this insurance, commit fraud or intentionally conceal or misrepresent a material fact relating to:

   **(1)** This Coverage Part or Coverage Form;

   **(2)** The Covered Property;

   **(3)** Your interest in the Covered Property; or

   **(4)** A claim under this Coverage Part or Coverage Form.

   **c.** Notwithstanding the limitations stated in 3.a. above, we may cancel the Coverage Part or Coverage Form in accordance with the terms of the Cancellation Condition.

Copyright, Insurance Services Office, Inc., 1996

**CIN0011**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

**BUSINESSOWNERS POLICY**
**COMMERCIAL PROPERTY COVERAGE PART**
**FARM COVERAGE PART**

A. The CANCELLATION Common Policy Condition is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. If this policy has been in effect for 60 days or less, except as provided in paragraphs 9 and 10 below, we may cancel this policy by mailing written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. If this policy has been in effect for more than 60 days, except as provided in paragraphs 9 and 10 below, we may cancel this policy only for one or more of the following reasons:

   a. Nonpayment of premium;

   b. The policy was obtained through a material misrepresentation;

   c. You have violated any of the terms and conditions of the policy;

   d. The risk originally accepted has measurably increased;

   e. Certification to the Director of Insurance of the loss of reinsurance by the insurer which provided coverage to us for all or a substantial part of the underlying risk insured; or

   f. A determination by the Director that the continuation of the policy could place us in violation of the insurance laws of this State.

   If we cancel this policy based on one or more of the above reasons except for nonpayment of premium, we will mail written notice at least 60 days before the effective date of cancellation. When cancellation is for nonpayment of premium, we will mail written notice at least 10 days before the effective date of cancellation.

4. We will mail our notice to you, any mortgagee or lienholder known to us and to the agent or broker, at the last addresses known to us.

5. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

6. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

7. Proof of mailing will be sufficient proof of notice.

8. Our notice of cancellation will state the reason for cancellation.

9. **REAL PROPERTY OTHER THAN RESIDENTIAL PROPERTIES OCCUPIED BY 4 FAMILIES OR LESS:**

   The following applies only if this policy covers real property other than residential property occupied by 4 families or less:

   If any one or more of the following conditions exists at any building that is Covered Property in this policy, we may cancel this policy by mailing to you written notice of cancellation at least 10 days before the effective date of cancellation:

   a. After a fire loss, permanent repairs to the building have not started within 60 days of satisfactory adjustment of loss, unless the delay is due to a labor dispute or weather conditions.

   b. The building has been unoccupied 60 or more consecutive days. This does not apply to:

      (1) Seasonal unoccupancy; or

      (2) Buildings under repair, construction or reconstruction, if properly secured against unauthorized entry.

   c. The building has:

      (1) An outstanding order to vacate;

      (2) An outstanding demolition order; or

      (3) Been declared unsafe in accordance with the law.

   d. Heat, water, sewer service or public lighting have not been connected to the building for 30 consecutive days or more.

10. **RESIDENTIAL PROPERTIES OCCUPIED BY 4 FAMILIES OR LESS:**

Copyright, Insurance Services Office, Inc., 1990
Copyright, ISO Commercial Risk Services, Inc., 1990

CIN0012

The following applies if this policy covers residential properties occupied by 4 families or less:

If this policy has been in effect for 60 days, or if this is a renewal policy, we may only cancel this policy for one or more of the following reasons:

a.  Nonpayment of premium;

b.  The policy was obtained by misrepresentation or fraud; or

c.  Any act that measurably increases the risk originally accepted.

The provisions of paragraphs 9 and 10 above do not apply to coverage under the Glass Coverage Form.

11. For insurance provided under the **COMMERCIAL PROPERTY COVERAGE PART**, the following applies: **GRAIN IN PUBLIC GRAIN WAREHOUSES**

(Not applicable to grain owned by the Commodity Credit Corporation)

The following applies only with respect to grain in public grain warehouses:

The first Named Insured or we may cancel this policy at any time by mailing to:

a.  The other; and

b.  The Director of the Illinois Department of Agriculture (at its Springfield Office);

60 days' written notice of cancellation.

B.  The following is added:

**NONRENEWAL**

1.  If we decide not to renew this policy, we will mail written notice stating the reason for nonrenewal to your last mailing address known to us at least 60 days before the expiration date of the policy. A copy of the notice will also be sent to:

a.  The broker, if known to us, or the agent of record; and

b.  The last known mortgagee or lienholder named in the policy at the last mailing address known to us.

This paragraph does not apply if we have manifested our willingness to renew directly to you.

2.  The following provision applies only if this policy covers residential properties occupied by 4 families or less:

If this policy has been issued to you and in effect with us for 5 or more years, we may not fail to renew this policy unless:

a.  The policy was obtained by misrepresentation or fraud;

b.  The risk originally accepted has measurably increased; or

c.  You received 60 days' notice of our intent not to renew as provided in 1. above.

The provisions of paragraph B.2. above do not apply to coverage under the Glass Coverage Form.

**CIN0013**

Copyright, Insurance Services Office, Inc., 1990
Copyright, ISO Commercial Risk Services, Inc., 1990

*Litchfield Cavo, LLP*      *8/21/08*

# IMPORTANT INFORMATION TO POLICYHOLDERS
## ILLINOIS

In the event you need to contact someone about this policy for any reason, please contact your agent. If you have additional questions, you may contact the insurance company issuing this policy at the following address or telephone collect:

The Cincinnati Insurance Company
P.O. Box 145496
Cincinnati, Ohio 45250-5496
Telephone (513) 870-2278

The Cincinnati Casualty Company
P.O. Box 145496
Cincinnati, Ohio 45250-5496
Telephone (513) 870-2278

The Cincinnati Indemnity Company
P.O. Box 145496
Cincinnati, Ohio 45250-5496
Telephone (513) 870-2278

IP 409IL (1/91)

**CIN0014**

*Litchfield Cavo, LLP*    *8/21/08*

# POLICYHOLDER NOTICE
# TERRORISM INSURANCE COVERAGE

## THIS POLICYHOLDER NOTICE DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

Your policy may contain coverage for certain losses caused by terrorism.

### Premium:

We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act of 2002.

- Refer to the SUMMARY OF PREMIUMS CHARGED or DECLARATIONS PAGE for the portion of your premium that is attributable to coverage for terrorist acts certified under the Act.

### Federal Participation:

The Act also requires us to provide disclosure of federal participation in payment of terrorism losses.

- Under your policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States Government, Department of Treasury, under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

### Act of Terrorism:

As defined in Section 102(1) of the Act, the term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**NOTE:**    **IF YOUR POLICY IS A RENEWAL POLICY, THIS NOTICE IS PROVIDED TO SATISFY THE REQUIREMENTS UNDER THE TERRORISM RISK INSURANCE ACT OF 2002 FOR POLICYHOLDER DISCLOSURE: (1) AT THE TIME OF OUR OFFER TO RENEW THE POLICY AND (2) AT THE TIME THE RENEWAL IS COMPLETED.**

IA 4236 11 02

CIN0015

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**All Commercial Lines Coverage Parts, Coverage Forms, Policies and Endorsements subject to the federal Terrorism Risk Insurance Act of 2002 and any amendments thereto**

**A.** The following definition is added with respect to the provisions of this endorsement:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 and any amendments thereto. The criteria contained in that Act for a "certified act of terrorism" include the following:

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** **Cap On Losses from Certified Acts of Terrorism**

With respect to any one or more "certified acts of terrorism" under the federal Terrorism Risk Insurance Act of 2002 and any amendments thereto, we will not pay any amounts for which we are not responsible under the terms of that Act (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

**C.** **Application of Other Exclusions**

The inapplicability, omission or absence of a terrorism exclusion does not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part, Coverage Form, Policy or endorsement such as losses excluded by:

1. Exclusions that address war, warlike action, insurrection, rebellion, revolution, military action, nuclear hazard, nuclear materials, nuclear reaction, radiation, or radioactive contamination; or

2. Any other exclusion,

regardless if the "certified act of terrorism" contributes concurrently or in any sequence to the loss.

**D.** **Sunset Clause**

If the federal Terrorism Risk Act of 2002 and any amendments thereto expires or is repealed, then this endorsement is null and void for any act of terrorism that takes place after the expiration or repeal of the Act.

Includes copyrighted material of ISO Properties, Inc. and American Association of Insurance Services, with their permission.

IA 4238 02 03

CIN0016

# THE CINCINNATI INSURANCE COMPANY
# THE CINCINNATI CASUALTY COMPANY
# THE CINCINNATI INDEMNITY COMPANY

## NOTICE TO POLICYHOLDERS

Please be advised that in your application for insurance you disclosed information to The Cincinnati Insurance Company, The Cincinnati Casualty Company and The Cincinnati Indemnity Company. The information disclosed in the application and all information subsequently collected by any of these companies may be shared among all three.

# NOTICE TO POLICY HOLDERS - WAR LIABILITY EXCLUSION Farm Liability, General Liability, Commercial Umbrella Liability, Professional Umbrella Liability and Excess Liability Coverage Parts

## RESTRICTIONS OF COVERAGE

This is a summary of the major changes found in the new Endorsements listed below applicable to your renewal policy. NO COVERAGE IS PROVIDED BY THIS SUMMARY. Nor can it be construed to replace any provision of your policy. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE CAREFULLY for complete information on the coverage that you are provided. If there is any conflict, between the policy and this summary, THE PROVISIONS OF THE POLICY SHALL PREVAIL.

**CG 00 62 12 02 WAR LIABILITY EXCLUSION** for the Commercial General Liability Coverage Part,

**CG 00 63 12 02 WAR LIABILITY EXCLUSION** for the Owners and Contractors Protective and Products / Completed Operations Liability Coverage Parts,

**CG 00 64 12 02 WAR LIABILITY EXCLUSION** for the Liquor Liability, Pollution Liability, Railroad Protective Liability Coverage Parts and Underground Storage Tank Policy,

**GA 391 07 03 WAR LIABILITY EXCLUSION** for the Employment Practice Liability Coverage Part,

**GA 392 07 03 WAR LIABILITY EXCLUSION** for the Contractor's Errors and Omissions Coverage Part,

**GA 393 IL 07 03 WAR LIABILITY EXCLUSION** for the Illinois Contractor's Limited Worksite Pollution Liability Coverage Parts,

**FL 10 20 12 02 WAR LIABILITY EXCLUSION** for Farm Liability Coverage and Personal Liability Endorsement,

**US 3053 02 03 WAR LIABILITY EXCLUSION** for Commercial, Professional and Professional Claims - Made Umbrella Coverage Parts, and

**XS 319 02 03 WAR LIABILITY EXCLUSION** for Excess Liability and Claims - Made Excess Liability Coverage parts.

All of these endorsements either replace a war exclusion that was restricted to contractually assumed liabilities or introduce a war exclusion to coverage parts that did not contain the limited contractual war exclusion.

When any of these endorsements are attached to your policy, a war exclusion is added to exclude injury or damage, however caused, arising, directly or indirectly, out of:

- War, including undeclared or civil war;

- Warlike action by a military force; or

- Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority in hindering or defending against any of these.

In addition in Form **CG 00 62 12 02** and **FL 10 20 12 02** the War exclusion is deleted from the Medical Payments Exclusions section. Medical Payments are now subject to an exclusion that applies all bodily injury exclusions, including this new War Liability Exclusion, to Medical Payments.

IA 4262 IL 02 03

**CIN0018**

Litchfield Cavo, LLP                    8/21/08

# POLICYHOLDER NOTICE
# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

## THIS POLICYHOLDER NOTICE DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

### Limitation on Payment of Terrorism Losses:

The provisions of the Terrorism Risk Insurance Act of 2002 limit the maximum payment of losses from certified acts of terrorism. That determination will be based on a formula set forth in the law involving the national total of federally insured terrorism losses in an annual period. If one or more certified acts of terrorism in an annual period causes the maximum payment of losses from certified acts of terrorism to be reached, and we have satisfied our required level of payments under the law, then we will not pay for the portion of such losses above that maximum. However, that is subject to possible change at that time, as Congress may, under the Act, determine that payments above the cap will be made.

IA 4239 02 03

CIN0019

Litchfield Cavo. LLP

# THE CINCINNATI INSURANCE COMPANY

A STOCK INSURANCE COMPANY

# COMMERCIAL GENERAL LIABILITY COVERAGE
# PART DECLARATIONS

Attached to and forming part of POLICY NUMBER: **CPP 553 15 65 AWR**   Effective Date: **01-25-2005**

Named Insured: **IS THE SAME AS IT APPEARS ON THE COMMON POLICY DECLARATION**

## LIMITS OF INSURANCE

| | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $ **1,000,000** | |
| GENERAL AGGREGATE LIMIT | $ **2,000,000** | |
| PRODUCTS-COMPLETED OPERATIONS AGGREGATE LIMIT | $ **2,000,000** | |
| PERSONAL & ADVERTISING INJURY LIMIT | $ **1,000,000** | ANY ONE PERSON OR ORGANIZATION |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT $100,000 limit unless otherwise indicated herein: | $ **REFER TO GA210** | ANY ONE PREMISES |
| MEDICAL EXPENSE LIMIT $5,000 limit unless otherwise indicated herein: | $ **REFER TO GA210** | ANY ONE PERSON |

| CLASSIFICATION | CODE NO. | PREMIUM BASE A - Area B - Payroll C - Gross Sales D - Units E - Other | RATE | | ADVANCE PREMIUM | |
|---|---|---|---|---|---|---|
| | | | Products / Completed Operations | All Other | Products / Completed Operations | All Other |
| BROADENED COVERAGE | 20291 | | | | | 125 |
| ELECTRONIC COMPONENTS MFG. | 52469 | C 13,500,000 | .834 | .458 | 11,259 | 6,183 |
| ELECTROPLATING | 52547 | C 1,500,000 | .251 | .735 | 377 | 1,103 |
| BI EXCEPTIONS TO POLLUTANT EXCLUSION | 20410 | | | | | 148 |
| ADDITIONAL INSURED | | | | | | 105 |

| | |
|---|---|
| The General Liability Coverage Part is subject to an annual minimum premium. | |
| TOTAL ANNUAL PREMIUM | $  **19,300** |

FORMS AND / OR ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| GA101 | 10/01* | GA4079 | 10/01* | GA4084 | 10/01* | CG0062 | 12/02* |
| GA478 | 10/01* | GA210 | 10/01* | GA4205IL | 10/01* | GA4153IL | 10/01* |

**CIN0020**

GA 501 10 01

*Litchfield Cavo, LLP*   *8/21/08*

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this Coverage Part restrict this insurance. Read the entire Coverage Part carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Part the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this Coverage Part. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II - WHO IS AN INSURED.**

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION V - DEFINITIONS**.

## SECTION I - COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

    **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        **(1)** The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE;** and

        **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY;** or medical expenses under **SECTION I - COVERAGES, COVERAGE C. MEDICAL PAYMENTS.**

        No other obligation or liability to pay sums or perform acts or services is covered unless expressly provided for under

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.

    **b.** This insurance applies to "bodily injury" and "property damage" only if:

        **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

        **(3)** Prior to the "coverage term" in which "bodily injury" or "property damage" occurs, you did not know, per Paragraph **1.d.** below, that the "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part.

    **c.** "Bodily injury" or "property damage" which:

        **(1)** Occurs during the "coverage term"; and

        **(2)** Was not, prior to the "coverage term", known by you, per Paragraph **1.d.** below, to have occurred;

    includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the "coverage term" in which it first became known by you.

    **d.** You will be deemed to know that "bodily injury" or "property damage" has occurred at the earliest time when any "authorized representative":

        **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

        **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage";

        **(3)** First observes, or reasonably should have first observed, the "bodily injury" or "property damage";

        **(4)** Becomes aware, or reasonably should have become aware, by any means other than as described in (3) above, that "bodily injury" or "property damage" had occurred or had begun to occur; or

        **(5)** Becomes aware, or reasonably should have become aware, of a

**CIN0021**

Litchfield Cavo, LLP     8/21/08

**GA 101 10 01**       Includes copyrighted material of Insurance Services Office, Inc., with its permission.       Page 1 of 22

condition from which "bodily injury" or "property damage" was substantially certain to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

### a. Expected or Intended Injury

"Bodily injury" or "property damage" which may reasonably be expected to result from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually expected or intended. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. When a claim for such "bodily injury" or "property damage" is made, we will defend that claim provided the insured has assumed the obligation to defend such claim in the "insured contract". Such defense payments will not reduce the limits of insurance.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation and Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured sustained in the "workplace";

(2) An "employee" of the insured arising out of the performance of duties related to the conduct of the insured's business; or

(3) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraphs (1) or (2) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

### f. Pollutant

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or emission of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, Paragraph (a) does not apply to:

1) "Bodily injury" to any person injured while on any premises, site or location owned or occupied by, or rented or loaned to, you provided:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

CIN0022

*field Corn, LLP*

*8/21/08*

**a)** The injury is caused by the inadequate ventilation of vapors;

**b)** The person injured is first exposed to such vapors during the policy period; and

**c)** Within 30 days of such first exposure, the person injured is clinically diagnosed or treated by a physician for the medical condition caused by the exposure to such vapors. However, Paragraph **c)** does not apply if the "bodily injury" is caused by vapors from equipment used to heat the building.

This exception **1)** shall apply only to Named Insureds; we shall have no duty to defend or pay damages for any person or organization that is not a Named Insured. However, this paragraph does not apply if the "bodily injury" is caused by vapors from equipment used to heat the building.

For the purpose of the exception granted in Paragraph **1)** only, vapors means any gaseous or airborne irritant or airborne contaminant, other than asbestos, which is discharged, dispersed, or released or escapes from materials, machinery or equipment used in the service or maintenance of the premises. Vapors does not mean any gaseous or airborne irritants or contaminants used in a manufacturing process or which is the product or by-product of any manufacturing process;

**2)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor, and the owner or lessee of such premises, site or location has been added to this Coverage Part as an additional insured with respect to your ongo-

ing operations or "your work" performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**3)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b).** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**1)** Any insured; or

**2)** Any person or organization for whom you may be legally responsible;

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, Paragraph **(d)** does not apply to:

**1)** "Bodily injury" or "property damage" arising out of the discharge, dispersal, seepage, migration, release, escape or emission of fuels, lubricants or other operating fluids, or exhaust gases, which are needed to perform, or are the result of, the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids, or exhaust gases, escape, seep, migrate, or are discharged, dispersed, released or

CIN0023

Litchfield Cavo, LLP          8/21/08

GA 101 10 01          Includes copyrighted material of Insurance Services Office, Inc., with its permission.          Page 3 of 22

emitted from a vehicle part designed to hold, store or receive them. This exception does not apply if the fuels, lubricants or other operating fluids, or exhaust gases, are discharged, dispersed, released or emitted with the intent to cause "bodily injury" or "property damage" or with the knowledge that "bodily injury" or "property damage" is substantially certain to occur, or if such fuels, lubricants or other operating fluids, or exhaust gases, are brought on or to the premises, site or location with such intent to be discharged, dispersed, released, or emitted as part of the operations being performed by such insured, contractor or subcontractor;

2) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

3) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, Paragraphs (2)(a) and (b) do not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. **Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 51 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

CIN0024

8/21/08

Jackfield Conn, LLP

f.(2) or f.(3) of the definition of "mobile equipment".

**h.  Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1)  The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2)  The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i.  War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j.  Damage to Property**

"Property damage" to:

(1)  Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2)  Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3)  Property loaned to you;

(4)  Personal property in the care, custody or control of an insured;

(5)  That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6)  That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire or explosion)

to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days, for which the amount we will pay is limited to the Damage To Premises Rented To You Limit as described in SECTION III - LIMITS OF INSURANCE.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k.  Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.  Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.  Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1)  A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2)  A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.  Recall of Products, Work or Impaired Property**

Any liability or damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

CIN0025

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o.  Personal and Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p.  Asbestos**

"Bodily injury" or "property damage" arising out of, attributable to, or any way related to asbestos in any form or transmitted in any manner.

**q.  Employment-Related Practices**

"Bodily injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Other employment-related practices, policies, acts or omissions including but not limited to coercion, criticism, demotion, evaluation, failure to promote, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b) or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**r.  Additional Insured Prior Knowledge**

An additional insured added by attachment of an endorsement to this Coverage Part that is seeking coverage for a claim or "suit", if that additional insured knew, per the following paragraph, that "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part, prior to the "coverage term" in which such "bodily injury" or "property damage" occurs or begins to occur.

An additional insured added by attachment of an endorsement to this Coverage Part will be deemed to have known that "bodily injury" or "property damage" has occurred or has begun to occur at the earliest time when that additional insured, or any one of its owners, members, partners, managers, executive officers, "employees" assigned to manage that additional insured's insurance program, or "employees" assigned to give or receive notice of an "occurrence", "personal and advertising injury" offense, claim or "suit":

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage";

(3) First observes, or reasonably should have first observed, the "bodily injury" or "property damage";

(4) Becomes aware, or reasonably should have become aware, by any means other than as described in (3) above, that "bodily injury" or "property damage" had occurred or had begun to occur; or

(5) Becomes aware, or reasonably should have become aware, of a condition from which "bodily injury" or "property damage" was substantially certain to occur.

Exclusions c. through q. do not apply to "property damage" by fire or explosion to premises while rented to you or temporarily occupied by you with permission of the owner, for which the amount we will pay is limited as described in **SECTION III - LIMITS OF INSURANCE.**

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.  Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

CIN0026

will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

    (1)  The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE**; and

    (2)  Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**; or medical expenses under **SECTION I - COVERAGES, COVERAGE C. MEDICAL PAYMENTS**.

No other obligation or liability to pay sums or perform acts or services is covered unless expressly provided for under **SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**.

**b.**  This insurance applies to "personal and advertising injury" only if:

    (1)  The "personal and advertising injury" is caused by an offense arising out of your business; and

    (2)  The "personal and advertising injury" offense was committed in the "coverage territory" during the policy period; and

    (3)  Prior to the "coverage term" in which the "personal and advertising injury" offense is committed, you did not know, per Paragraph **1.d.** below, that the offense had been committed or had begun to be committed, in whole or in part.

**c.**  "Personal and advertising injury" caused by an offense which:

    (1)  Was committed during the "coverage term"; and

    (2)  Was not, prior to the "coverage term", known by you, per Paragraph **1.d.** below, to have been committed; includes any continuation, change or resumption of that offense after the end of the "coverage term" in which it first became known by you.

**d.**  You will be deemed to know that a "personal and advertising injury" offense has been committed at the earliest time when any "authorized representative":

    (1)  Reports all, or any part, of the "personal and advertising injury" to us or any other insurer;

    (2)  Receives a written or verbal demand or claim for damages because of the "personal and advertising injury";

    (3)  First observes, or reasonably should have first observed, the offense that caused the "personal and advertising injury";

    (4)  Becomes aware, or reasonably should have become aware, by any means, other than as described in (3) above, that the offense had been committed or had begun to be committed; or

    (5)  Becomes aware, or reasonably should have become aware, of a condition from which "personal and advertising injury" was substantially certain to occur.

**2.**  **Exclusions**

This insurance does not apply to:

  **a.**  **Knowing Violation of Rights of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

  **b.**  **Material Published With Knowledge of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

  **c.**  **Material Published Prior to Coverage Term**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the "coverage term" in which insurance coverage is sought.

  **d.**  **Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

  **e.**  **Contractual Liability**

"Personal and advertising injury" for which the insured is obligated to pay

**CIN0027**

Litchfield Cavo, LLP    8/21/08

damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "personal and advertising injury" is caused by or arises out of an offense committed subsequent to the execution of the contract or agreement. When a claim for such "personal and advertising injury" is made, we will defend that claim, provided the insured has assumed the obligation to defend such claim in the "insured contract". Such defense payments will not reduce the limits of insurance.

**f. Breach of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality or Performance of Goods - Failure to Conform to Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement of Copyright, Patent, Trademark or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds in Media and Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web-sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **17. a., b.** and **c.** of "personal and advertising injury" under **SECTION V - DEFINITIONS**.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet is not, by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board any insured hosts, owns, or over which any insured exercises control.

**l. Unauthorized Use of Another's Name or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Employment Related Practices**

"Personal and advertising injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Other employment-related practices, policies, acts or omissions including but not limited to coercion, criticism, demotion, evaluation, failure to promote, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

**CIN0028**

Litchfield Cavo, LLP          8/21/08

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**n.** **Pollutant**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or emission of "pollutants" at any time.

**o.** **Pollutant-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**p.** **Asbestos**

"Personal and advertising injury" arising out of, attributable to, or any way related to asbestos in any form or transmitted in any manner.

**q.** **Additional Insured Prior Knowledge**

An additional insured added by attachment of an endorsement to this Coverage Part that is seeking coverage for a claim or "suit", if that additional insured knew, per the following paragraph, that a "personal and advertising injury" offense had been committed or had begun to be committed, in whole or in part, prior to the "coverage term" in which such offense was committed or began to be committed.

An additional insured added by attachment of an endorsement to this Coverage Part will be deemed to have known that a "personal and advertising injury" offense has been committed or has begun to be committed at the earliest time when that additional insured, or any one of its owners, members, partners, managers, executive officers, "employees" assigned to manage that additional insured's insur-

ance program, or "employees" assigned to give or receive notice of an "occurrence", "personal and advertising injury" offense, claim or "suit":

**(1)** Reports all, or any part, of the "personal and advertising injury" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "personal and advertising injury";

**(3)** First observes, or reasonably should have first observed, the offense that caused the "personal and advertising injury";

**(4)** Becomes aware, or reasonably should have become aware, by any means other than as described in (3) above, that the "personal and advertising injury" offense had been committed or had begun to be committed; or

**(5)** Becomes aware, or reasonably should have become aware, of a condition from which "personal and advertising injury" was substantially certain to occur.

**COVERAGE C. MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(1)** The accident takes place in the "coverage territory" and during the policy period;

**(2)** The expenses are incurred and reported to us within three years of the date of the accident; and

**(3)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**CIN0029**

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

## 2. Exclusions

We will not pay expenses for "bodily injury":

### a. Any Insured

To any insured, except "volunteer workers".

### b. Hired Person

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

### c. Injury on Normally Occupied Premises

To a person injured on that part of premises you own or rent that the person normally occupies.

### d. Workers' Compensation and Similar Laws

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

### e. Athletic Activities

To any person while officiating, coaching, practicing for or participating in any contest or exhibition of an athletic or sports nature sponsored by an insured.

### f. Products-Completed Operations Hazard

Included within the "products-completed operations hazard".

### g. Coverage A Exclusions

Excluded under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY.**

### h. War

Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

1. All expenses we incur.

2. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

3. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

5. All costs taxed against the insured in the "suit".

6. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**CIN0030**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

(1) "Bodily injury" or "personal and advertising injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by; or

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Insurance under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

CIN0031

Litchfield Cavo, LLP        8/21/08

GA 101 10 01

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 11 of 22

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. a. The General Aggregate Limit is the most we will pay for the sum of:

   (1) Medical expenses under COVERAGE C. MEDICAL PAYMENTS;

   (2) Damages under COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   (3) Damages under COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY.

   This General Aggregate Limit will not apply if either the Location General Aggregate Limit of Insurance, Paragraph 2.b., or the Construction Project General Aggregate Limit of Insurance, Paragraph 2.c. applies.

   b. A separate Location General Aggregate Limit of Insurance, equal to the amount of the General Aggregate Limit shown in the Declarations, shall apply to each location owned by, or rented or leased to you and is the most we will pay for the sum of:

   (1) Damages under COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   (2) Medical expenses under COVERAGE C. MEDICAL PAYMENTS,

   which can be attributed to operations at only a single location owned by, or rented or leased to you.

   c. A separate Construction Project General Aggregate Limit of Insurance, equal to the amount of the General Aggregate

Limit shown in the Declarations, shall apply to each construction project and is the most we will pay for the sum of:

   (1) Damages under COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   (2) Medical expenses under COVERAGE C. MEDICAL PAYMENTS;

   which can be attributed only to ongoing operations and only at a single construction project.

   d. Only for the purpose of determining which General Aggregate Limit of Insurance, 2.a., 2.b., or 2.c., applies:

   (1) Location means premises involving the same or connecting lots, or premises, whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

   (2) Construction project means a location you do not own, rent or lease where ongoing improvements, alterations, installation, demolition or maintenance work is performed by you or on your behalf. All connected ongoing improvements, alterations, installation, demolition or maintenance work performed by you or on your behalf at the same location for the same persons or organizations, no matter how often or under how many different contracts, will be deemed to be a single construction project.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to 2.a. above, the Personal and Advertising Injury Limit is the most we will pay under COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

CIN0032

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

*Litchfield Cavo, LLP*    8/21/08

a. Damages under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**; and

b. Medical expenses under **COVERAGE C. MEDICAL PAYMENTS**;

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to 5. above, the Damage to Premises Rented to You Limit is the most we will pay under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire or explosion, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under **COVERAGE C. MEDICAL PAYMENTS** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each "coverage term".

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

### 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

### 2. Duties in the Event of Occurrence, Offense, Claim or Suit

a. You must see to it that we are notified as soon as practicable of an "occurrence" or a "personal and advertising injury" offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

### 4. Liberalization

If, within 45 days prior to the beginning of this Coverage Part or during the policy period, we make any changes to any forms or endorsements of this Coverage Part for which there is currently no separate premium charge, and that change provides more coverage than this Coverage Part, the change will be considered as included until the end of the current policy period. We will make no additional premium charge for this additional coverage during the interim.

### 5. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover

**CIN0033**

*Yield Cave, LLP*     8/21/08

under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** or **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** of this Coverage Part, our obligations are limited as follows:

**a.    Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b.    Excess Insurance**

This insurance is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

    (a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar insurance for "your work";

    (b) That is Fire or Explosion insurance for premises rented to you or temporarily occupied by you with permission of the owner;

    (c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

    (d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions, g. Aircraft, Auto or Watercraft.**

(2) Any other primary insurance available to the insured covering liability for damages arising out of the premises or operations for which the insured has been added as an additional insured by attachment of an endorsement.

(3) Any other insurance:

    (a) Whether primary, excess, contingent or on any other basis, except when such insurance is written specifically to be excess over this insurance; and

    (b) That is a consolidated (wrap-up) insurance program which has been provided by the prime contractor/project manager or owner of the consolidated project in which you are involved.

When this insurance is excess, we will have no duty under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** or **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c.    Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**6.    Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we

**CIN0034**

will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the "coverage term" is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**7. Representations**

By accepting this Coverage Part, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this Coverage Part in reliance upon your representations.

**8. Separation of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**9. Transfer of Rights of Recovery Against Others to Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**10. Two or More Coverage Forms or Policies Issued by Us**

If this Coverage Part and any other Coverage Form, Coverage Part or policy issued to you by us or any company affiliated with us apply to the same "occurrence" or "personal and advertising injury" offense, the aggregate maximum limit of insurance under all the Coverage Forms, Coverage Parts or policies shall not exceed the highest applicable limit of insurance under any one Coverage Form, Coverage Part or policy. This condition does not apply to any Coverage Form, Coverage Part or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Part.

**11. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V - DEFINITIONS**

1. "Advertisement" means a notice that is broadcast, telecast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. "Advertisement" includes a publicity article. For purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an "advertisement".

2. "Authorized representative" means:

**a.** If you are designated in the Declarations as:

**(1)** An individual, you and your spouse are "authorized representatives".

**(2)** A partnership or joint venture, your members, your partners, and their spouses are "authorized representatives".

**(3)** A limited liability company, your members and your managers are "authorized representatives".

**(4)** An organization other than a partnership, joint venture or limited liability company, your "executive officers" and directors are "authorized representatives". Provided you are not a publicly traded organization, your stockholders are also, "authorized representatives".

**(5)** A trust, your trustees are "authorized representatives".

**b.** Your "employees":

**(1)** Assigned to manage your insurance program; or

**(2)** Responsible for giving or receiving notice of an "occurrence", "personal and advertising injury" offense, claim or "suit";

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

CIN0035

Lindfeld Cross, LLP

are also "authorized representatives".

3. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

4. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

5. "Coverage term" means the following individual increment, or if a multi-year policy period, increments, of time, which comprise the policy period of this Coverage Part:

   a. The year commencing on the Effective Date of this Coverage Part at 12:01 AM standard time at your mailing address shown in the Declarations, and if a multi-year policy period, each consecutive annual period thereafter, or portion thereof if any period is for a period of less than 12 months, constitute individual "coverage terms". The last "coverage term" ends at 12:00 AM standard time at your mailing address shown in the Declarations on the earlier of:

      (1) The day the policy period shown in the Declarations ends; or

      (2) The day the policy to which this Coverage Part is attached is terminated or cancelled.

   b. However, if after the issuance of this Coverage Part, any "coverage term" is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding "coverage term".

6. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in a. above;

      (2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the

Internet or similar electronic means of communication,

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement to which we agree.

7. "Electronic data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

8. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

9. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

10. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

11. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

    a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    b. You have failed to fulfill the terms of a contract or agreement;

    if such property can be restored to use by:

    a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

    b. Your fulfilling the terms of the contract or agreement.

12. "Insured contract" means:

    a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for "property damage" by fire or explosion to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

    b. A sidetrack agreement;

    c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

CIN0036

*Litchfield Cavo, LLP*

8/21/08

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal and advertising injury" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury", "property damage" or "personal and advertising injury" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph (2) above and supervisory, inspection, architectural or engineering activities.

(4) That indemnifies an advertising, public relations or media consulting firm for "personal and advertising injury" arising out of the planning, execution or failure to execute marketing communications programs. Marketing communications programs include but are not limited to comprehensive marketing campaigns; consumer, trade and corporate advertising for all media; media planning, buying, monitoring and analysis; direct mail; promotion; sales materials; design; presentations; point-of-sale; materials; market research; public relations and new product development;

(5) Under which the insured, if an advertising, public relations or media consulting firm, assumes liability for "personal and advertising injury" arising out of the insured's rendering or failure to render professional services, including those services listed in Paragraph (4), above;

(6) That indemnifies a web-site designer or content provider, or Internet search, access, content or service provider for injury or damage arising out of the planning, execution or failure to execute Internet services. Internet Services include but are not limited to design, production, distribution, maintenance and administration of web-sites and web-banners; hosting web-sites; registering domain names; registering with search engines; marketing analysis; and providing access to the Internet or other similar networks; or

(7) Under which the insured, if a web-site designer or content provider, or Internet search, access, content or service provider, assumes liability for injury or damage arising out of the insured's rendering or failure to render Internet services, including those listed in Paragraph (6), above.

13. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" includes supervisors furnished to you by the labor leasing firm. "Leased worker" does not include a "temporary worker".

14. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that

**CIN0037**

Litchfield Cavo, LLP                    8/21/08

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

is not attached to the aircraft, watercraft or "auto".

15. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) Power cranes, shovels, loaders, diggers or drills; or

      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

      (1) Equipment designed primarily for:

         (a) Snow removal;

         (b) Road maintenance, but not construction or resurfacing; or

         (c) Street cleaning;

      (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

      (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

16. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

17. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

18. "Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment regardless of whether the injury or damage is caused directly or indirectly by the "pollutants" and whether:

   a. The insured is regularly or otherwise engaged in activities which taint or degrade the environment; or

   b. The insured uses, generates or produces the "pollutant".

19. "Products-completed operations hazard":

   a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

      (1) Products that are still in your physical possession; or

CIN0038

881/028

*Litefield Gern, LLP*

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

  **(a)** When all of the work called for in your contract has been completed; or

  **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or

  **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

  Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

  **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

  **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

  **(3)** Products or operations for which the classification, listed in the Declarations or in a schedule, states that products-completed operations are included.

**20.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, "electronic data" is not tangible property.

**21.** "Suit" means a civil proceeding in which money damages because of "bodily injury",

"property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent;

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent; or

**c.** An appeal of a civil proceeding.

**22.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**23.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**24.** "Workplace" means that place and during such hours to which the "employee" sustaining "bodily injury" was assigned by you, or any other person or entity acting on your behalf, to work on the date of "occurrence".

**25.** "Your product":

**a.** Means:

  **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    **(a)** You;

    **(b)** Others trading under your name; or

    **(c)** A person or organization whose business or assets you have acquired; and

  **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

  **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

  **(2)** The providing of or failure to provide warnings or instructions.

**CIN0039**

Litchfield Cavo, LLP          8/21/08

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

26. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.

CIN0040

*Litchfield Cavo, LLP*      *8/21/08*

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

GA 101 10 01      Page 20 of 22

# NUCLEAR ENERGY LIABILITY EXCLUSION
## (Broad Form)

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an insured under this Coverage Part is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this Coverage Part not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured, or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by

an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this exclusion:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

   "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

   "Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

   "Nuclear facility" means:

   A. Any "nuclear reactor";

   B. Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

   C. Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

CIN0041

Litchfield Cavo, LLP          8/21/08

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

D.  Any structure, basin, excavation, prem-
ises or place prepared or used for the
storage or disposal of "waste";

and includes the site on which any of the
foregoing is located, all operations conducted
on such site and all premises used for such
operations.

"Nuclear reactor" means any apparatus de-
signed or used to sustain nuclear fission in a
self-supporting chain reaction or to contain a
critical mass of fissionable material.

"Property damage" includes all forms of ra-
dioactive contamination of property.

CIN0042

Litchfield Cavo, LLP          8/21/08

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

1.  Designation of Premises (Part Leased to You):

    **3615 WOLF ROAD
    FRANKLIN PARK IL   60131**

2.  Name of Person or Organization (Additional Insured):

    **HARRIS BANK ROSELLE
    2401 W SCHAUMBURG RD
    SCHAUMBURG IL   60194-3888**

**SECTION II - WHO IS AN INSURED** is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

1.  Any "occurrence" which takes place after you cease to be a tenant in that premises.

2.  Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the Schedule.

3.  "Bodily injury", "property damage" or "personal and advertising injury" arising out of the sole negligence or willful misconduct of the additional insured or its "employees".

**CIN0043**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.          *Litchfield Cavo, LLP*          *8/21/08*

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

Name of Person or Organization:

```
ILLINOIS SMALL BUSINESS GROUP
CORP CDC 05-270
511 W CAPITAL STE 102
SPRINGFIELD IL  62704-1989
```

A. **SECTION II - WHO IS AN INSURED** is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of your operations or premises owned by or rented to you.

B. The following exclusion is added to **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions** and **SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY, 2. Exclusions:**

The insurance provided to the additional insured does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the sole negligence or willful misconduct of, or for defects in design furnished by, the additional insured or its "employees".

C. **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 5. Other Insurance** is amended to include:

Any insurance provided by this endorsement shall be primary to other insurance available to the additional insured except:

a. As otherwise provided in **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 5. Other Insurance;** or

b. For any other valid and collectible insurance available to the additional insured as an additional insured by attachment of an endorsement to another insurance policy that is written on an excess basis. In such case, the coverage provided under this endorsement shall also be excess.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

CIN0044

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

**Name of Person or Organization:**

```
U S SMALL BUSINESS ADMINISTRATION
500 W MADISON ST
CHICAGO IL  60661-2511
```

**A.** **SECTION II - WHO IS AN INSURED** is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of your operations or premises owned by or rented to you.

**B.** The following exclusion is added to **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions** and **SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY, 2. Exclusions:**

The insurance provided to the additional insured does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the sole negligence or willful misconduct of, or for defects in design furnished by, the additional insured or its "employees".

**C.** **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 5. Other Insurance** is amended to include:

Any insurance provided by this endorsement shall be primary to other insurance available to the additional insured except:

**a.** As otherwise provided in **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 5. Other Insurance**; or

**b.** For any other valid and collectible insurance available to the additional insured as an additional insured by attachment of an endorsement to another insurance policy that is written on an excess basis. In such case, the coverage provided under this endorsement shall also be excess.

Includes copyrighted material of Insurance
Services Office, Inc., with its permission.

**CIN0045**

*Litchfield Cavo, LLP*                    8/21/08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WAR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**A.** Exclusion **i.** under Paragraph **2., Exclusions of Section I - Coverage A - Bodily Injury and Property Damage Liability** is replaced by the following:

 **2.** **Exclusions**

 This insurance does not apply to:

 **i.** **War**

 "Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

 **(1)** War, including undeclared or civil war; or

 **(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

 **(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**B.** The following exclusion is added to Paragraph **2., Exclusions of Section I - Coverage B - Personal and Advertising Injury Liability**:

 **2.** **Exclusions**

 This insurance does not apply to:

 **WAR**

 "Personal and advertising injury", however caused, arising, directly or indirectly, out of:

 **a.** War, including undeclared or civil war; or

 **b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

 **c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**C.** Exclusion **h.** under Paragraph **2., Exclusions of Section I - Coverage C - Medical Payments** does not apply.  Medical payments due to war are now subject to Exclusion **g.** of Paragraph **2., Exclusions** of **Section I - Coverage C - Medical Payments** since "bodily injury" arising out of war is now excluded under Coverage **A.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BODILY INJURY EXCEPTIONS TO POLLUTANT EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

For purposes of insurance provided by this endorsement:

**1. Sudden and Accidental Exception**

Exclusion **f. Pollutant, (1)(a)** and **(1)(d)** of **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** do not apply to "bodily injury" provided:

**a.** The "release" of "pollutants" from which the "bodily injury" arises is "sudden" and "accidental"; and

**b.** The injured person's first exposure to such "pollutants" occurred during the policy period; and

**c.** The injured person is clinically diagnosed or treated by a physician for the "bodily injury" caused by exposure to such "pollutants" within one (1) year of such first exposure.

**2. Amendment to On Premises Exception**

The on premises exception to the Pollutant Exclusion, **f.(1)(a)1) c)** of **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, is deleted in its entirety and replaced by the following:

**c)** Within one year of such first exposure, the person injured is clinically diagnosed or treated by a physician for the medical condition caused by the exposure to such vapors. However, Paragraph c) does not apply if the "bodily injury" is caused by vapors from equipment used to heat the building.

**3. Off Premises Exception**

Exclusion **f. Pollutant (1)(d)** of **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** does not apply to "bodily injury" that is caused by "gaseous or airborne pollutants" provided:

**a.** The injured person's first exposure to "gaseous or airborne pollutants" occurred during the policy period; and

**b.** The injured person is clinically diagnosed or treated by a physician for the "bodily injury" caused by the exposure to "gaseous or airborne pollutants" within one (1) year of such first exposure.

**4. Amended Who Is An Insured**

As respects Paragraphs **1.** and **3.** of this endorsement, the **Sudden and Accidental Exception** and the **Off Premises Exception, SECTION II - WHO IS AN INSURED** is deleted in its entirety and replaced by the following:

The coverage afforded shall apply only to Named Insureds. We shall have no duty to defend or pay damages for any person or organization that is not a Named Insured.

**5. SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS 5. Other Insurance b. Excess Insurance** is amended to include the following:

The insurance provided by Paragraphs **1. Sudden and Accidental Exception** and **3. Off Premises Exception**, of this endorsement is excess over any other valid and collectible insurance, whether primary, excess, contingent or on any other basis, except insurance written specifically to cover as excess over the limits of insurance that apply in this endorsement.

**6. SECTION V - DEFINITIONS** is amended to add the following:

**1.** "Accidental" means unintended and unexpected.

**2.** "Gaseous or airborne pollutants" means "pollutants" which:

**(a)** Are a gas, smoke, fume, vapor or other similar airborne substance; and

**(b)** Are the result of the "release" of such "pollutants" from materials, machinery or equipment brought on or to the "work site" by any Named Insured or any "employees", contractors or subcontractors working directly or indirectly on any Named Insured's behalf.

"Gaseous or airborne pollutants" does not include asbestos or lead.

**3.** "Release" means actual discharge, dispersal, seepage, migration, release, escape or emission.

**CIN0047**

4.  "Sudden" means abrupt, immediate and brief as well as unexpected and without prior notice. "Sudden" has a temporal element which requires that the "release" of "pollutants" begins and ends within a brief period of time. A "release" of a "pollutant" which results from a series of ongoing events which constitute a course of conduct or course of business is not "sudden".

5.  "Work site" means any premises, site or location while a Named Insured or a Named Insured's "employees", contractors or subcontractors are performing operations directly or indirectly on the Named Insured's behalf, provided the premises, site or location is not owned or occupied by or rented or loaned to a Named Insured.

**CIN0048**

*Litchfield Cavo, LLP*    *8/21/08*

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES - KNOWN INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Paragraph **d.** of **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 1. Insuring Agreement** is deleted in its entirety and replaced by the following:

**d.** You will be deemed to know that "bodily injury" or "property damage" has occurred at the earliest time when any "authorized representative":

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage";

(3) First observes the "bodily injury" or "property damage";

(4) Becomes aware by any means other than as described in (3) above, that "bodily injury" or "property damage" had occurred or had begun to occur; or

(5) Becomes aware of a condition from which "bodily injury" or "property damage" was substantially certain to occur.

**B.** **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions, r. Additional Insured Prior Knowledge** is deleted in its entirety and replaced by the following:

**r.** **Additional Insured Prior Knowledge**

An additional insured added by attachment of an endorsement to this Coverage Part that is seeking coverage for a claim or "suit", if that additional insured knew, per the following paragraph, that "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part, prior to the "coverage term" in which such "bodily injury" or "property damage" occurs or begins to occur.

An additional insured added by attachment of an endorsement to this Coverage Part will be deemed to have known that "bodily injury" or "property damage" has occurred or has begun to occur at the earliest time that additional insured, or any one of its owners, members, part-

ners, managers, executive officers, "employees" assigned to manage that additional insured's insurance program, or "employees" assigned to give or receive notice of an "occurrence", "personal and advertising injury" offense, claim or "suit":

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage";

(3) First observes the "bodily injury" or "property damage";

(4) Becomes aware by any means other than as described in (3) above, that "bodily injury" or "property damage" had occurred or had begun to occur; or

(5) Becomes aware of a condition from which "bodily injury" or "property damage" was substantially certain to occur.

**C.** **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY, 1. Insuring Agreement** is deleted in its entirety and replaced by the following:

**1.** **Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE;** and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments and settlements under **SECTION I -**

**CIN0049**

*Litchfield Cavo, LLP*          *8/21/08*

COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY; or medical expenses under SECTION I - COVERAGES, COVERAGE C. MEDICAL PAYMENTS.

No other obligation or liability to pay sums or perform acts or services is covered unless expressly provided for under **SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.**

b.  This insurance applies to "personal and advertising injury" only if:

(1)  The "personal and advertising injury" is caused by an offense arising out of your business; and

(2)  The "personal and advertising injury" offense was committed in the "coverage territory" during the policy period.

D.  COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY, 2. Exclusions, q. **Additional Insured Prior Knowledge** is deleted in its entirety.

CIN0050

*Litchfield Cavo, LLP*                    *8/21/08*

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

GA 4205 IL 10 01                                        Page 2 of 2

08CV4817
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE NOLAN    BR

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMMERCIAL GENERAL LIABILITY BROADENED ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**A.** **Endorsement - Table of Contents:**

| Coverage: | Begins on Page: |
|---|---|
| **1.** Employee Benefit Liability Coverage | 2 |
| **2.** Unintentional Failure to Disclose Hazards | 7 |
| **3.** Damage to Premises Rented to You | 7 |
| **4.** Supplementary Payments | 9 |
| **5.** Medical Payments | 9 |
| **6.** 180 Day Coverage for Newly Formed or Acquired Organizations | 9 |
| **7.** Waiver of Subrogation | 9 |
| **8.** Automatic Additional Insured - Specified Relationships: | 9 |
| • Managers or Lessors of Premises; | |
| • Lessor of Leased Equipment; | |
| • Vendors; and | |
| • State or Political Subdivisions - Permits Relating to Premises | |
| **9.** Property Damage to Borrowed Equipment | 12 |
| **10.** Employees as Insureds - Specified Health Care Services: | 12 |
| • Nurses; | |
| • Emergency Medical Technicians; and | |
| • Paramedics | |
| **11.** Broadened Notice of Occurrence | 12 |

**B.** **Limits of Insurance:**

The Commercial General Liability Limits of Insurance apply to the insurance provided by this endorsement, except as provided below:

**1.** **Employee Benefit Liability Coverage**

| | |
|---|---|
| Each Employee Limit: | $ 1,000,000 |
| Aggregate Limit: | $ 3,000,000 |
| Deductible: | $ 1,000 |

**3.** **Damage to Premises Rented to You**

The lesser of:

**a.** The Each Occurrence Limit shown in the Declarations; or

**b.** $500,000

**4.** **Supplementary Payments**

| | | |
|---|---|---|
| **a.** | Bail bonds: | $ 1,000 |
| **b.** | Loss of earnings: | $ 350 |

**5.** **Medical Payments**

| | |
|---|---|
| Medical Expense Limit: | $ 10,000 |

**9.** **Property Damage to Borrowed Equipment**

| | |
|---|---|
| Each Occurrence Limit: | $ 10,000 |
| Deductible: | $ 250 |

CIN0051

Litchfield Cavo, LLP                    8/21/08

C.  Coverages

1.  Employee Benefit Liability Coverage

   a.  The following is added to **SECTION I - COVERAGES: Employee Benefit Liability Coverage.**

   (1)  **Insuring Agreement**

      (a)  We will pay those sums that the insured becomes legally obligated to pay as damages caused by any act, error or omission of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any claim or "suit" that may result. But:

      1)  The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE;** and

      2)  Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

      (b)  This insurance applies to damages only if the act, error or omission, is negligently committed in the "administration" of your "employee benefit program"; and

      1)  Occurs during the policy period; or

      2)  Occurred prior to the effective date of this endorsement provided:

      a)  You did not have knowledge of a claim or "suit" on or before the effective date of this endorsement.

         You will be deemed to have knowledge of a claim or "suit" when any "authorized representative";

      i)  Reports all, or any part, of the act, error or omission to us or any other insurer;

      ii)  Receives a written or verbal demand or claim for damages because of the act, error or omission; and

      b)  There is no other applicable insurance.

   (2)  **Exclusions**

      This insurance does not apply to:

      (a)  **Bodily Injury, Property Damage or Personal and Advertising Injury**

         "Bodily injury", "property damage" or "personal and advertising injury".

      (b)  **Dishonest, Fraudulent, Criminal or Malicious Act**

         Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act or omission, committed by any insured, including the willful or reckless violation of any statute.

      (c)  **Failure to Perform a Contract**

         Damages arising out of failure of performance of contract by any insurer.

      (d)  **Insufficiency of Funds**

         Damages arising out of an insufficiency of funds to meet any obligations under

**CIN0052**

any plan included in the "employee benefit program".

**(e) Inadequacy of Performance of Investment / Advice Given With Respect to Participation**

Any claim based upon:

**1)** Failure of any investment to perform;

**2)** Errors in providing information on past performance of investment vehicles; or

**3)** Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

**(f) Workers' Compensation and Similar Laws**

Any claim arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

**(g) ERISA**

Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

**(h) Available Benefits**

Any claim for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

**(i) Taxes, Fines or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

**(j) Employment-Related Practices**

Any liability arising out of any:

**(1)** Refusal to employ;

**(2)** Termination of employment;

**(3)** Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, acts or omissions; or

**(4)** Consequential liability as a result of (1), (2) or (3) above.

This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

**(3) Supplementary Payments**

SECTION I - COVERAGES, SUPPLEMENTARY PAYMENTS - COVERAGES A AND B also apply to this Coverage.

**b. Who is an Insured**

As respects Employee Benefit Liability Coverage, SECTION II - WHO IS AN INSURED is deleted in its entirety and replaced by the following:

**(1)** If you are designated in the Declarations as:

**(a)** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**(b)** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds but only with respect to the conduct of your business.

**(c)** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business.

Your managers are insureds, but only with respect to their duties as your managers.

**(d)** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**(e)** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**(2)** Each of the following is also an insured:

**(a)** Each of your "employees" who is or was authorized to administer your "employee benefit program".

**(b)** Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

**(c)** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**(3)** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization. However, coverage under this provision:

**(a)** Is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

**(b)** Does not apply to any act, error or omission that was committed before you ac-

quired or formed the organization.

**c.** Limits of Insurance

As respects Employee Benefit Liability Coverage, **SECTION III - LIMITS OF INSURANCE** is deleted in its entirety and replaced by the following:

**(1)** The Limits of Insurance shown in Section **B. Limits of Insurance, 1. Employee Benefit Liability Coverage** and the rules below fix the most we will pay regardless of the number of:

**(a)** Insureds;

**(b)** Claims made or "suits" brought;

**(c)** Persons or organizations making claims or bringing "suits";

**(d)** Acts, errors or omissions; or

**(e)** Benefits included in your "employee benefit program".

**(2)** The Aggregate Limit shown in Section **B. Limits of Insurance, 1. Employee Benefit Liability Coverage** of this endorsement is the most we will pay for all damages because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

**(3)** Subject to the limit described in **(2)** above, the Each Employee Limit shown in Section **B. Limits of Insurance, 1. Employee Benefit Liability Coverage** of this endorsement is the most we will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

**(a)** An act, error or omission; or

**(b)** A series of related acts, errors or omissions, regardless of the amount of time that lapses between such acts, errors or omissions,

negligently committed in the "administration" of your "employee benefit program".

However, the amount paid under this endorsement shall not exceed, and will be subject to the limits and restrictions that apply to the payment of benefits in any

plan included in the "employee benefit program".

**(4) Deductible Amount**

    **(a)** Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in the Declarations as applicable to Each Employee. The limits of insurance shall not be reduced by the amount of this deductible.

    **(b)** The deductible amount stated in the Declarations applies to all damages sustained by any one "employee", including such employee's dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

    **(c)** The terms of this insurance, including those with respect to:

        **1)** Our right and duty to defend the insured against any "suits" seeking those damages; and

        **2)** Your duties; and the duties of any other involved insured, in the event of an act, error or omission, or claim;

apply irrespective of the application of the deductible amount.

    **(d)** We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

**d.** **Additional Conditions**

As respects **Employee Benefit Liability Coverage, SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** is amended as follows:

**(1)** Item **2. Duties in the Event of Occurrence, Offense, Claim or**

Suit is deleted in its entirety and replaced by the following:

**2. Duties in the Event of an Act, Error or Omission, or Claim or Suit**

  **a.** You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a claim. To the extent possible, notice should include:

    **(1)** What the act, error or omission was and when it occurred; and

    **(2)** The names and addresses of anyone who may suffer damages as a result of the act, error or omission;

  **b.** If a claim is made or "suit" is brought against any insured, you must:

    **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

    **(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

  **c.** You and any other involved insured must:

    **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

    **(2)** Authorize us to obtain records and other information;

    **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

    **(4)** Assist us, upon our request, in the

CIN0055

Litchfield Cavo, LLP

enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

(2) Item 5. **Other Insurance** is deleted in its entirety and replaced by the following:

5. **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when **c.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **b.** below.

b. **Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method,

each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

c. **No Coverage**

This insurance shall not cover any loss for which the insured is entitled to recovery under any other insurance in force previous to the effective date of this Coverage Part.

e. **Additional Definitions**

As respects **Employee Benefit Liability Coverage, SECTION V - DEFINITIONS** is amended as follows:

(1) The following definitions are added:

1. "Administration" means:

a. Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs";

b. Interpreting the "employee benefit programs";

c. Handling records in connection with the "employee benefit programs"; or

d. Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

However, "administration" does not include:

a. Handling payroll deductions; or

b. The failure to effect or maintain any insurance or adequate limits of coverage of insurance, including but not limited to unemployment insurance, social security benefits, workers' compensation and disability benefits.

2. "Cafeteria plans" means plans authorized by applicable law to allow "employees" to elect to pay for certain benefits with pre-tax dollars.

3. "Employee benefit programs" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

a. Group life insurance; group accident or health insurance; dental, vision and hearing plans; and flexible spending accounts; provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

b. Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

c. Unemployment insurance, social security benefits, workers' compensation and disability benefits; and

d. Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies.

(2) The following definitions are deleted in their entirety and replaced by the following:

21. "Suit" means a civil proceeding in which money damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent;

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent; or

c. An appeal of a civil proceeding.

8. "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired, "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

2. **Unintentional Failure to Disclose Hazards**

SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 7. Representations is hereby amended by the addition of the following:

Based on our dependence upon your representations as to existing hazards, if unintentionally you should fail to disclose all such hazards at the inception date of your policy, we will not reject coverage under this Coverage Part based solely on such failure.

3. **Damage to Premises Rented to You**

a. The last Subparagraph of SECTION I COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions is hereby deleted and replaced by the following:

Exclusions c. through q. do not apply to damage by fire, explosion, lightning, smoke or soot to premises while rented to you or temporarily occupied by you with permission of the owner.

b. The insurance provided under SECTION I - COVERAGES, COVERAGE

**A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** applies to "property damage" arising out of water damage to premises that are both rented to and occupied by you.

(1) As respects Water Damage Legal Liability, as provided in Paragraph 3. **b.** above:

The exclusions under **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions,** other than **i. War** and the **Nuclear Energy Liability Exclusion,** are deleted and the following are added:

This insurance does not apply to:

(a) "Property damage":

1) Assumed in any contract; or

2) Loss caused by or resulting from any of the following:

   a) Wear and tear;

   b) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

   c) Smog;

   d) Mechanical breakdown including rupture or bursting caused by centrifugal force;

   e) Settling, cracking, shrinking or expansion; or

   f) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

(b) Loss caused directly or indirectly by any of the following:

1) Earthquake, volcanic eruption, landslide or any other earth movement;

2) Water that backs up or overflows from a sewer, drain or sump;

3) Water under the ground surface pressing on, or flowing or seeping through:

   a) Foundations, walls, floors or paved surfaces;

   b) Basements, whether paved or not; or

   c) Doors, windows or other openings.

(c) Loss caused by or resulting from water that leaks or flows from plumbing, heating, air conditioning, or fire protection systems caused by or resulting from freezing, unless:

1) You did your best to maintain heat in the building or structure; or

2) You drained the equipment and shut off the water supply if the heat was not maintained.

(d) Loss to or damage to:

1) Plumbing, heating, air conditioning, fire protection systems, or other equipment or appliances; or

2) The interior of any building or structure, or to personal property in the building or structure caused by or resulting from rain, snow, sleet or ice, whether driven by wind or not.

**c. Limit of Insurance**

The Damage to Premises Rented to You Limit as shown in the Declarations is amended as follows:

(2) Paragraph 6. of **SECTION III - LIMITS OF INSURANCE** is hereby deleted and replaced by the following:

6. Subject to 5. above, the Damage to Premises Rented to You Limit is the

Litchfield Cavo  LLP                    8/21/08

most we will pay under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** for damages because of "property damage" to premises while rented to you or temporarily occupied by you with permission of the owner, arising out of any one "occurrence" to which this insurance applies.

**(3)** The amount we will pay is limited as described in Section **B. Limits of Insurance, 3. Damage to Premises Rented to You** of this endorsement.

**4.** **Supplementary Payments**

Under **SECTION I - COVERAGE, SUPPLEMENTARY PAYMENTS - COVERAGES A AND B:**

**a.** Paragraph 2. is replaced by the following:

Up to the limit shown in Section **B. Limits of Insurance, 4. a.** Bail Bonds of this endorsement for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**b.** Paragraph 4. is replaced by the following:

All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to the limit shown in Section **B. Limits of Insurance, 4. b.** Loss of Earnings of this endorsement per day because of time off from work.

**5.** **Medical Payments**

The Medical Expense Limit of Any One Person as stated in the Declarations is amended to the limit shown in Section **B. Limits of Insurance, 5. Medical Payment** of this endorsement.

**6.** **180 Day Coverage for Newly Formed or Acquired Organizations**

**SECTION II - WHO IS AN INSURED** is amended as follows:

Subparagraph **a.** of Paragraph **4.** is hereby deleted and replaced by the following:

**a.** Insurance under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**7.** **Waiver of Subrogation**

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 9. Transfer of Rights of Recovery Against Others to Us** is hereby amended by the addition of the following:

We waive any right of recovery we may have because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a written contract requiring such waiver with that person or organization and included in the "products-completed operations hazard". However, our rights may only be waived prior to the "occurrence" giving rise to the injury or damage for which we make payment under this Coverage Part. The insured must do nothing after a loss to impair our rights. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce those rights.

**8.** **Automatic Additional Insured - Specified Relationships**

**a.** The following is hereby added to **SECTION II - WHO IS AN INSURED:**

**(1)** Any person or organization described in Paragraph 8.a.(2) below (hereinafter referred to as additional insured) whom you are required to add as an additional insured under this Coverage Part by reason of:

**(a)** A written contract or agreement; or

**(b)** An oral agreement or contract where a certificate of insurance showing that person or organization as an additional insured has been issued,

is an insured, provided:

**(a)** The written or oral contract or agreement is:

**1)** Currently in effect or becomes effective during the policy period; and

**2)** Executed prior to an "occurrence" or offense to which this insurance would apply; and

Litchfield Corp LLP

(b) They are not specifically named as an additional insured under any other provision of, or endorsement added to, this Coverage Part.

(2) Only the following persons or organizations are additional insureds under this endorsement, and insurance coverage provided to such additional insureds is limited as provided herein:

(a) The manager or lessor of a premises leased to you with whom you have agreed per Paragraph 8.a.(1) above to provide insurance, but only with respect to liability arising out of the ownership, maintenance or use of that part of a premises leased to you, subject to the following additional exclusions:

This insurance does not apply to:

1) Any "occurrence" which takes place after you cease to be a tenant in that premises.

2) Structural alterations, new construction or demolition operations performed by or on behalf of such additional insured.

(b) Any person or organization from which you lease equipment with whom you have agreed per Paragraph 8.a.(1) above to provide insurance. Such person(s) or organization(s) are insureds solely with respect to their liability arising out of the maintenance, operation or use by you of equipment leased to you by such person(s) or organization(s). However, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

(c) Any person or organization (referred to below as vendor) with whom you have agreed per Paragraph 8.a.(1) above to provide insurance, but only with respect to "bodily injury" or "property damage" arising

out of "your products" which are distributed or sold in the regular course of the vendor's business, subject to the following additional exclusions:

1) The insurance afforded the vendor does not apply to:

a) "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

b) Any express warranty unauthorized by you;

c) Any physical or chemical change in the product made intentionally by the vendor;

d) Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

e) Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

f) Demonstration, installation, servicing or repair opera-

Litchfield Cavo, LLP    8/21/08

tions, except such operations performed at the vendor's premises in connection with the sale of the product;

g) Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing, or substance by or for the vendor.

2) This insurance does not apply to any insured person or organization:

a) From whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products; or

b) When liability included within the "products-completed operations hazard" has been excluded under this Coverage Part with respect to such products.

(d) Any state or political subdivision with which you have agreed per Paragraph 8.a.(1) above to provide insurance, subject to the following additional provision:

This insurance applies only with respect to the following hazards for which the state or political subdivision has issued a permit in connection with premises you own, rent or control and to which this insurance applies:

1) The existence, maintenance, repair, construction, erection, or removal of advertising signs, awnings, canopies, cellar entrances, coal holes, driveways, manholes, marquees, hoist away openings,

sidewalk vaults, street banners, or decorations and similar exposures; or

2) The construction, erection, or removal of elevators; or

3) The ownership, maintenance, or use of any elevators covered by this insurance.

(3) Any insurance provided to an additional insured designated under Paragraph 8.a.(2). Sub-Paragraphs (a), (b) and (d) does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the sole negligence or willful misconduct of the additional insured or their agents, "employees" or any other representative of the additional insured.

b. SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS is hereby amended as follows:

Condition 5. Other Insurance is amended to include:

(1) Where required by a written contract or agreement, this insurance is primary and / or non-contributory as respects any other insurance policy issued to the additional insured, and such other insurance policy shall be excess and / or noncontributing, whichever applies, with this insurance.

(2) Any insurance provided by this endorsement shall be primary to other insurance available to the additional insured except:

(a) As otherwise provided in SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 5. Other Insurance, b. Excess Insurance; or

(b) For any other valid and collectible insurance available to the additional insured as an additional insured by attachment of an endorsement to another insurance policy that is written on an excess basis. In such case, the coverage provided under this endorsement shall also be excess.

9. **Property Damage to Borrowed Equipment**

   a. The following is hereby added to Exclusion **j. Damage to Property** of Paragraph 2., **Exclusions of SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY.**

   Paragraphs (3) and (4) of this exclusion do not apply to tools or equipment loaned to you, provided they are not being used to perform operations at the time of loss.

   b. With respect to the insurance provided by this section of the endorsement, the following additional provisions apply:

     (1) The Limits of Insurance shown in the Declarations are replaced by the limits designated in Section **B. Limits of Insurance, 9. Property Damage to Borrowed Equipment** of this endorsement with respect to coverage provided by this endorsement. These limits are inclusive of and not in addition to the limits being replaced. The Limits of Insurance shown in Section B. **Limits of Insurance, 9. Property Damage to Borrowed Equipment** of this endorsement fix the most we will pay in any one "occurrence" regardless of the number of:

       (a) Insureds;

       (b) Claims made or "suits" brought; or

       (c) Persons or organizations making claims or bring "suits".

     (2) **Deductible Clause**

       (a) Our obligation to pay damages on your behalf applies only to the amount of damages for each "occurrence" which are in excess of the deductible amount stated in Section **B. Limits of Insurance, 9. Property Damage to Borrowed Equipment** of this endorsement. The limits of insurance will not be reduced by the application of such deductible amount.

       (b) SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, **2. Duties in the Event of Occurrence, Offence, Claim or Suit,** applies to each claim or "suit" irrespective of the amount.

       (c) We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

10. **Employees as Insureds - Specified Health Care Services**

   It is hereby agreed that Paragraph 2.a.(1)(d) of SECTION II - WHO IS AN INSURED, does not apply to your "employees" who provide professional health care services on your behalf as duly licensed:

   a. Nurses;

   b. Emergency Medical Technicians; or

   c. Paramedics,

   in the jurisdiction where an "occurrence" or offense to which this insurance applies takes place.

11. **Broadened Notice of Occurrence**

   Paragraph **a.** of SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, **2. Duties in the Event of Occurrence, Offence, Claim or Suit** is hereby deleted and replaced by the following:

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

     (1) How, when and where the "occurrence" or offense took place;

     (2) The names and addresses of any injured persons and witnesses; and

     (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   This requirement applies only when the "occurrence" or offense is known to an "authorized representative".

*Litchfield Cavo, LLP*                 8/21/08

# 2001 NOTICE TO POLICY HOLDERS
# COMMERCIAL GENERAL LIABILITY
# COVERAGE FORM AND ENDORSEMENTS

## BROADENING, RESTRICTIONS AND CLARIFICATIONS OF COVERAGE

This is a summary of the major changes found in this rewrite of the Commercial General Liability Coverage Form and Endorsements. NO COVERAGE IS PROVIDED BY THIS SUMMARY. Nor can it be construed to replace any provision of your policy. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE CAREFULLY for complete information on the coverage that you are provided. If there is any conflict, between the policy and this summary, THE PROVISIONS OF THE POLICY SHALL PREVAIL.

## GENERAL CHANGES TO FORMS - GA 101 10 01 Commercial General Liability Coverage Form

### PERSONAL AND ADVERTISING INJURY

The definitions of "Personal Injury" and "Advertising Injury" have been combined into one definition, "Personal and Advertising Injury". This change is being listed separately because the changes result in broadening in coverage in certain respects and may, in certain states, result in a restriction of coverage in other respects.

As a whole the revision is at least equal to, if not broader than, that which the current coverage provides. Endorsements which make only this and editorial changes are not mentioned in this Notice.

The changes being made to Coverage B, Personal and Advertising Injury are closely related to changes for Internet exposures, which directly follow this section.

Coverage for trade dress is now included. The definition of personal and advertising injury no longer refers to style of doing business or title. To provide further clarity a definition of "advertisement" is introduced.

Willful violation of a penal statute is replaced with a criminal act exclusion that will grant coverage for vicarious liability to other insureds who had no knowledge of a criminal act.

The addition of an intentional injury exclusion, or knowingly violating the rights of others, clarifies that the Personal and Advertising Injury coverage as a general principle of insurance requires fortuity for coverage to apply.

An explicit exclusion of the infringement of the intellectual property rights of copyright, patent, trademark or trade secret, with an exception of some limited offenses in an "advertisement", is introduced.

Coverage B. Personal and Advertising Injury Liability has been broadened to include consequential bodily injury. Coverage A. Bodily Injury and Property Damage Liability has been reduced by adding a corresponding exclusion of coverage. Overall no change in coverage results.

### INTERNET LIABILITY

Internet Liability is listed separately as some of the changes being made broaden coverage but in some states may result in a decrease in coverage in some respects.

The definition of "Personal and advertising injury" is amended to refer to "oral or written publication, in any manner" with regard to slander, libel and privacy rights.

The definition of "coverage territory" is expanded to include for personal and advertising injury offenses occurring on the Internet or other electronic means of communication. Suits must be filed in the territory otherwise described.

The exclusion for insureds under Coverage B. Personal and Advertising Injury Liability, who are in the business of providing media for others, is clarified to include media used on the internet and Internet based businesses providing search, access, content or service.

Separate exclusions are introduced for electronic chatroom or bulletin board operation and unauthorized use of another's name or product on the internet

The references to various advertising activities have been clarified with the addition of the defined term "advertisement". A statement was included in the definition specifying that the definition applies to advertising material only, when other material, as well as advertising, is put forth on a web-site.

Most states have not ruled on whether electronic data is tangible property. Some have ruled it is not. The property damage definition is clarified to specifically exclude electronic data and a corresponding definition of electronic data in introduced.

# BROADENINGS OF COVERAGE - GA 101 10 01 Commercial General Liability Coverage Form

Section II - Who Is An Insured is broadened to include trusts as Named Insureds when designated in the policy Declarations.

Section II - Who Is An Insured is broadened to automatically include "volunteer workers" as insureds, but only while performing duties related to the conduct of the insured's business.

Corresponding to this change, endorsements adding volunteers as insureds are modified to delete that particular reference.

Coverage C - Medical Payments is amended to not exclude "volunteer workers" from medical payments to be consistent with other endorsements which included Medical Payments for volunteers.

A definition of "volunteer workers" is introduced.

The Pollutant exclusion of Coverage A. Bodily Injury and Property Damage Liability is amended in format and broadened in several ways. The various endorsements that refer back to or copy this language are also amended to correspond to these changes and are not enumerated here.

The cause of polluting is clarified to include emission.

The definitions of "hostile fire" and "pollutant" which were part of the exclusion are moved to the Definitions section. The "pollutant" definition itself is clarified.

An exception for the operating fluids and exhaust gases of mobile equipment is introduced, unless the intent is to cause harm or the fluid or gas is intended to be released as a part of some operation.

An On Premises Exception to the Pollutant exclusion is broadened by deleting the 30 day notice requirement.

Contractors as Named Insureds are excepted from the exclusion for operations or "your work" when they have added the owner of a job site or premises as an additional insured.

An exception to the Pollutant exclusion from materials brought into a building in connection with construction operations is introduced.

The exclusion for remediation is clarified to also apply to statutory or regulatory requirements. An exception to the exclusion for remediation for clean up from property damage which is otherwise covered is introduced.

Several revisions have been made to provide additional coverage for damage to premises rented or loaned to the named insured on a short-term basis (7 days).

A liberalization clause is added to this form. The Coverage Part will be amended to include any changes to forms or endorsements of this Coverage Part which provide more coverage, if there is no separate premium charged for the form or endorsement, until renewal of the policy.

Coverage for Personal and Advertising Injury arising out of an Insured Contract is added.

# BROADENING OF COVERAGE - MULTISTATE ENDORSEMENTS

### GA 355 10 01 Total Pollution Exclusion With A Hostile Fire Exception

The endorsement is amended to correspond with the many changes in the regular pollutant exclusion. It deletes all exceptions, including the exceptions mentioned above, except for the "hostile fire" exception, and utilizes the new definitions of "pollutants" and "hostile fire".

### GA 241 10 01 Druggist - Broadened Coverage

This endorsement is introduced for use in states that permit broader pharmacist's duties and responsibilities.

### CG 22 96 10 01 Limited Exclusion - Personal And Advertising Injury Lawyers

Provides coverage for lawyers when they perform activities that fall outside of a lawyer's professional services.

# CLARIFICATIONS IN COVERAGE - GA 101 10 01 Commercial General Liability Coverage Form

The Pollutant exclusion clarifies that with respect to third-party property damage claims paragraph (2) of the pollutant exclusion does not nullify coverage for property damage not excluded by paragraph (1) of the exclusion.

The Other Insurance Condition is clarified in Paragraph 4.b.2. by making this insurance excess over insurance provided by any other primary insurance which covers an insured as an additional insured. Form **GA 4092** will no longer be required.

The Other Insurance Condition is amended to make this insurance excess over insurance provided under a Consolidated (Wrap-Up) Insurance Program. Form **GA 236** will no longer be required.

The "Coverage territory" definition is revised to clarify that international waters or airspace are included under "coverage territory" but only if an injury occurs in the course of travel or transportation between any two of the following: US (including its territories and possessions), Puerto Rico and Canada.

A definition of "coverage term" is introduced. References to policy period are amended accordingly. The new definition takes into account multi year policy effective dates.

The Aircraft, Auto Or Watercraft exclusion is revised to clarify that the exclusion applies even if the allegation is of negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured. This same revision also appears in several endorsements.

In the insuring agreements for Bodily Injury and Property Damage, and separately for Personal and Advertising Injury, our duty to defend ends when limits of liability are exhausted. The new General Aggregate encompasses both "personal and advertising injury" and "bodily injury" and "property damage". Each insuring agreement now applies to bodily injury, property damage and personal and advertising injury. Other than the change from having a General Aggregate that will encompass the duty to defend, this is not a change in coverage. The General Aggregate does not apply to Products/Completed Operations which has its own Aggregate.

The Insuring Agreement for Bodily Injury and Property Damage, and separately for Personal and Advertising Injury, is modified to address the issue of known injury or damage. It now points out that the insurance does not respond to "bodily injury", "property damage" or "personal and advertising injury" that is known by the insured prior to the policy period. We introduce a new definition of "authorized representative". This phrase defines which insured's prior knowledge of injury or damage will result in the policy not responding. It further address the applicability of the Commercial General Liability Coverage Form in situations involving continuation, change or resumption of the same "bodily injury" or "property damage" during or after the "coverage term".

In most states, this revision to the Insuring Agreement represents neither a broadening nor a restriction in coverage from the original intent. However, in certain states, this revision may represent a decrease in coverage. This revision may result in the shifting of coverage, under certain circumstances, between current policies and past or future policies.

GA 4153 10 01    CIN0065    Page 3 of 6

## CLARIFICATIONS IN COVERAGE - MULTISTATE ENDORSEMENTS

### GA 352 10 01 Exclusion - Employees And Volunteer Workers As Insureds

The endorsement is clarified to show that volunteer workers as well as employees are excluded as insureds. A further revision is to add the Aircraft, Auto or Watercraft exclusion clarifying that allegations of negligent supervision are also excluded.

### GA 231 10 01 Religious Institutions Commercial General Liability Endorsement

With the addition of Volunteer workers to the Who Is An Insured provisions this form has been amended to delete those sections referring to Volunteers.

### GA 360 10 01 Colleges Or Schools (Limited Form) and GA 361 10 01 Colleges or Schools

Both endorsements are revised to add the Aircraft, Auto or Watercraft exclusion clarifying that allegations of negligent supervision are also excluded.

## RESTRICTIONS OF COVERAGE - GA 101 10 01 Commercial General Liability Coverage Form

The Damage To Property exclusion is revised to clarify that expenses incurred for repairs made on the insured's own property for any reason, including to avoid injury to a third party, will not be covered.

A General Aggregate is being added to the policy. The General Aggregate will apply to each location or construction project and places an annual maximum paid on claims. There is an additional aggregate limit that remains unchanged in our policy. This is the aggregate that applies to Products/Completed Operations.

A new exclusion is added regarding an additional insured's prior knowledge of injury or damage.

## RESTRICTIONS OF COVERAGE - MULTISTATE ENDORSEMENTS

### CG 22 69 10 01 Druggist

The form clarifies that the types of pharmacist services not within the traditional duties of pharmacist, such as writing prescriptions, administering drugs and vaccinations, and performing blood test, are excluded.

## SPECIAL ENDORSEMENTS COMMON TO MANY POLICIES

### GA 478 10 01 Bodily Injury Exceptions To Pollutant Exclusion

Various editorial changes have been made. In addition under the Amendment to On Premises Exception clarification is added to when coverage for vapors apply. In the definition of "gaseous or airborne pollutants" lead is added to asbestos as not being included within the definition.

### GA 207 10 01 Hired Auto And Non-Owned Auto Liability

The Insuring Agreement and the exclusions in this form are clarified. The Who Is Insured is expanded to include Limited Liability Companies and to exclude relatives of co-employees as well as the co-employee. The separate Limits Of Insurance section is deleted.

The next 3 forms are much the same but are designed for different types of risk. The changes are identical, except for coverage that one form has that another does not have. All 3 forms include Employee Benefit Liability. There was some variation among them on this coverage. All variation has been eliminated.

The 3 forms are:

## GA 210 10 01 Commercial General Liability Broadened Endorsement

## GA 227 10 01 Commercial General Liability Extended Endorsement

## GA 233 10 01 Contractors' Commercial General Liability Broadened Endorsement

All 3 of these forms have the following changes:

Various editorial changes have been made and references to personal and advertising injury have been corrected to be in accord with the **GA 101**.

GA 4153 10 01                                   **CIN0066**                          Page 4 of 6

Volunteer workers are now included in the **GA 101**. The section amending the Who Is An Insured provisions which added volunteer workers is deleted.

The Fire Legal section is renamed as in the **GA 101**, Damage To Premises Rented To You.

Employee Benefit Liability Coverage is extensively rewritten.

The Insuring Agreement is enhanced to include claims prior to the effective date if there was no prior knowledge of the claim and no other applicable insurance. Our duty to defend is also clarified.

Exclusions now have titles and are clarified. New exclusions are added, including an exclusion for Employment Related Practices.

The Who Is An Insured provision is broadened by adding trust and employees who administer benefit plans.

The per claim limit is amended to a per Employee limit.

Various Definitions are clarified and new Definitions of Employee and Cafeteria Plan are added. Other changes that are not in common to all 3 forms:

### GA 210 10 01 Commercial General Liability Broadened Endorsement

Under Medical Payments the condition that expenses be reported within 3 years is deleted. This condition is now part of the main coverage part, **GA 101**.

### GA 233 10 01 Contractors' Commercial General Liability Broadened Endorsement

In the Additional Insured section, an exclusion for jobs covered by a Consolidated (Wrap-Up) Insurance Program is added. Also, the clause to provide coverage in compliance with a written contract is amended, if a specific edition date of the CG 20 10 is not required.

### OTHER COMMON ENDORSEMENTS

The endorsements listed below may have editorial changes or changes for the new "personal and advertising injury" definition. Only changes other than the editorial or definition change are noted. If an endorsement has only editorial or the definition change, it is not listed.

### GA 214 10 01 Sexual Misconduct Or Sexual Molestation Liability

The insuring agreement is clarified and conditions of coverage are separately stated. The Who Is An Insured provisions are modified in accordance with changes made to other coverage parts. Definitions of "each claim", "sexual misconduct or sexual molestation" and "suit" are added to the form. The Duties condition is modified to use the definitions added to the form. The exclusions are modified to take into account the addition of the definitions and other changes made to the coverage part. Other exclusions are added or clarified in the same manner as done in other forms. An exclusion is added to clarify the extent of coverage and defense when some resolution to a charge or complaint is reached.

### GA 4024 10 01 Funeral Directors Liability Coverage Enhancement

The terminology and format of the exclusion is clarified.

### GA 4040 10 01 Medical Payments - Excess Coverage For Athletic Participants

The nature of the activities being covered on an excess basis is clarified.

### GA 4078 10 01 Additional Insured - Owners, Lessees Or Contractors - Scheduled Person Or Organization

Products/Completed Operations is excluded. The Other Insurance Condition is modified. The coverage is primary unless other policies provided coverage to the Additional Insured on an excess basis. In such a case our coverage is excess also.

### GA 4105 10 01 Cosmetology Or Barbering School  Amendatory Endorsement

Amended to correspond with the appropriate changes in the main coverage form, **GA 101**.

### GA 4106 10 01 Cosmetologist And Barbers Amendatory Endorsement

Amended to correspond with the appropriate changes in the main coverage form, **GA 101**.

Litchfield Cavo, LLP                    8/21/08

### GA 4140 10 01 Corporal Punishment

Adds Corporal Punishment as an exception to the Expected or Intended exclusion of our **GA 101**.

### GA 4144 10 01 Contractual Liability - Railroads

The excluded items under the redefinition of "insured contract" are expanded generally to advertising and Internet Services.

### GA 4145 10 01 Principals Protective Liability Coverage

Amended the exclusions to correspond with changes in other coverage parts.

### GA 428 10 01 Fellow Employee Coverage

The coverage is amended to encompass changes in the Who Is An Insured provision.

### GA 472 10 01 Additional Insured - When Required In A Contract Or Agreement

An exclusion for work covered by a Consolidated (Wrap-Up) Insurance Program is added. Also, a clause to provide coverage in compliance with a written contract is amended, if a specific edition date of the CG 20 10 is not required

In all of the following forms the Other Insurance Condition is modified. The coverage is primary unless other policies provided coverage to the Additional Insured on an excess basis. In such a case our coverage is excess also.

### GA 4077 10 01 Additional Insured - Engineers, Architects, Or Surveyors (CGL Version)

### GA 4080 10 01 Additional Insured - State Or Political Subdivisions - Permits

### GA 4081 10 01 Additional Insured - State Or Political Subdivisions - Permits Relating To Premises

### GA 4082 10 01 Additional Insured - Vendors

### GA 4084 10 01 Additional Insured - Designated Person Or Organization

### GA 4088 10 01 Additional Insured - Engineers, Architects, Or Surveyors Not Engaged By The Named Insured

8/21/08

# THE CINCINNATI INSURANCE COMPANY

P.O. BOX 145496, CINCINNATI, OHIO. 45250-5496
(513) 870-2000

CCC 440 45 19

A Stock Insurance Company                     Previous Policy No.

## COMMON POLICY DECLARATIONS

RENEWAL

| DECLARATIONS | POLICY NUMBER | CCC 440 45 19 |
| --- | --- | --- |

**NAMED INSURED** AMERICAN STANDARD CIRCUITS INC
(REFER TO NAMED INSURED ENDORSEMENT-IA905)
**ADDRESS** 3615 WOLF ROAD
(Number & Street) FRANKLIN PARK IL 60131
Town, County,
State & Zip No.)

**Policy Period:** At 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE

**All coverages except Automobile and/or Garage**
Policy number: CCC 440 45 19          FROM: 07-29-2005   TO: 01-25-2006
**Automobile and/or Garage**
Policy number:                        FROM:              TO:

**Agency** LUNDSTROM INSURANCE 12-141
**City** ELGIN, IL

*CORRECTED*

**Legal Entity/Business Description**
CORPORATION

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS
POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.
FORMS APPLICABLE TO ALL COVERAGE PARTS: (show numbers)

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| IA905 | 01/92 | IA102 | 02/03 | CA1139 | 01/86 | IA42101L | 09/02 |
| IA4236 | 11/02 | IA4238 | 02/03 | IA4239 | 02/03 | IA4262IL | 02/03 |
| IP446 | 08/01 | USC504 | 09/02 | | | | |

**TAX ID#004100**

**BB3**
08-31-2005

Countersigned _____    By _____
                        (Date)                      (Authorized Representative)

IN WITNESS WHEREOF, this policy has been signed by our President and Secretary in the City of Fairfield,
Ohio, but this policy shall not be binding upon us unless countersigned by an authorized representative of
ours. This provision does not apply in Arizona, Virginia and Wisconsin.

Kenneth W. Stecher
Secretary

John Schiff
By



EXHIBIT
I

COMPANY COPY

This is a true & certified copy of policy.

Matt Zimmerman, Assistant Vice President

CIN0071

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination of Your Books and Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections and Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer of Your Rights and Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**CIN0072**

*Litchfield Cavo, LLP*          *8/21/08*

# THE CINCINNATI INSURANCE COMPANY

P.O. BOX 145496, CINCINNATI, OHIO 45250-5496
(513) 870-2000

CCC 440 45 19

A Stock Insurance Company                    Previous Policy No.

## COMMON POLICY DECLARATIONS

DS4  PMS MAN
RENEWAL 2005

| DECLARATIONS | POLICY NUMBER | CCC 440 45 19 |
|---|---|---|

**NAMED INSURED** AMERICAN STANDARD CIRCUITS, INC
AMI PARTNERS, LLC, AM-WAVE, LLC
**ADDRESS** 3615 WOLF ROAD
(Number & Street FRANKLIN PARK, IL 60131
Town, County,
State & Zip No.) **TAX ID #004100**

**Policy Period:** At 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE

**All coverages except Automobile and/or Garage**
   Policy number: CCC 440 45 19   FROM: 01-25-2005   TO: 01-25-2006

**Automobile and/or Garage**
   Policy number:   FROM:   TO:

Agency: **LUNDSTROM INSURANCE 12-141**
City **ELGIN, IL**

**Legal Entity/Business Description**
**CORPORATION**

**SEE CORRECTED**

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS
POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.
FORMS APPLICABLE TO ALL COVERAGE PARTS: (show numbers)

| | | | | |
|---|---|---|---|---|
| IA102 | 02/03 | CA1139 | 01/86 | IA4210IL | 09/02 | IA4236 | 11/02 |
| IA4238 | 02/03 | IA4239 | 02/03 | IA4262IL | 02/03 | IP446 | 08/01 |
| USC504 | 09/02 | | | | | | |

LB8
05-12-2005

Countersigned _____  By _____
            (Date)                 (Authorized Representative)

IN WITNESS WHEREOF, this policy has been signed by our President and Secretary in the City of Fairfield,
Ohio, but this policy shall not be binding upon us unless countersigned by an authorized representative of
ours. This provision does not apply in Arizona, Virginia and Wisconsin.

Secretary                              President

COMPANY COPY

IA 501 02 01                    CIN0073                    Page 1 of 2

Litchfield Cavo, LLP                    8/21/08

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination of Your Books and Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections and Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer of Your Rights and Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**CIN0074**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NAMED INSURED SCHEDULE

```
AMERICAN STANDARD CIRCUITS INC,
COATING INTERNATIONAL DBA AMERICOATS & AMERICOATS INC
AMI INVESTMENTS PARTNERSHIP
HARRIS BANK TRUST #R13642
AMERICAN PRECISION MACHINING INC
NISHI INVESTMENT
CHICAGO TRUST #1105519
AMI PARTNERS LLC
AM-WAVE LLC
```

IA 905 01 92

Litchfield Cavo, LLP          8/21/08

Attached to POLICY
NUMBER  <u>CCC 440 45 19</u>

# SUMMARY OF PREMIUMS CHARGED

### THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM CHARGE IS INDICATED

| | | |
|---|---|---|
| Commercial Property Coverage Part | $ | |
| Commercial General Liability Coverage Part | $ | |
| Commercial Crime Coverage Part | $ | |
| Commercial Umbrella / Excess Liability Coverage | $ | 23,138 |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| Installment Charge | $ | 20 |
| Sub-Total | $ | 23,158 |
| | | |
| Commercial Auto Coverage Part | $ | |
| Auto Installment Charge | $ | |
| Terrorism Coverage | $ | 1,157 |
| Annual Total | $ | 24,315 |

## SEE CORRECTED

### PAYMENTS

| | All Other | | + | Auto | | = | Total Installment | |
|---|---|---|---|---|---|---|---|---|
| | First Installment | Remaining Installment | | First Installment | Remaining Installment | | First Installment | Remaining Installment |
| ☐ SEMI-ANNUAL | $ | $ | + $ | | $ | = $ | | $ |
| ☒ QUARTERLY | $6,078 | $6,078 | + $ | | $ | = $6,078 | | $6,078 |

Automobile Coverages, Employers Liability, Employment Practices Liability Coverage, Professional Liability Coverage, Terrorism Coverage and / or Wrongful Acts Coverage, if included in the policy, are subject to Annual Adjustment of rates and premium on each anniversary of the policy.

Commercial Umbrella and Excess Liability, if included in the policy, may be subject to Annual Adjustment of premium on each anniversary.  Refer to the Commercial Umbrella or Excess Liability Coverage Part Declarations form to see if this is applicable.

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED**

IA 102 02 03

CIN0076

Litchfield Cavo, LLP          8/21/08

# IMPORTANT NOTICE

The address of the Complaint Department of The Cincinnati Insurance Company is P. O. Box 145496, Cincinnati, Ohio, 45250-5496.

The address of the Public Service Division of the Department of Insurance is 320 West Washington, Springfield, Illinois, 62767.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CLAIMS MADE CONTRACTORS ERRORS AND OMISSIONS COVERAGE FORM
CLAIMS-MADE EXCESS LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL UMBRELLA LIABILITY COVERAGE PART
EMPLOYEE BENEFIT LIABILITY COVERAGE FORM
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART
EXCESS LIABILITY COVERAGE PART
HOLE-IN-ONE COVERAGE PART
ILLINOIS CONTRACTORS' LIMITED WORKSITE POLLUTION LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS / COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART
PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE

**A. Cancellation** (Common Policy Conditions) is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this Coverage Part by mailing to us advance written notice of cancellation.

2. **a.** We may cancel this policy by mailing to you written notice stating the reason for cancellation.

   **b.** If we cancel for nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   **c.** If we cancel for a reason other than nonpayment of premium, we will mail the notice at least;

      **(1)** 30 days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

      **(2)** 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   **a.** Nonpayment of premium;

   **b.** The policy was obtained through a material misrepresentation;

   **c.** Any insured has violated any of the terms and conditions of the policy;

   **d.** The risk originally accepted has measurably increased;

   **e.** Certification to the Director of Insurance of the loss of reinsurance by the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

   **f.** A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled we will send the First Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be less than pro rata. The cancellation will be effective even if we have not offered a refund.

**B.** The following is added and supersedes any provision to the contrary:

**NONRENEWAL**

1. If we decide not to renew this policy, we will mail written notice stating the reason for nonrenewal no less than 60 days before the expiration date to:

   **a.** You; and

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1987.

IA 4210 IL 09 02

Page 1 of 2

*Litchfield Cavo, LLP*    *8/21/08*

CIN0078

    b.  The broker, if known to us, or the agent of record.

2.  Even if we do not comply with these terms, this policy will terminate:

    a.  On the expiration date if:

        (1)  You fail to perform any of your obligations in connection with the payment of the premium for the policy, or any installment payment, whether payable directly to us or our agents or indirectly under any premium finance plan or extension of credit; or

        (2)  We have indicated our willingness to renew this policy to you or your representative; or

        (3)  You have notified us or our agent that you do not want to renew this policy.

    b.  On the effective date of any other insurance replacing this policy.

**C. Mailing of Notices**

We will mail cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

**CIN0079**

*Litchfield Cavo, LLP*    *8/21/08*

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Insurance Services Office, Inc., 1987

IA 4210 IL 09 02        Page 2 of 2

# POLICYHOLDER NOTICE
# TERRORISM INSURANCE COVERAGE

## THIS POLICYHOLDER NOTICE DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

Your policy may contain coverage for certain losses caused by terrorism.

### Premium:

We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act of 2002.

- Refer to the SUMMARY OF PREMIUMS CHARGED or DECLARATIONS PAGE for the portion of your premium that is attributable to coverage for terrorist acts certified under the Act.

### Federal Participation:

The Act also requires us to provide disclosure of federal participation in payment of terrorism losses.

- Under your policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States Government, Department of Treasury, under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

### Act of Terrorism:

As defined in Section 102(1) of the Act, the term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**NOTE:**     IF YOUR POLICY IS A RENEWAL POLICY, THIS NOTICE IS PROVIDED TO SATISFY THE REQUIREMENTS UNDER THE TERRORISM RISK INSURANCE ACT OF 2002 FOR POLICYHOLDER DISCLOSURE: (1) AT THE TIME OF OUR OFFER TO RENEW THE POLICY AND (2) AT THE TIME THE RENEWAL IS COMPLETED.

IA 4236 11 02

CIN0080

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**All Commercial Lines Coverage Parts, Coverage Forms, Policies and Endorsements subject to the federal Terrorism Risk Insurance Act of 2002 and any amendments thereto**

**A.** The following definition is added with respect to the provisions of this endorsement:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 and any amendments thereto. The criteria contained in that Act for a "certified act of terrorism" include the following:

   **1.** The act resulted in aggregate losses in excess of $5 million; and

   **2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** **Cap On Losses from Certified Acts of Terrorism**

With respect to any one or more "certified acts of terrorism" under the federal Terrorism Risk Insurance Act of 2002 and any amendments thereto, we will not pay any amounts for which we are not responsible under the terms of that Act (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

**C.** **Application of Other Exclusions**

The inapplicability, omission or absence of a terrorism exclusion does not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part, Coverage Form, Policy or endorsement such as losses excluded by:

   **1.** Exclusions that address war, warlike action, insurrection, rebellion, revolution, military action, nuclear hazard, nuclear materials, nuclear reaction, radiation, or radioactive contamination; or

   **2.** Any other exclusion,

regardless if the "certified act of terrorism" contributes concurrently or in any sequence to the loss.

**D.** **Sunset Clause**

If the federal Terrorism Risk Act of 2002 and any amendments thereto expires or is repealed, then this endorsement is null and void for any act of terrorism that takes place after the expiration or repeal of the Act.

Includes copyrighted material of ISO Properties, Inc. and American Association of Insurance Services, with their permission.

IA 4238 02 03

CIN0081

# POLICYHOLDER NOTICE
# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

## THIS POLICYHOLDER NOTICE DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

**Limitation on Payment of Terrorism Losses:**

The provisions of the Terrorism Risk Insurance Act of 2002 limit the maximum payment of losses from certified acts of terrorism. That determination will be based on a formula set forth in the law involving the national total of federally insured terrorism losses in an annual period. If one or more certified acts of terrorism in an annual period causes the maximum payment of losses from certified acts of terrorism to be reached, and we have satisfied our required level of payments under the law, then we will not pay for the portion of such losses above that maximum. However, that is subject to possible change at that time, as Congress may, under the Act, determine that payments above the cap will be made.

IA 4239 02 03

CIN0082

Litchfield Cavo, LLP                8/21/08

# NOTICE TO POLICY HOLDERS - WAR LIABILITY EXCLUSION
# Farm Liability, General Liability, Commercial Umbrella Liability, Professional Umbrella Liability and Excess Liability Coverage Parts

## RESTRICTIONS OF COVERAGE

This is a summary of the major changes found in the new Endorsements listed below applicable to your renewal policy. NO COVERAGE IS PROVIDED BY THIS SUMMARY. Nor can it be construed to replace any provision of your policy. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE CAREFULLY for complete information on the coverage that you are provided. If there is any conflict, between the policy and this summary, THE PROVISIONS OF THE POLICY SHALL PREVAIL.

**CG 00 62 12 02 WAR LIABILITY EXCLUSION** for the Commercial General Liability Coverage Part,

**CG 00 63 12 02 WAR LIABILITY EXCLUSION** for the Owners and Contractors Protective and Products / Completed Operations Liability Coverage Parts,

**CG 00 64 12 02 WAR LIABILITY EXCLUSION** for the Liquor Liability, Pollution Liability, Railroad Protective Liability Coverage Parts and Underground Storage Tank Policy,

**GA 391 07 03 WAR LIABILITY EXCLUSION** for the Employment Practice Liability Coverage Part,

**GA 392 07 03 WAR LIABILITY EXCLUSION** for the Contractor's Errors and Omissions Coverage Part,

**GA 393 IL 07 03 WAR LIABILITY EXCLUSION** for the Illinois Contractor's Limited Worksite Pollution Liability Coverage Parts,

**FL 10 20 12 02 WAR LIABILITY EXCLUSION** for Farm Liability Coverage and Personal Liability Endorsement,

**US 3053 02 03 WAR LIABILITY EXCLUSION** for Commercial, Professional and Professional Claims - Made Umbrella Coverage Parts, and

**XS 319 02 03 WAR LIABILITY EXCLUSION** for Excess Liability and Claims - Made Excess Liability Coverage parts.

All of these endorsements either replace a war exclusion that was restricted to contractually assumed liabilities or introduce a war exclusion to coverage parts that did not contain the limited contractual war exclusion.

When any of these endorsements are attached to your policy, a war exclusion is added to exclude injury or damage, however caused, arising, directly or indirectly, out of:

- War, including undeclared or civil war;

- Warlike action by a military force; or

- Insurrection, rebellion, revolution, usurped power, or action taken by a governmental authority in hindering or defending against any of these.

In addition in Form **CG 00 62 12 02** and **FL 10 20 12 02** the War exclusion is deleted from the Medical Payments Exclusions section. Medical Payments are now subject to an exclusion that applies all bodily injury exclusions, including this new War Liability Exclusion, to Medical Payments.

IA 4262 IL 02 03

CIN0083

Litchfield Cavo, LLP                8/21/08

# THE CINCINNATI INSURANCE COMPANY
# THE CINCINNATI CASUALTY COMPANY
# THE CINCINNATI INDEMNITY COMPANY

## NOTICE TO POLICYHOLDERS

Please be advised that in your application for insurance you disclosed information to The Cincinnati Insurance Company, The Cincinnati Casualty Company and The Cincinnati Indemnity Company.  The information disclosed in the application and all information subsequently collected by any of these companies may be shared among all three.

IP 446 08 01

CIN0084

Litchfield Cavo, LLP          8/21/08

# THE CINCINNATI INSURANCE COMPANY

# COMMERCIAL UMBRELLA LIABILITY COVERAGE
# PART DECLARATIONS

RENEWAL OF   **CCC 440 45 19**

Attached to and forming part of POLICY NO.: **CCC 440 45 19**      Effective Date: **01-25-2005**

NAMED INSURED is the same as it appears in the Common Policy Declarations unless another entry is made here.

**IS THE SAME AS IT APPEARS ON THE COMMON POLICY DECLARATIONS**

LIMITS OF INSURANCE
$ **10** ,000,000 Each Occurrence Limit        $ **10** ,000,000 Aggregate Limit

ADVANCE PREMIUM $   **INCL**
Applicable to Premium, if box is checked:
☐ Subject to Annual Adjustment
☐ Subject to Audit (see Premium Computation Endorsement for Rating Basis)

Form Numbers of the Coverage Part and Endorsements forming a part of the Coverage Part at issuance:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| US511 | 09/02 | US101UM | 10/02 | US4033IL | 09/02 | US4048IL | 09/02 |
| US407 | 09/02 | US302 | 09/02 | US3053 | 02/03 | | |

| SCHEDULE OF UNDERLYING INSURANCE | | |
|---|---|---|
| **Insurer, Policy Number & Period:** | **Underlying Insurance:** | **Underlying Limits:** |
| **(a)  WESTPORT INS. CORP**<br>**WCX0026330**<br>**01-25-2005 TO 2006** | Employer's Liability<br><br>$ 100,000<br><br>$ 100,000<br><br>$ 500,000 | Employer's Liability<br>Bodily Injury by Accident<br>Each Accident<br>Bodily Injury by Disease<br>Each Employee<br>Bodily Injury by Disease<br>Policy Limit |
| **(b)  CINCINNATI INS. CO.**<br>**CPP 553 15 65**<br>**01-25-2005 TO 2006**<br><br>☒ Products-Completed<br>Operations Coverage | Commercial General Liability<br>including:<br><br>$ 1,000,000<br>$ 2,000,000<br><br><br><br>$ 2,000,000<br><br><br>$ 1,000,000<br><br>$ | Bodily Injury and<br>Property Damage Liability<br>Each Occurrence Limit<br>General Aggregate<br>Limit<br>(other than Products-<br>Completed Operations)<br>Products-Completed<br>Operations Aggregate<br>Limit<br>Personal and Advertising Injury<br>Limit<br>Personal and Advertising Injury<br>Aggregate Limit |
| **(c)  SAME AS (b)**<br><br>☐ Owned Autos<br>☐ Non-Owned Autos<br>☐ Hired Autos<br>☒ Any Auto | Automobile Liability<br>including:<br><br>$<br><br>$<br><br>$<br><br><br><br><br><br>$ 1,000,000 | Bodily Injury Liability<br>Each Person<br><br>Each Occurrence<br>Property Damage Liability<br>Each Occurrence<br>or<br>Bodily Injury Liability<br>and/or Property Damage<br>Liability or Both Combined<br>Each Occurrence |

# ADDITIONAL SCHEDULE OF UNDERLYING INSURANCE

Attached to and forming part of Policy No. CCC 440 45 19          Effective Date:    01-25-2005

| Insurer, Policy Number & Period: | Underlying Insurance: | Underlying Limits: |
|---|---|---|
| (d) CINCINNATI INS. CO. CPP 553 15 65 01-25-2005 TO 2006 | EMPLOYEE BENEFIT LIABILITY | 1,000,000 EACH CLAIM 3,000,000 AGGREGATE |
| (e) SAME AS (d) | BI EXCEPTION TO POLLUTANT EXCLUSION | 1,000,000 AGGREGATE |
| (f) WESTPORT INS. CORP. WCX0026322 01-25-2005 TO 2006 | EMPLOYERS LIABILITY | 100,000 BODILY INJURY BY ACCIDENT, EACH ACCIDENT 100,000 BODILY INJURY BY DISEASE, EACH EMPLOYEE 500,000 BODILY INJURY BY DISEASE, POLICY LIMIT |
| (g) CINCINNATI INS. CO. CPP 553 92 63 01-25-2005 TO 2006 | COMMERCIAL GENERAL LIABILITY INCLUDING: PRODUCTS-COMPLETED OPERATIONS COVERAGE | BODILY INJURY AND PROPERTY DAMAGE LIABILITY 1,000,000 EACH OCCURRENCE LIMIT 2,000,000 GENERAL AGGREGATE (OTHER THAN PRODUCTS-COMPLETED OPERATIONS) 2,000,000 PRODUCTS-COMPLETED OPERATIONS AGGREGATE LIMIT 1,000,000 PERSONAL INJURY AND ADVERTISING INJURY LIMIT |
| (h) SAME AS (g) | AUTOMOBILE LIABILITY INCLUDING: OWNED AUTOMOBILES NON-OWNED AUTOMOBILES HIRED AUTOMOBILES | BODILY INJURY LIABILITY OR PROPERTY DAMAGE LIABILITY OR BOTH COMBINED 1,000,000 EACH OCCURRENCE |
| (i) SAME AS (h) | EMPLOYEE BENEFIT LIABILITY | 1,000,000 EACH CLAIM 3,000,000 AGGREGATE |
| (j) SAME AS (h) | BI EXCEPTION TO POLLUTANT EXCLUSION | 1,000,000 AGGREGATE |
| (k) CINCINNATI CAS. CO. WC 897 61 40 01-25-2005 TO 2006 | EMPLOYERS LIABILITY | BODILY INJURY BY ACCIDENT 100,000 EACH ACCIDENT BODILY INJURY BY DISEASE 100,000 EACH EMPLOYEE BODILY INJURY BY DISEASE 500,000 POLICY LIMIT |
| (l) CINCINNATI INS. CO. CPP 069 39 91 01-25-2005 TO 2006 | COMMERCIAL GENERAL LIABILITY INCLUDING PRODUCTS-COMPLETED OPERATIONS COVERAGE | BODILY INJURY AND PROPERTY DAMAGE LIABILITY 1,000,000 EACH OCCURRENCE LIMIT 2,000,000 GENERAL AGGREGATE *OTHER THAN PRODUCTS-COMPLETED OPERATIONS) 2,000,000 PRODUCTS-COMPLETED OPERATIONS AGGREGATE LIMIT 1,000,000 PERSONAL INJURY AND ADVERTISING INJURY LIMIT |
| (m) SAME AS (l) | EMPLOYEE BENEFIT LIABILITY | 1,000,000 EACH CLAIM 3,000,000 AGGREGATE |
| (n) SAME AS (l) | BI EXCEPTION TO POLLUTANT EXCLUSION | 1,000,000 AGGREGATE |

CIN0086

8/21/08

# ADDITIONAL SCHEDULE OF UNDERLYING INSURANCE

Attached to and forming part of Policy No. **CCC 440 45 19**          Effective Date:    **01-25-2005**

| Insurer, Policy Number & Period: | Underlying Insurance: | Underlying Limits: |
|---|---|---|
| **(o) CINCINNATI INS. CO.**<br>**CPP 069 39 91**<br>**01-25-2005 TO 2006** | **AUTOMOBILE LIABILITY**<br>**INCLUDING:**<br>**OWNED AUTOMOBILES**<br>**NON-OWNED AUTOMOBILES**<br>**HIRED AUTOMOBILES** | **BODILY INJURY LIABILITY OR**<br>**PROPERTY DAMAGE LIABILITY**<br>**OR BOTH COMBINED**<br>**1,000,000 EACH OCCURRENCE** |

US 511 09 02

**CIN0087**

# COMMERCIAL UMBRELLA - TABLE OF CONTENTS

| Coverage Part Provision: | Begins on Page: |
|---|---|

Preamble ................................................................ 3

SECTION I - COVERAGE: ....................................... 3

A.  Insuring Agreement ........................................ 3

B.  Exclusions: ..................................................... 4

1.  Asbestos ........................................................ 4
2.  Breach of Contract, Failure to Perform, Wrong Description and Violation of Another's Rights ........................ 4
3.  Contractual Liability ...................................... 4
4.  Damage to Impaired Property or Property Not Physically Injured .......... 4
5.  Damage to Property ....................................... 4
6.  Damage to Your Product ................................ 4
7.  Damage to Your Work .................................... 4
8.  Electronic Chatrooms or Bulletin Boards .......... 5
9.  Employer's Liability Limitation ...................... 5
10. Employment-Related Practices ....................... 5
11. Expected or Intended Injury .......................... 5
12. Falsity, Prior Publication, Criminal Act and Media and Internet Type Businesses ......... 5
13. Infringement of Copyright, Patent, Trademark or Trade Secret ........ 6
14. Pollutant - Auto ............................................ 6
15. Pollutant - Other Than Auto .......................... 7
16. Recall of Products, Work or Impaired Property .... 8
17. Unauthorized Use of Another's Name or Product .... 8
18. Uninsured / Underinsured Motorist ................ 8
19. War ............................................................... 8
20. Workers' Compensation ................................ 9

C.  Defense and Supplementary Payments ........... 9

SECTION II - WHO IS AN INSURED .................... 9

SECTION III - LIMITS OF INSURANCE ................ 11

SECTION IV - CONDITIONS: ............................... 12

1.  Appeals ........................................................ 12
2.  Audit ............................................................ 12
3.  Bankruptcy ................................................... 12
4.  Duties in the Event of Occurrence, Claim or Suit ... 12
5.  First Named Insured ..................................... 13
6.  Legal Action Against Us and Loss Payments ..... 13
7.  Liberalization ............................................... 13
8.  Maintenance of Underlying Insurance ............ 13
9.  Other Insurance ........................................... 14
10. Premium ....................................................... 14
11. Representations ............................................ 14
12. Separation of Insureds .................................. 14
13. Transfer of Rights of Recovery Against Others to Us ... 14

SECTION V - DEFINITIONS: ................................ 15

1.  "Advertisement" ........................................... 15
2.  "Authorized representative" .......................... 15
3.  "Auto" .......................................................... 15
4.  "Bodily injury" ............................................. 15
5.  "Coverage term" ........................................... 15
6.  "Coverage territory" ..................................... 15
7.  "Electronic data" .......................................... 15
8.  "Employee" ................................................... 15
9.  "Executive officer" ....................................... 15

Includes copyrighted material of ISO Properties, Inc., with its permission.

US 101 UM 10 02

**Coverage Part Provision:**                                                     **Begins on Page:**

10. "Hostile fire" ................................................................................................... 16
11. "Impaired property" ......................................................................................... 16
12. "Insured contract" ........................................................................................... 16
13. "Leased worker" .............................................................................................. 17
14. "Loading or unloading" .................................................................................... 17
15. "Mobile equipment" ......................................................................................... 17
16. "Occurrence" .................................................................................................... 18
17. "Personal and advertising injury" .................................................................... 18
18. "Pollutants" ...................................................................................................... 18
19. "Products-completed operations hazard" ........................................................ 18
20. "Property damage" ........................................................................................... 18
21. "Subsidiary" ..................................................................................................... 19
22. "Suit" ................................................................................................................ 19
23. "Temporary worker" ......................................................................................... 19
24. "Ultimate net loss" ........................................................................................... 19
25. "Underlying insurance" .................................................................................... 19
26. "Underlying limit" ............................................................................................. 19
27. "Workplace" ..................................................................................................... 19
28. "Your product" .................................................................................................. 19
29. "Your work" ...................................................................................................... 19

**NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT** ................................................ 20

**CIN0089**

*Litchfield Cavo, LLP*         *8/21/08*

# COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

Various provisions in this Coverage Part restrict this insurance. Read the entire Coverage Part carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Part the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this Coverage Part. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II - WHO IS AN INSURED.**

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION V - DEFINITIONS.**

In return for your payment of premium, and subject to all the terms of this Coverage Part, we agree to provide the insurance as stated in this Coverage Part.

## SECTION I - COVERAGE

**A. Insuring Agreement**

1.  We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages for "bodily injury", "personal and advertising injury" or "property damage" arising out of an "occurrence" to which this insurance applies:

    a.  Which is in excess of the "underlying insurance"; or

    b.  Which is either excluded or not insured by "underlying insurance".

2.  This insurance applies to "bodily injury", "personal and advertising injury" or "property damage" only if:

    a.  The "bodily injury", "personal and advertising injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

    b.  The "bodily injury" or "property damage" occurs during the policy period shown in the Declarations; or

    c.  The "personal and advertising injury" results from an "occurrence" that takes place during the policy period shown in the Declarations; and

    d.  Prior to the "coverage term" in which "bodily injury" or "property damage" occurs, or a "personal and advertis-

ing injury" offense is committed, you did not know, per Paragraph **5.** below, that the "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part, or that the "personal and advertising injury" offense had been committed or had begun to be committed, in whole or in part.

3.  "Bodily injury" or "property damage" which:

    a.  Occurs during the "coverage term"; and

    b.  Was not, prior to the "coverage term", known by you, per Paragraph **5.** below, to have occurred;

    includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the "coverage term" in which it first became known by you.

4.  "Personal and advertising injury" caused by an offense which:

    a.  Was committed during the "coverage term"; and

    b.  Was not, prior to the "coverage term", known by you, per Paragraph **5.** below, to have been committed;

    includes any continuation, change or resumption of that "personal and advertising injury" offense after the end of the "coverage term" in which it first became known by you.

5.  You will be deemed to know that "bodily injury" or "property damage" has occurred, or that a "personal and advertising injury" offense has been committed at the earliest time when any "authorized representative":

    a.  Reports all, or any part, of the "bodily injury", "personal and advertising injury" or "property damage" to us or any other insurer;

    b.  Receives a written or verbal demand or claim for damages because of the "bodily injury", "personal and advertising injury" or "property damage"; or

    c.  First observes, or reasonably should have first observed, the "bodily injury" or "property damage", or the offense that caused the "personal and advertising injury";

CIN0090

Litchfield Cavo, LLP

8/21/08

Includes copyrighted material of ISO Properties, Inc., with its permission.

d. Becomes aware, or reasonably should have become aware, by any means, other than as described in **c.** above, that "bodily injury" or "property damage" had occurred or had begun to occur, or that the "personal and advertising injury" offense had been committed or had begun to be committed; or

e. Becomes aware, or reasonably should have become aware, of a condition from which "bodily injury", "personal and advertising injury" or "property damage" is substantially certain to occur.

6. The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE.**

No other obligation or liability to pay sums or perform acts or services is covered, unless expressly provided for under **SECTION I - COVERAGE, C. Defense and Supplementary Payments.**

B. **Exclusions**

This insurance does not apply to:

1. **Asbestos**

Any liability arising out of, attributable to or any way related to asbestos in any form or transmitted in any manner.

2. **Breach of Contract, Failure to Perform, Wrong Description and Violation of Another's Rights**

"Personal and advertising injury":

a. Arising out of breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

b. Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

c. Arising out of the wrong description of the price of goods, products or services stated in your "advertisement"; or

d. Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

3. **Contractual Liability**

Any liability for which the insured is obligated to pay damages by reason of the

assumption of liability in a contract or agreement. This exclusion does not apply to liability for "bodily injury", "personal and advertising injury" or "property damage":

a. That the insured would have in the absence of the contract or agreement; or

b. Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury", "personal and advertising injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

4. **Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

a. A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

b. A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

5. **Damage to Property**

"Property damage" to property owned by any insured, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property.

6. **Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

7. **Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

CIN0091

*Litchfield Cavo, LLP*        *8/21/08*

Includes copyrighted material of ISO Properties, Inc., with its permission.

**8. Electronic Chatrooms or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**9. Employer's Liability Limitation**

Any liability arising from any injury to:

**a.** An "employee" of the insured sustained in the "workplace";

**b.** An "employee" of the insured arising out of the performance of duties related to the conduct of the insured's business; or

**c.** The spouse, child, parent, brother or sister of that "employee" as a consequence of **a.** or **b.** above.

This exclusion applies:

**a.** Whether the insured may be liable as an employer or in any other capacity; and

**b.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply when such insurance is provided by valid and collectible "underlying insurance" listed in the Schedule of Underlying Insurance, or would have been provided by such listed "underlying insurance" except for the exhaustion by payment of claims of its limits of insurance, and then only for such hazards for which coverage is provided by such "underlying insurance", unless otherwise excluded by this Coverage Part.

**10. Employment-Related Practices**

Any liability arising from any injury to:

**a.** A person arising out of any:

(1) Refusal to employ that person;

(2) Termination of that person's employment; or

(3) Other employment-related practices, policies, acts or omissions including but not limited to coercion, criticism, demotion, evaluation, failure to promote, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**b.** The spouse, child, parent, brother or sister of that person as a consequence of any injury to that person at whom any of the employment-related practices described in Paragraphs **(1)**, **(2)**, or **(3)** above is directed.

This exclusion applies:

**a.** Whether the insured may be liable as an employer or in any other capacity; and

**b.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**11. Expected or Intended Injury**

"Bodily injury" or "property damage" which may reasonably be expected to result from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually intended or expected.

However, this exclusion does not apply to:

**a.** "Bodily injury" resulting from the use of reasonable force by an insured to protect persons or property; or

**b.** "Bodily injury" or "property damage" resulting from the use of reasonable force by an insured to prevent or eliminate danger in the operation of "autos" or watercraft.

**12. Falsity, Prior Publication, Criminal Act and Media and Internet Type Businesses**

"Personal and advertising injury":

**a.** Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

**b.** Arising out of oral or written publication of material whose first publication took place before the later of the following:

(1) The inception of this Coverage Part; or

(2) The "coverage term" in which insurance coverage is sought;

**c.** Arising out of a criminal act committed by or at the direction of the insured; or

CIN0092

Litchfield Cavo, LLP          8/21/08

Includes copyrighted material of ISO Properties, Inc., with its permission.

d.  Committed by an insured whose business is:

   (1) Advertising, broadcasting, publishing or telecasting;

   (2) Designing or determining content of web-sites for others; or

   (3) An Internet search, access, content or service provider.

   However, Paragraph **d.** does not apply to Paragraphs **17. a., b., c., d.** and **i.** of "personal and advertising injury" under **SECTION V - DEFINITIONS.**

   For the purposes of Paragraph **d.**, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

13. **Infringement of Copyright, Patent, Trademark or Trade Secret**

   "Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property.

   However, this exclusion does not apply to infringement in your "advertisement", of copyright, trade dress or slogan.

14. **Pollutant - Auto**

   a.  Any liability arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, emission or escape of "pollutants":

   (1) That are, or that are contained in any property that is:

      (a) Being transported or towed by, handled, or handled for movement into, onto or from, an "auto";

      (b) Otherwise in the course of transit by or on behalf of the insured; or

      (c) Being stored disposed of, treated or processed in or upon an "auto";

   (2) Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the insured for

movement into or onto an "auto"; or

   (3) After the "pollutants" or any property in which the "pollutants" are contained are moved from an "auto" to the place where they are finally delivered, disposed of or abandoned by the insured.

   Paragraph **(1)** above does not apply to "bodily injury" or "property damage" arising from fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of an "auto" or its parts, if:

   (a) The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

   (b) The "bodily injury" or "property damage" does not arise out of the operation of any equipment listed in Paragraphs **2. b.** and **c.** of the definition of "auto".

   Paragraphs **(2)** and **(3)** above do not apply to an "occurrence" that occurs away from premises owned by or rented to an insured with respect to "pollutants" not in or upon an "auto" if:

   (a) The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of an "auto"; and

   (b) The discharge, dispersal, seepage, migration, release, emission or escape of the "pollutants" is caused directly by such upset, overturn or damage.

   b.  Any liability caused by "pollutants" and arising from the operation, maintenance, use, "loading or unloading" of an "auto", for which insurance coverage is excluded by "underlying insurance".

   Exclusion **14.** applies to every injury to person or property caused directly or indirectly by "pollutants" regardless of whether:

**CIN0093**

a. The insured is regularly or otherwise engaged in activities that taint or degrade the environment; or

b. The insured uses, generates or produces the "pollutant".

**15. Pollutant - Other Than Auto**

a. Any liability arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, emission or escape of "pollutants":

(1) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

However, Paragraph **a. (1)** of this exclusion does not apply to the following if such liability is covered by "underlying insurance" listed in the Schedule of Underlying Insurance, but only to the extent insurance is provided at the "underlying limit" specified in the Schedule of Underlying Insurance for the "underlying insurance" listed and subject to all its terms, limitations and conditions:

(a) "Bodily injury", if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(b) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor, and the owner or lessee of such premises, site or location has been added to your "underlying insurance" as an additional insured with respect to your ongoing operations or "your work" performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(c) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(2) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(3) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(4) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations, if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

However, Paragraph **a. (4)** of this exclusion does not apply to the following if such liability is covered by "underlying insurance" listed in the Schedule of Underlying Insurance, but only to the extent insurance is provided at the "underlying limit" specified in the Schedule of Underlying Insurance for the "underlying insurance" listed and subject to all its terms, limitations and conditions:

(a) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are

CIN0094

*Litchfield Cavo, LLP*                                    *8/21/08*

Includes copyrighted material of ISO Properties, Inc., with its permission.

brought on or to the prem-ises, site or location with the intent that they be dis-charged, dispersed or re-leased as part of the opera-tions being performed by such insured, contractor or subcontractor;

(b) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a con-tractor or subcontractor; or

(c) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(5) At or from any premises, site or location on which any insured or any contractors or subcontrac-tors working directly or indirectly on any insured's behalf are performing operations, if the op-erations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of, "pollutants".

b. Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory require-ment that any insured or others test for, monitor, clean up, re-move, contain, treat, detoxify or neutralize, or in any way re-spond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for dam-ages because of testing for, monitoring, cleaning up, remov-ing, containing, treating, detoxi-fying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this Paragraph **b.** does not apply to liability for damages be-cause of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement,

or such claim or "suit" by or on behalf of a governmental authority.

c. Any liability caused by "pollutants", for which insurance coverage is ex-cluded by "underlying insurance".

Exclusion **15.** applies to every injury to person or property caused directly or indi-rectly by "pollutants" regardless of whether:

a. The insured is regularly or otherwise engaged in activities that taint or de-grade the environment; or

b. The insured uses, generates or pro-duces the "pollutant".

16. **Recall of Products, Work or Impaired Property**

Any liability or damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, re-call, inspection, repair, replacement, ad-justment, removal or disposal of:

a. "Your product";

b. "Your work"; or

c. "Impaired Property";

if such product, work or property is with-drawn or recalled from the market or from use by any person or organization be-cause of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

17. **Unauthorized Use of Another's Name or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag or any other similar tactics to mislead another's poten-tial customers.

18. **Uninsured / Underinsured Motorist**

Any liability or obligation to any insured or anyone else under any uninsured motor-ist, underinsured motorist, automobile no-fault or first party personal injury law.

19. **War**

Any liability due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrec-tion, rebellion or revolution.

This exclusion applies only to liability as-sumed under a contract or agreement. This exclusion does not apply with re-

**CIN0095**

Litchfield Cavo, LLP          8/21/08

spect to "occurrences" taking place in the United States of America, its territories or possessions, or Canada.

**20. Workers' Compensation**

Any liability or obligation of the insured under any workers' compensation, un-employment compensation, disability benefits or similar law. However, this ex-clusion does not apply to liability of others assumed by you under an "insured con-tract" in existence at the time of "occur-rence".

**C. Defense and Supplementary Payments**

1. We will have the right and duty to defend the insured against any "suit" seeking damages because of "bodily injury", "per-sonal and advertising injury" or "property damage" to which this insurance applies. We will have no duty to defend the in-sured against any "suit" seeking dam-ages for "bodily injury", "personal and ad-vertising injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result when:

    a. The applicable limits of the "underly-ing insurance" and any other insur-ance have been exhausted by pay-ment of claims; or

    b. Damages are sought for "bodily in-jury", "personal and advertising in-jury" or "property damage" which are not covered by "underlying insur-ance" or other insurance.

2. When we have the duty to defend, we will pay all expenses we incur in addition to the applicable limits of insurance.

    Our right and duty to defend ends when the applicable limits of insurance, as stated in the Declarations, has been ex-hausted by payment of claims.

3. We have no duty to investigate, settle or defend any claim or "suit" other than those circumstances described in Para-graph C. 1. However, we do have the right to participate in the investigation, settlement or defense of any claim or "suit" to which this insurance applies. If we exercise this right, we will do so at our expense.

4. If there is no underlying insurer or other insurance obligated to do so, we will pay the following when we provide a defense:

    a. All expenses we incur.

    b. The cost of bail bonds up to $3,000. We do not have to furnish these bonds.

    c. The cost of bonds to appeal a judg-ment or award in any claim or "suit" we defend and the cost of bonds to release attachments, but only for bond amounts within the applicable limits of insurance. We do not have to furnish these bonds.

    d. Reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including the ac-tual loss of earnings.

    e. All costs taxed against the insured in the "suit".

    These payments will not reduce the limits of insurance.

5. If there is no underlying insurer obligated to do so, we will pay the following for an "occurrence" to which this insurance ap-plies, even if we have no duty to provide a defense:

    a. Prejudgment interest awarded against the insured on that part of the judgment we become obligated to pay. If we make an offer to pay the applicable limits of insurance, we will not pay any prejudgment interest based on the period of time after the offer.

    b. All interest awarded against the in-sured on that amount of any judg-ment which we become obligated to pay that accrues after entry of the judgment and before we have paid, offered to pay or deposited in court the part of the judgment which we are obligated to pay and that is within the applicable limits of insurance.

    These payments will not reduce the limits of insurance.

6. If we are prevented by law or otherwise from carrying out any of the provisions of **SECTION I - COVERAGE, C. Defense and Supplementary Payments**, we will pay any expense incurred with our written consent.

**SECTION II - WHO IS AN INSURED**

1. Except for liability arising out of the ownership, maintenance, occupancy or use of an "auto":

    a. If you are designated in the Declarations as:

**CIN0096**

(1) An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

(2) A partnership or joint venture, you are an insured. Your members, partners and their spouses are also insureds, but only with respect to the conduct of your business.

(3) A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

(4) An organization other than a partnership, joint venture, or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders. Each of the following is also a Named Insured:

   (a) Any "subsidiary" company of such organization, including any "subsidiary" of such "subsidiary":

      1) Existing at the inception of this Coverage Part; or

      2) Formed or acquired on or after the inception of this Coverage Part.

   (b) Any other company controlled and actively managed by such organization or any "subsidiary" thereof:

      1) At the inception of this Coverage Part; or

      2) If the control and active management thereof is acquired on or after the inception of this Coverage Part.

(5) A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

b. Each of the following is also an insured:

   (1) Any "employee" of yours while acting within the scope of their duties as such.

(2) Any person or organization while acting as your real estate manager.

(3) Any person or organization having proper temporary custody of your property if you die, but only:

   (a) With respect to liability arising out of the maintenance or use of that property; and

   (b) Until your legal representative has been appointed.

(4) Your legal representative if you die, but only with respect to duties as such.

c. With respect to "mobile equipment" registered in your name under any motor vehicle registration law:

   (1) Any person is an insured while driving such equipment along a public highway with your permission; and

   (2) Any other person or organization responsible for the conduct of such person described in (1) above is also an insured, but only with respect to liability arising out of the operation of the equipment. However, such other person or organization is an insured only if they are provided insurance coverage for such liability by valid and collectible "underlying insurance" listed in the Schedule of Underlying Insurance and then only for such hazards for which coverage is provided by such "underlying insurance".

2. Only with respect to liability arising out of the ownership, maintenance, occupancy or use of an "auto":

a. You are an insured.

b. Anyone else while using with your permission an "auto" you own, hire or borrow is also an insured except:

   (1) The owner or any other person or organization (except your "executive officers" or principals) from whom you hire or borrow an "auto", unless such persons or organizations are insureds in your "underlying insurance" listed in the Schedule of Underlying Insurance, and then only for such hazards for which coverage is provided by such "underlying insurance". This exception does not apply if the "auto" is a trailer or semitrailer connected to an "auto" you own.

**CIN0097**

Includes copyrighted material of ISO Properties, Inc., with its permission.

**(2)** Your "employee", if the "auto" is owned by that "employee" or a member of his or her household, unless:

    **(a)** Such "employee" is an insured with respect to that "auto" in the "underlying insurance" listed in the Schedule of Underlying Insurance, and then only for such hazards for which coverage is provided by such "underlying insurance"; or

    **(b)** The "bodily injury" or "property damage" is sustained by a co-"employee" of such "employee".

**(3)** Someone using an "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos", unless that business is yours.

**(4)** Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their "employees", while moving property to or from an "auto".

**c.** Anyone liable for the conduct of an insured described in Paragraphs **2.a.** and **b.** above is also an insured, but only if they are provided insurance coverage for such liability by valid and collectible "underlying insurance" listed in the Schedule of Underlying Insurance and then only for such hazards for which coverage is provided by such "underlying insurance".

**3.** At your option and subject to the terms of this insurance, any additional insureds not addressed by Paragraphs **1.** and **2.** above covered in the "underlying insurance" listed in the Schedule of Underlying Insurance are also insureds, but only to the extent that insurance is provided for such additional insureds thereunder.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture, or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    **a.** Insureds;

    **b.** Claims made or "suits" brought; or

    **c.** Persons or organizations making claims or bringing "suits".

**2.** The Aggregate Limit is the most we will pay for all damages:

    **a.** Included in the "products-completed operations hazard";

    **b.** Because of "bodily injury" by disease sustained by your "employees", arising out of and in the course of their employment by you; or

    **c.** Because of "bodily injury", "personal and advertising injury" or "property damage" not included within **a.** or **b.** above. However, this Aggregate Limit will not apply to damages which are not subject to an Aggregate Limit in the "underlying insurance".

The Aggregate Limit applies separately to **a.**, **b.** and **c.** The Aggregate Limit described in **c.** will apply only to damages not subject to **a.** or **b.** above.

**3.** Subject to the Limit of Insurance described in **2. c.** above:

    **a.** Only in the event that "underlying insurance" specifically listed in the Schedule of Underlying Insurance provides an annual Aggregate Limit of Insurance for damages that would not be subject to **2. a.** or **b.** above that is applicable separately to each:

    **(1)** Location owned by, or rented or leased to you solely with respect to damages which are the result of a claim or "suit" for "bodily injury" or "property damage" which can be attributed to a single location, then the Aggregate Limit described in **2. c.** above applies separately to each location owned by, or rented or leased to you.

    **(2)** Of your construction projects solely with respect to damages which are the result of a claim or "suit" for "bodily injury" or "property damage" which can be attributed to a single project, then the Aggregate Limit described in **2. c.** above applies separately to each of your construction projects.

    **b.** Only with respect to the application of Limits of Insurance described in **3. a.** above, the following terms location and construction project will have the following meanings:

CIN0098

Includes copyrighted material of ISO Properties, Inc., with its permission.

Litchfield Cavo, LLP    8/21/08

**(1)** Location means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

**(2)** Construction project means a location you do not own, rent or lease where ongoing improvements, alterations, installation, demolition or maintenance work is performed by you or on your behalf. All connected ongoing improvements, alterations, installation, demolition or maintenance work performed by you or on your behalf at the same location for the same persons or entities, no matter how often or under how many different contracts, will be deemed to be a single construction project.

**4.** Subject to the limits described in **2.** and **3.** above, the Each Occurrence Limit is the most we will pay for the "ultimate net loss":

**a.** In excess of the applicable limits of "underlying insurance"; or

**b.** If an "occurrence" is not covered by "underlying insurance", but covered by the terms and conditions of this Coverage Part,

Because of all "bodily injury", "personal and advertising injury" and "property damage" arising out of any one "occurrence".

We will not pay more than the Limits of Insurance shown in this Coverage Part's Declarations for each "occurrence" because any Personal Umbrella Liability Policy(ies) is / are attached to this policy.

**5.** Subject to the limits described in **2.**, **3.** and **4.** above and to the terms and conditions of the "underlying insurance":

**a.** If the limits of "underlying insurance" have been reduced by payment of claims, this Coverage Part will continue in force as excess of the reduced "underlying insurance"; or

**b.** If the limits of "underlying insurance" have been exhausted by payment of claims, this Coverage Part will continue in force as "underlying insurance".

**6.** The Limits of Insurance of this Coverage Part apply separately to each "coverage term".

## CIN0099

Litchfield Cavo, LLP          8/21/08

## SECTION IV - CONDITIONS

**1. Appeals**

If the insured or any insurer who provides the applicable "underlying insurance" elects not to appeal a judgment which exceeds the "underlying limit", we may elect to do so at our own expense. We shall be liable for the taxable costs and disbursements and interest incidental thereto, but in no event shall this provision increase our liability beyond:

**a.** Our applicable Limits of Insurance for all "ultimate net loss";

**b.** Our applicable Defense and Supplementary Payments as described in **SECTION I - COVERAGE, C. Defense and Supplementary Payments**; and

**c.** The expense of such appeal.

**2. Audit**

If this Coverage Part is subject to Audit, as indicated in the Declarations, then the following Condition applies:

**a.** The premium shown in the Premium Computation Endorsement as Advance Premium is a deposit premium. At the close of each audit period, we will compute the earned premium for that period. If:

**(1)** The earned premium is less than the deposit premium, we will return the excess to the first Named Insured; or

**(2)** The earned premium is greater than the deposit premium, the difference will be due and payable to us by the First Named Insured upon notice from us.

However, in no event will the earned premium be less than the Minimum Premium stated in the Premium Computation Endorsement.

**b.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**3. Bankruptcy**

Bankruptcy or insolvency of the insured or the insured's estate shall not relieve us of any obligations under this Coverage Part.

**4. Duties in the Event of Occurrence, Claim or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" which may result in a claim or "suit". To

the extent possible, notice should include:

(1) How, when and where the "occurrence" took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence".

This requirement applies only when the "occurrence" is known to an "authorized representative".

b. If a claim is made or "suit" is brought against any insured that is likely to involve this Coverage Part, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

This requirement will not be considered breached unless the breach occurs after a such claim or "suit" is known to an "authorized representative".

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

5. First Named Insured

The person or organization first named in the Declarations will act on behalf of all other insureds where indicated in this Coverage Part.

6. Legal Action Against Us and Loss Payments

a. No legal action may be brought against us unless there has been full compliance with all the terms of this Coverage Part nor until the amount of the insured's obligation to pay has been finally determined as provided below. No person or organization has any right under this Coverage Part to bring us into any action to determine the liability of the insured.

b. We shall be liable for payment of the "ultimate net loss" for any "occurrence" to which this Coverage Part applies:

(1) For "occurrences" not covered by "underlying insurance"; or

(2) In excess of the "underlying limit" applicable to the "occurrence" only after the insurers who provide the applicable "underlying insurance" have paid or become obligated to pay the amount of the "underlying limit" applicable to the "occurrence".

Our payment will be made following final determination of the amount of the insured's obligation to pay either by final judgment against the insured or by written agreement with the insured, the claimant, the underlying insurers and us.

7. Liberalization

If, within 45 days prior to the beginning of this Coverage Part or during the policy period, we make any changes to any forms or endorsements of this Coverage Part for which there is currently no separate premium charge, and that change provides more coverage than this Coverage Part, the change will be considered as included until the end of the current policy period. We will make no additional premium charge for this additional coverage during the interim.

8. Maintenance of Underlying Insurance

a. While this Coverage Part is in effect, the insured shall maintain in force the "underlying insurance" listed in the Schedule of Underlying Insurance as collectible insurance. The terms, conditions and endorsements of "underlying insurance" will not materially change and renewals or replacements of "underlying insurance" will not be more restrictive in coverage.

b. Limits of "underlying insurance" will not be reduced, except for any reduction or exhaustion in the aggregate limits of insurance due to payment of claims which are in accordance with SECTION I -

CIN0100

Litchfield Cavo, LLP          8/21/08

COVERAGE, A. Insuring Agreement, Paragraph 2. of this Coverage Part.

**c.** In the event you fail or neglect to maintain "underlying insurance" as required, this Coverage Part will apply as though such "underlying insurance" was in force and collectible at the time a claim is presented to us which is in accordance with **SECTION I - COVERAGE, A. Insuring Agreement**, Paragraph 2. of this Coverage Part.

**d.** The limits of "underlying insurance" shall be deemed applicable, regardless of any defense which the insurer who provides the "underlying insurance" may assert because of the insured's failure to comply with any Condition of the policy or the inability of the insurer to pay by reason of bankruptcy or insolvency.

**9. Other Insurance**

The insurance provided by this Coverage Part is excess over any other valid and collectible insurance, other than insurance written specifically to be excess over this insurance, and shall not be contributory.

**10. Premium**

The premium for this Coverage Part shall be as stated in the Declarations. The advance and anniversary premiums are not subject to adjustment, except as stated in the Declarations, or as stated in an endorsement issued by us to form a part of this Coverage Part.

You shall maintain records of such information as is necessary for premium computation, and shall, if requested by us, send copies of such records to us at the end of the "coverage term" and at such times during the policy period as we may direct.

**11. Representations**

**a.** By acceptance of this Coverage Part, you agree that the statements in the Declarations are your agreements and representations, that this Coverage Part is issued in reliance upon the truth of such representations and that this Coverage Part embodies all agreements existing between you and the company or any of our agents relating to this insurance.

**b.** However, to the extent that the following applies in the "underlying insurance" listed specifically in the Schedule of Underlying Insurance, it will also apply to this Coverage Part:

Based on our reliance upon your representations as to existing hazards, if un-

intentionally you should fail to disclose all such hazards at the inception date of this Coverage Part, we will not reject coverage under this Coverage Part based solely on such failure.

**12. Separation of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**13. Transfer of Rights of Recovery Against Others to Us**

**a.** If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**b.** Any recoveries shall be applied as follows:

**(1)** First, we will reimburse anyone, including the insured, the amounts actually paid by them that were in excess of our payments;

**(2)** Next, we will be reimbursed to the extent of our actual payment; and

**(3)** Lastly, any amounts left after meeting the obligations outlined in (1) and (2) above will be distributed to anyone else known to us at the time a recovery is made and who is legally entitled to such recovery.

Expenses incurred in the recovery shall be apportioned among all interests in the ratio of their respective recoveries as finally settled. If there is no recovery as a result of our attempts, we shall bear all of the recovery expenses.

**c.** If prior to an "occurrence" to which this Coverage Part would apply, you and the issuer of your applicable "underlying insurance" listed specifically in the Schedule of Underlying Insurance waive any right of recovery against a person or organization for injury or damage, we will also waive any rights we may have against such person or organization.

**CIN0101**

*Litchfield Cavo, LLP*     *8/21/08*

US 101 UM 10 02          Includes copyrighted material of ISO
                         Properties, Inc., with its permission.          Page 14 of 21

## SECTION V - DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Authorized representative" means:

   a. If you are:

      (1) An individual, you and your spouse are "authorized representatives".

      (2) A partnership or joint venture, your members, your partners, and their spouses are "authorized representatives".

      (3) A limited liability company, your members and your managers are "authorized representatives".

      (4) An organization other than a partnership, joint venture or limited liability company, your "executive officers" and directors are "authorized representatives". Provided you are not a publicly traded organization, your stockholders are also "authorized representatives".

      (5) A trust, your trustees are "authorized representatives".

   b. Your "employees" assigned to manage your insurance program, or assigned to give or receive notice of an "occurrence", offense, claim or "suit" are also "authorized representatives".

3. "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. "Auto" also means self-propelled vehicles with the following types of permanently attached equipment:

   a. Equipment designed primarily for:

      (1) Snow removal;

      (2) Road maintenance, but not construction or resurfacing; or

      (3) Street cleaning;

   b. Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well-servicing equipment.

   "Auto" does not include "mobile equipment".

4. "Bodily injury" means bodily harm or injury, sickness, disease, disability, humiliation, shock, fright, mental anguish or mental injury, including care, loss of services or death resulting from any of these at any time.

5. "Coverage term" means the following individual increment, or if a multi-year policy period, increments, of time, which comprise the policy period of this Coverage Part:

   a. The year commencing on the Effective Date of this Coverage Part at 12:01 AM standard time at your mailing address shown in the Declarations, and if a multi-year policy period, each consecutive annual period thereafter, or portion thereof if any period is for a period of less than 12 months, constitute individual "coverage terms". The last "coverage term" ends at 12:00 AM standard time at your mailing address shown in the Declarations on the earlier of:

      (1) The day the policy period shown in the Declarations ends; or

      (2) The day the policy to which this Coverage Part is attached is terminated or cancelled.

   b. However, if after the issuance of this Coverage Part, any "coverage term" is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding "coverage term".

6. "Coverage territory" means anywhere.

7. "Electronic data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

8. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

9. "Executive officer" means a person holding any of the officer positions created by your

CIN0102

Litchfield Cavo, LLP        8/21/08

Includes copyrighted material of ISO Properties, Inc., with its permission.

charter, constitution, by-laws or any similar governing document.

10. "Hostile fire" means one that becomes uncontrollable or breaks out from where it was intended to be.

11. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   **b.** You have failed to fulfill the terms of a contract or agreement,

if such property can be restored to use by:

   **a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or

   **b.** Your fulfilling the terms of the contract or agreement.

12. "Insured contract" means:

   **a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for "property damage" by fire or explosion to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   **b.** A sidetrack agreement;

   **c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   **d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   **e.** An elevator maintenance agreement;

   **f.** That part of any other contract or agreement pertaining to your business, other than a contract or agreement pertaining to the rental or lease of any "auto", (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal and advertising injury" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement; or

   **g.** That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

Paragraphs **f.** and **g.** do not include that part of any contract or agreement:

  **(1)** That indemnifies a railroad for "bodily injury", "property damage" or "personal and advertising injury" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing. However, if such liability is insured by valid and collectible "underlying insurance" as listed in the Schedule of Underlying Insurance, this Paragraph, **(1)** shall not apply for such hazards for which insurance coverage is afforded by such "underlying insurance";

  **(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    **(a)** Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

  **(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(2)** above and supervisory, inspection, architectural or engineering activities;

  **(4)** That indemnifies an advertising, public relations or media consulting firm for "personal and advertising injury" arising out of the planning, execution or failure to execute marketing communications programs. Marketing communications programs include

**CIN0103**

Litchfield Cavo, LLP        8/21/08

Includes copyrighted material of ISO Properties, Inc., with its permission.

but are not limited to comprehensive marketing campaigns; consumer, trade and corporate advertising for all media; media planning, buying, monitoring and analysis; direct mail; promotion; sales materials; design; presentations; point-of-sale materials; market research; public relations and new product development;

**(5)** Under which the insured, if an advertising, public relations or media consulting firm, assumes liability for "personal and advertising injury" arising out of the insured's rendering or failure to render professional services, including those services listed in Paragraph (4), above;

**(6)** That indemnifies a web-site designer or content provider, or Internet search, access, content or service provider for injury or damage arising out of the planning, execution or failure to execute Internet services. Internet Services include but are not limited to design, production, distribution, maintenance and administration of web-sites and web-banners; hosting web-sites; registering domain names; registering with search engines; marketing analysis; and providing access to the Internet or other similar networks;

**(7)** Under which the insured, if a web-site designer or content provider, or Internet search, access, content or service provider, assumes liability for injury or damage arising out of the insured's rendering or failure to render Internet services, including those listed in Paragraph (6), above;

**(8)** That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

**(9)** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of an "auto" over a route or territory that person or organization is authorized to serve by public authority.

**13.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business. "Leased worker" includes supervisors furnished to you by the labor leasing

firm. "Leased worker" does not include a "temporary worker".

**14.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**15.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well-servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

"Mobile equipment" does not include "auto".

CIN0104

Litchfield Cavo, LLP        8/21/08

Includes copyrighted material of ISO Properties, Inc., with its permission.

16. "Occurrence" means:

   a. An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "bodily injury" or "property damage"; or

   b. An offense that results in "personal and advertising injury".

All damages arising from the same accident, continuous or repeated exposure to substantially the same general harmful conditions, act or offense shall be deemed to arise from one "occurrence" regardless of:

   (1) The frequency of repetition;

   (2) The number or kind of media used; or

   (3) The number of claimants.

17. "Personal and advertising injury" means injury, including "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. Abuse of process;

   d. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   e. Defamation of character, including oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   f. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   g. The use of another's advertising idea in your "advertisement";

   h. Infringing upon another's copyright, trade dress or slogan in your "advertisement"; or

   i. Discrimination, unless insurance coverage therefor is prohibited by law or statute.

18. "Pollutants" mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum products and their by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include, but are not limited to,

substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment.

19. "Products-completed operations hazard":

   a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

      (1) Products that are still in your physical possession; or

      (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

         (a) When all of the work called for in your contract has been completed.

         (b) When all of the work to be done at the site has been completed, if your contract calls for work at more than one site.

         (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

      Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   b. Does not include "bodily injury" or "property damage" arising out of:

      (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

      (2) The existence of tools, uninstalled equipment or abandoned or unused materials.

20. "Property damage" means:

   a. Physical injury to or destruction of tangible property including all resulting loss of use. All such loss of use shall be deemed to occur at the time of the physical injury or destruction that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss of

CIN0105

Litchfield Cavo, LLP

8/21/08

Includes copyrighted material of ISO Properties, Inc., with its permission.

use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, "electronic data" is not tangible property.

21. "Subsidiary" means any organization in which more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors is owned or controlled, directly or indirectly, in any combination, by one or more of the Named Insureds.

22. "Suit" means a civil proceeding in which money damages because of "bodily injury", "personal and advertising injury" or "property damage" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such money damages are claimed and to which the insured must submit or does submit with our consent;

   b. Any other alternative dispute resolution proceeding in which such money damages are claimed and to which the insured submits with our consent; or

   c. An appeal of a civil proceeding.

23. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

24. "Ultimate net loss" means the sum actually paid or payable in the settlement or satisfaction of the insured's legal obligation for damages, covered by this insurance, either by adjudication or compromise. "Ultimate net loss" does not include Defense and Supplementary Payments as described in **SECTION I - COVERAGE, C. Defense and Supplementary Payments** of this Coverage Part.

25. "Underlying insurance" means the insurance listed in the Schedule of Underlying Insurance and the insurance available to the insured under all other insurance policies applicable to the "occurrence". "Underlying insurance" also includes any type of self-insurance or alternative method by which the insured arranges for funding of legal liabilities that affords coverage that this Coverage Part covers.

26. "Underlying limit" means the total of the applicable limits of all "underlying insurance" less the amount, if any, by which the applicable limit of the applicable policy listed in the Schedule of Underlying Insurance has been reduced solely by payment of loss resulting

from claims which are in accordance with **SECTION I - COVERAGE, A. Insuring Agreement,** Paragraph **2.** of this Coverage Part.

27. "Workplace" means that place and during such hours to which the "employee" sustaining injury was assigned by you, or any other person or entity acting on your behalf, to work on the date of "occurrence".

28. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name; or

         (c) A person or organization whose business or assets you have acquired; and

      (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of your product; and

      (2) The providing of or failure to provide warnings or instructions.

   c. Does not include vending machines or other property rented to or located for the use of others but not sold.

29. "Your work":

   a. Means:

      (1) Work or operations performed by you or on your behalf; and

      (2) Materials, parts or equipment furnished in connection with such work or operations.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

      (2) The providing of or failure to provide warnings or instructions.

Includes copyrighted material of ISO Properties, Inc., with its permission.

CIN0106

Litchfield Cavo, LLP

8/21/08

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**

**A.** **SECTION I - COVERAGE, B. Exclusions** is modified to add the following:

This insurance does not apply to:

1. Any liability:

   **a.** With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   **b.** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(1)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(2)** the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2. Any liability resulting from the "hazardous properties" of "nuclear material", if

   **a.** The "nuclear material" **(1)** is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or **(2)** has been discharged or dispersed therefrom;

   **b.** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

   **c.** The injury or damage arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **c.** applies only to "property damage" to such "nuclear facility" and any property thereat.

**B.** **SECTION V - DEFINITIONS** is hereby modified to add the following definitions:

1. "Hazardous properties" include radioactive, toxic or explosive properties;

2. "Nuclear material" means "source material", "special nuclear material" or "by-product material";

3. "Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

4. "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

5. "Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

6. "Nuclear facility" means:

   **a.** Any "nuclear reactor";

   **b.** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", **(3)** or handling, processing or packaging "waste";

   **c.** Any equipment or device used for the processing, fabricating or alloying of "special nuclear materials", if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any

**CIN0107**

*Litchfield Cavo, LLP*          8/21/08

combination thereof, or more than 250 grams of uranium 235;

d. Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations con-ducted on such site and all premises used for such operations;

7. "Nuclear reactor" means any apparatus designed or used to sustain nuclear fis-sion in a self-supporting chain reaction or to contain a critical mass of fissionable material;

8. "Property damage" includes all forms of radioactive contamination of property.

CIN0108

Litchfield Cavo, LLP          8/21/08

Includes copyrighted material of ISO Properties, Inc., with its permission.

# NOTICE TO POLICYHOLDERS
# COMMERCIAL UMBRELLA LIABILITY PROGRAM

This is a summary of the major changes found in the new edition of the Commercial Umbrella, Professional Umbrella and Professional Umbrella - Claims-Made Coverage Forms. NO COVERAGE IS PROVIDED BY THIS SUMMARY nor can it be construed to replace any provision of your policy. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE for complete information on the coverages you are provided. If there is any conflict between the policy and this summary, THE PROVISIONS OF THE POLICY SHALL PREVAIL.

The areas within the Coverage Form that broaden, reduce or clarify coverage are highlighted below. We have followed the Coverage Form sequence of provisions in setting out this material.

I.  BROADENING OF COVERAGE

  A.  **SECTION I - COVERAGE, B. Exclusions** has been modified as follows:

    1.  Paragraph **b.** of Exclusion **11. Expected or Intended Injury** provides coverage for "bodily injury" or "property damage" resulting from the use of reasonable force by an insured to prevent or eliminate danger in the operation of "autos" or watercraft; and

    2.  Subparagraphs **a.(1) and (4)** of Exclusion **15. Pollutant - Other Than Auto** provide follow form exceptions for:

      a.  "Bodily injury" sustained in a building caused by smoke, fumes, etc. from equipment used to heat the building;

      b.  "Bodily injury" or "property damage" for which the named insured may be liable, if a contractor, on account of adding the owner or lessee of a premises, on which the named insured is performing operations, as an additional insured on "underlying insurance" for liability arising out of the named insured's operations or work;

      c.  "Bodily injury" or "property damage" arising from the escape of fuels, lubricants or other operating fluids from "mobile equipment"; and

      d.  "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor.

  B.  **SECTION II - WHO IS AN INSURED** has been revised to include Trusts named in the Declarations, including their trustees with respect to their duties as trustees.

  C.  **SECTION IV - CONDITIONS** has been modified as follows:

    1.  Condition **7. Liberalization** has been added;

    2.  Condition **11. Representations** has been modified to be follow form to "underlying insurance" with respect to unintentional failures to disclose all hazards; and

    3.  Condition **13. Transfer of Rights of Recovery Against Others to Us** has been modified to be follow form to "underlying insurance" with respect to waivers of recovery made prior to an "occurrence".

  C.  **SECTION V - DEFINITIONS** has been revised as follows:

      The definition of "personal and advertising injury" has been expanded to include the offenses of:

    1.  Abuse of process; and

    2.  Defamation of character (whether or not related to the oral or written publication of material).

II.  RESTRICTION OF COVERAGE

  A.  **SECTION I - COVERAGE, B. Exclusions** has been modified as follows:

    1.  Subparagraph **d.** of Exclusion **2. Breach of Contract, Failure to Perform, Wrong Description and Violation of Another's Rights** excludes "personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and cause "personal and advertising injury".

2. Added Exclusion **3. Contractual Liability**, which excludes liability assumed in a contract or agreement. However, the exclusion does not apply to liability for "bodily injury", "personal and advertising injury" or "property damage":

   **a.** That the insured would have in the absence of the contract or agreement; or

   **b.** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury", "personal and advertising injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

3. Added Exclusion **8. Electronic Chatrooms or Bulletin Boards**, which excludes "personal and advertising injury" arising out of chatrooms or bulletin boards hosted or controlled by the insured.

4. Subparagraph **d.** of Exclusion **12. Falsity, Prior Publication, Criminal Act and Media and Internet Type Businesses** excludes "personal and advertising injury" committed by an insured whose business is advertising, broadcasting, publishing, telecasting, designing or determining the content of web-sites for others, or an Internet search, access, content or service provider. **(Note:** This exposure was previously excluded by endorsement when insuring a risk in one or more of these businesses.)

5. Added Exclusion **13. Infringement of Copyright, Patent, Trademark or Trade Secret**, which excludes "personal and advertising injury" arising out of the infringement of intellectual property rights, except infringement of copyright, trade dress or slogan in your "advertisement".

6. Added Exclusion **17. (18. In Professional Umbrellas) Unauthorized Use of Another's Name or Product**, which excludes "personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag.

B. **SECTION II - WHO IS AN INSURED** the Paragraph granting insured status to persons or organizations you are required to via a written contract has been deleted (formerly Paragraph **2.b.**).

C. **SECTION III - LIMITS OF INSURANCE** Paragraph **2.** has been modified to include a separate Aggregate Limit for all damages not subject to another aggregate in the umbrella. However this aggregate:

   1. Does not apply to damages not subject to an aggregate in the "underlying insurance"; and

   2. Applies separately to each of your locations or projects, if coverage is provided on that basis in the "underlying insurance".

III. CLARIFICATION OF COVERAGE

A. **SECTION I - COVERAGE, A. Insuring Agreement** has been revised as follows:

   1. The format has been revised to more closely resemble primary Insurance Services Office (ISO) forms.

   2. Replaced the defined terms "personal injury" and "advertising injury" with the newly defined term "personal and advertising injury" to be consistent with ISO's current Commercial General liability (CGL) coverage form.

   3. Added the reference to a defined "coverage territory", which is defined as <u>anywhere</u>.

   4. Added a Known Injury or Damage Provision. Paragraphs **2.d., 3.,** and **4.** in the Commercial Umbrella Liability Coverage Form and the Professional Umbrella Liability Coverage Form - Claims-Made, and Paragraphs **3.d., 4.,** and **5.** in the Professional Umbrella Liability Coverage Form.

B. **SECTION I - COVERAGE, B. Exclusions** has been revised as follows:

   1. The phrase "... unless otherwise excluded by this Coverage Part." has been added to the end of the **Employer's Liability Limitation**.

   2. The **Non-Owned Auto Limitation** has been deleted. This issue is addressed by Paragraph **2.b.** of SECTION II - WHO IS AN INSURED.

   3. The Pollutant exclusion has been separated into two separate exclusions: Exclusion **14. Pollutant - Auto** and Exclusion **15. Pollutant - Other Than Auto**.

   4. A clarifying statement (per ISO changes to the CGL form) has been added to Paragraph **b.** of Exclusion

15. **Pollutant - Other Than Auto**, clarifying that the regulatory exclusionary verbiage of Paragraph **b.** does not exclude liability for "property damage" the insured would be liable for in the absence of the regulatory action.

C.  **SECTION II - WHO IS AN INSURED** has been revised as follows:

1.  Section II has been divided into three parts. Paragraph **1.** applies to liability other than that arising out of the ownership, maintenance, occupancy or use of an "auto", Paragraph **2.** applies only with respect to liability arising out of the ownership, maintenance, occupancy or use of an "auto", and Paragraph **3.** applies to any other insureds included in the "underlying insurance", on a follow form basis, not addressed by Paragraphs **1.** and **2.** at the option of the Named Insured.

2.  Paragraph **1.c.** has been added to clarify who is insured with respect to "mobile equipment".

D.  **SECTION IV - CONDITIONS** has been revised as follows:

1.  The **Cancellation, Changes, Inspection and Surveys** and **Transfer of Your Rights and Duties** Conditions have been deleted, as they will be included in the Common Policy Conditions, rather than in the Coverage Part Conditions.

2.  The **Audit** Condition has been revised to spell out the duties and responsibilities of the insured, if coverage is subject to audit.

E.  **SECTION V - DEFINITIONS** has been revised as follows:

1.  Deleted the separately defined terms of "advertising injury" and "personal injury", as they have been replaced by the newly defined term "personal and advertising injury".

2.  Added the term "advertisement", as it is used in the newly defined term "personal and advertising injury". This term has also been clarified to include notices published on the Internet.

3.  Added the newly defined term "authorized representative", which has been added in conjunction with the Known Injury or Damage Provision in the Insuring Agreement.

4.  Added the newly defined term "coverage term", which has been added to more clearly define the individual increments of time that make up a policy period.

5.  Added the newly defined term "coverage territory", which is underlying, providing the same coverage as the previous edition of this coverage form.

6.  Added the newly defined term "electronic data", which is referenced in the definition of "property damage".

7.  The definition of "hostile fire" has been removed from the Pollutant Exclusion and placed in the Definitions section.

8.  The definition "insured contract" has been added to correspond with Exclusion 3. **Contractual Liability**.

9.  Subparts **e.** and **f.** of the definition of "personal and advertising injury" have been clarified to include publication in any manner.

10. The definition of "pollutants" has been removed from the Pollutant Exclusion and placed in the Definitions section, as well as being modified to specifically reference petroleum products and their by-products.

11. The definition of "property damage" has been clarified by stating that "electronic data" is not tangible property.

12. The reference to you in Subparts **a.** and **b.** of the definition of "suit" has been replaced with the insured.

**CIN0111**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES - KNOWN INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**

SECTION I - COVERAGE, A. Insuring Agreement is deleted in its entirety and replaced by the following:

**A.  Insuring Agreement**

1.  We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages for "bodily injury", "personal and advertising injury" or "property damage" arising out of an "occurrence" to which this insurance applies:

    a.  Which is in excess of the "underlying insurance"; or

    b.  Which is either excluded or not insured by "underlying insurance".

2.  This insurance applies to "bodily injury", "personal and advertising injury" or "property damage" only if:

    a.  The "bodily injury", "personal and advertising injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

    b.  The "bodily injury" or "property damage" occurs during the policy period shown in the Declarations; or

    c.  The "personal and advertising injury" results from an "occurrence" that takes place during the policy period shown in the Declarations; and

    d.  Prior to the "coverage term" in which "bodily injury" or "property damage" occurs you did not know, per Paragraph 4. below, that the "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part.

3.  "Bodily injury" or "property damage" which:

    a.  Occurs during the "coverage term"; and

    b.  Was not, prior to the "coverage term", known by you, per Paragraph 4. below, to have occurred;

    includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the "coverage term" in which it first became known by you.

4.  You will be deemed to know that "bodily injury" or "property damage" has occurred at the earliest time when any "authorized representative":

    a.  Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

    b.  Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage";

    c.  First observes the "bodily injury" or "property damage";

    d.  Becomes aware by any means, other than as described in c. above, that "bodily injury" or "property damage" had occurred or had begun to occur; or

    e.  Becomes aware of a condition from which "bodily injury" or "property damage" is substantially certain to occur.

5.  The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE.**

No other obligation or liability to pay sums or perform acts or services is covered, unless expressly provided for under **SECTION I - COVERAGE, C. Defense and Supplementary Payments.**

Includes copyrighted material of ISO Properties, Inc., with its permission.

CIN0112

*Litchfield Cavo, LLP*                    8/21/08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYEE BENEFIT LIABILITY

This endorsement modifies insurance provided under the following:

    **COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**
    **PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**
    **PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE**

This policy is modified to add the following:

**I.**    **SECTION I - COVERAGE, A. Insuring Agreement** is modified to add the following:

    **EMPLOYEE BENEFIT LIABILITY:**

    We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages because of any negligent act, error or omission of the insured or any other person for whose acts the insured is legally liable arising out of the administration of the insured's employee benefit programs.

    This insurance applies only to negligent acts, errors or omissions:

    **a.**    Whose damages are in excess of the "underlying insurance" provided by an Employee Benefit Liability policy listed in the Schedule of Underlying Insurance; and

    **b.**    Which occur during the policy period.

**II.**    **SECTION I - COVERAGE, B. Exclusions** is modified to add the following exclusion:

    This insurance does not apply to:

    Any liability arising out of employee benefit programs unless such liability is covered by valid and collectible "underlying insurance" as listed in the Schedule of Underlying Insurance, and then only for such hazards for which coverage is afforded by such "underlying insurance".

US 407 09 02

**CIN0113**

*Litchfield Cavo, LLP*    8/21/08

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# POLLUTANT EXCLUSION - OTHER THAN AUTO

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE**

**SECTION I - COVERAGE, B. Exclusions** is modified as follows:

Exclusion **15. Pollutant - Other Than Auto** is hereby deleted and replaced by the following:

**15. Pollutant - Other Than Auto**

This insurance does not apply to:

**a.** Any liability arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, emission or escape of "pollutants":

   **(1)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

   **(2)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

   **(3)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

   **(4)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

Subparagraphs **a.(1)** and **a.(4)** do not apply:

   **(a)** To "bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

   **(b)** If insurance is provided to the insured by "underlying insurance" specifically listed in the Schedule of Underlying Insurance at the "underlying limit" scheduled, but only to the extent "bodily injury" or "property damage" coverage is provided by that "underlying insurance" specifically listed in the Schedule of Underlying Insurance and subject to all its terms and conditions.

   **(5)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of, "pollutants".

**b.** Any loss, cost or expense arising out of any:

   **(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

   **(2)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**c.** Any liability caused by "pollutants" excluded by "underlying insurance".

Exclusion **15.** applies to every injury to person or property caused directly or indirectly by "pollutants" regardless of whether:

**a.** The insured is regularly or otherwise engaged in activities that taint or degrade the environment; or

**b.** The insured uses, generates or produces the "pollutant".

Includes copyrighted material of ISO Properties, Inc., with its permission.

CIN0114

*Litchfield Cavo, LLP*                    8/21/08

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WAR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE**

**SECTION I - COVERAGE, B. Exclusions** is modified as follows:

The **War** exclusion is hereby deleted and replaced by the following:

**B. Exclusions**

This insurance does not apply to:

**WAR**

Any liability however caused, arising, directly or indirectly, out of:

**a.** War, including undeclared or civil war; or

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

US 3053 02 03

Includes copyrighted material of ISO
Properties, Inc., with its permission.

**CIN0115**

*Litchfield Cavo, LLP*          *8/21/08*